# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-00488-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. RICHARD HOLZER,

      Defendant.

---

## PLEA AGREEMENT

---

      The United States of America, by and through Julia Martinez, Assistant United States Attorney, and Michael J. Songer, Trial Attorney, and defendant, RICHARD HOLZER, personally and through counsel, Mary V. Butterton and David Kraut, Assistant Federal Public Defenders, submit the following Plea Agreement.

### I.  PLEA AGREEMENT

      Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties understand that any recommendations that a particular sentence or sentencing range be imposed pursuant to this Plea Agreement is not binding on the court.

### A.  Defendant's Obligations

#### 1.  Count of Conviction

      The defendant agrees to plead guilty to Counts One and Two of the Indictment charging violations of 18 U.S.C. § 247(a)(2) and (d)(3), Attempt to Obstruct Persons in the Enjoyment of

1

Court's Exhibit

1

Their Free Exercise of Religious Beliefs Through Force and Use of Explosives and Fire (Count One), and 18 U.S.C. § 844(i), Attempt to Maliciously Damage and Destroy, by Means of Fire and Explosives, a Building Used in Interstate Commerce (Count Two).  The defendant also agrees to admit the Forfeiture Allegation contained in the Indictment.

### 3. **Waiver of Appeal**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined.  Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds **240 months**; or (3) the government appeals the sentence imposed.  If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255).  This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.  Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement.

4. **Defendant's Abandonment of Right, Title, and Claim to Seized Property**

The United States of America and the defendant hereby agree that any property subject to forfeiture pursuant to 18 U.S.C. § 844(c) and/or 18 U.S.C. § 982(a)(2)(B), seized from the defendant and currently in the custody and/or control of the Federal Bureau of Investigation (FBI), was properly seized and that such property constitutes evidence, contraband, or fruits of the crimes to which the defendant has pleaded guilty. As such, the defendant hereby relinquishes all claims, title, and interest the defendant has in such property, specifically the items listed on Attachment A to this Plea Agreement, to the United States of America with the understanding and consent that the FBI, or other appropriate agency, is to destroy the property described above forthwith without further obligation or duty whatsoever owing to the defendant or any other person.

As part of the Plea Agreement in this case, the defendant hereby states under penalty of perjury that the defendant was the sole and rightful owner of the previously referenced property, and that the defendant hereby voluntarily abandons all right and claim to this property.

5. **Forfeiture of Assets**

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 844(c) and/or 18 U.S.C. § 982(a)(2)(B), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to, the items listed on Attachment A to this Plea Agreement. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant also hereby

agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

B. **Government's Obligations**

1. **Dismissal of Charge**

If the defendant enters an unconditional plea of guilty to Counts One and Two of the Indictment and otherwise fulfills all obligations outlined above, the government will dismiss Count Three of the Indictment and agrees not to charge the defendant with any other violations of law now known to the United States Attorney's Office for the District of Colorado.

2. **Sentencing Position**

The government reserves the right to argue for an upward departure pursuant to any applicable provision, including but not limited to the Terrorism Enhancement, *see* § 3A1.4, n.4(B), and/or for an upward variance. Nonetheless, the government agrees that it will not recommend a sentence of imprisonment greater than 20 years (240 months). The government notes that its specific sentencing recommendation will be made after consideration of all available and relevant information and may be less than 20 years, but in any event will not be greater than 20 years. The government is not bound to recommend any particular term of supervised release.

3. **Acceptance of Responsibility**

If the defendant engages in no conduct that otherwise implicates § 3C1.1, the government agrees that a 3-point reduction in the offense level for acceptance of responsibility, pursuant to § 3E1.1, is appropriate and agrees to make the appropriate motion at sentencing.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of the offenses to which this plea is being tendered are as follows. The elements of Count One, Attempt to Obstruct Persons in the Enjoyment of Their Free Exercise of Religious Beliefs Through Force and Use of Explosives and Fire, in violation of 18 U.S.C. § 247(a)(2) and (d)(3), are as follows:

*One*: Defendant acted intentionally;

*Two*: Defendant attempted to obstruct, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs;

*Three*: The offense included the attempted use of a dangerous weapon, fire, or explosive device; and

*Four:*    The offense was in or affected interstate or foreign commerce.

The elements of Count Two, Attempt to Maliciously Damage and Destroy, by Means of Fire and Explosives, Temple Emanuel, in violation of 18 U.S.C. § 844(i), are as follows:

*One*: Defendant attempted to maliciously damage or destroy the Temple Emanuel Synagogue in Pueblo, CO;

*Two*: Defendant attempted to do so by means of fire or explosives; and

*Three*: At the time of the offense, Temple Emanuel was used in interstate commerce or was used in an activity affecting interstate commerce.

### III.  STATUTORY PENALTIES

Based on the defendant's criminal history known at this time, the applicable maximum statutory penalty for a violation of 18 U.S.C. § 247(a)(2) and (d)(3) is not more than 20 years of imprisonment, not more than a $250,000 fine, or both, not more than three years of supervised release.  The applicable maximum statutory penalty for a violation of 18 U.S.C. § 844(i) is not more than 20 years of imprisonment, not more than a $250,000 fine, or both, not more than lifetime supervised release.  The applicable minimum statutory penalty for a violation of 18 U.S.C. § 844(i) is not less than 5 years of imprisonment.  Defendant will also be required to pay a $100 special assessment fee per count of conviction.

The Court will impose a separate sentence on each count of conviction and may, to the extent permitted by law, impose such sentences either concurrently with or consecutively to each other.

### IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the right to possess firearms, vote, hold elected office, and to serve on a jury.  If the defendant is not a United States citizen, this conviction will result in the defendant's removal from the United States once he has completed any sentence of imprisonment.

#### A.  Future Violations of Supervised Release

If supervised release is imposed, a violation of any conditions of probation or supervised release may result in a separate prison sentence and additional supervision.  If a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision.

6

## V. **STIPULATION OF FACTS**

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this Plea Agreement. That basis is set forth below.  Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations.  To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the Plea Agreement.

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein, which do not contradict the facts to which the parties have stipulated, and which are relevant to the guideline computation under § 1B1.3, or to the sentencing factors found in § 1B1.4, 18 U.S.C. § 3553(a), or to this Court's overall sentencing decision.  In "determining the factual basis for the sentence, the Court will consider the stipulation of the parties, together with the results of the presentence investigation, and any other relevant information." § 6B1.4 Comm.

The parties stipulate to the following facts:

Temple Emanuel is a Synagogue serving a congregation of Jewish families in Pueblo, Colorado.  Its stated mission is to foster Jewish identity and ensure the survival of Judaism in a small community.  Constructed in 1900, the Temple Emanuel is on the National Register of Historic Places and is the second-oldest synagogue in Colorado.  It is periodically open to the public.

Temple Emanuel also runs a Sunday School for Jewish children in Pueblo and surrounding areas. The school meets every Sunday during the school year and charges yearly tuition of $150 per student for those families able to pay. The teachers are all volunteers. The money collected from tuition is used to purchase school supplies, including books and workbooks on an annual basis. The books are purchased from out-of-state publishers. Last year's books were purchased from a publishing house located in Pennsylvania.

The defendant, Richard Holzer, is a 28-year-old white male who was living in Pueblo, Colorado, at the time of the offenses. The defendant used social media accounts to promote white supremacy ideology and acts of violence, including racially- and religiously- motivated acts of violence.

On September 28, 2019, an FBI Online Covert Employee ("OCE") contacted the defendant. The OCE's Facebook account portrayed the OCE as a white female who is supportive of white supremacy ideology. She told the defendant that Facebook suggested they be friends. The defendant sent a picture of three buttons showing a swastika and two other symbols associated with white supremacy ideology. Shortly thereafter he sent pictures of himself wearing clothing with symbols and phrases associated with white supremacy. He stated that he lives in Colorado, used to be a member of the Ku Klux Klan ("KKK"), and is now a skinhead. He then asked the OCE to contact him on his other Facebook account, from which the defendant sent the OCE multiple pictures of himself holding firearms – including a .44 caliber handgun and an AR-15 – and a video showing him putting on a mask, grabbing a machete and saying, "I went after another pedophile. It's something that I've actually enjoyed doing is killing them." The defendant also sent the OCE a message stating "I was outside a Jewish center once"

8

and then forwarded a video showing him urinating on the front door of a Jewish center in California.

The next day, the defendant began to tell the OCE about his efforts to drive Jewish people out of Pueblo. He volunteered that, on October 31, 2018, he paid a Mexican cook $70 to "hex and poison a local Synagogue" by putting arsenic in the Synagogue's pipes, and that the Synagogue was shut down as a result. Noting that he had faced backlash from the "white movement" for hiring a Mexican to carry out the attack, the defendant explained, "You really want the Jews gone then sometimes you have to improvise." The defendant explained that the man he paid was nicknamed "Mexican Hitler," and that he agreed to poison the synagogue "for cheap" because he and the defendant "both do not like Jews." After the defendant described the arsenic attack, OCE asked him to "let me know when you have an activist event coming up." The defendant responded by sending a video that he had previously filmed at Temple Emanuel.

On October 3, 2019, the defendant messaged the OCE to tell her "I'm getting ready for rahowa" (a racial holy war). When the OCE asked the defendant to "message me so we can talk about rahowa," the defendant responded by sending a voice recording in which he explained he was going to scope out Temple Emanuel.

On October 4, 2019, the defendant told the OCE that he was going to "check out the synagogue and see if any ants come out of the HILL." He then sent the OCE a video showing Nazi propaganda, knives, and masks. Three hours later, the defendant sent the OCE a video he had just taken outside Temple Emanuel. The video shows a woman outside the Synagogue and the defendant can be heard saying: "Oh shit. This would mean the kikes are going back into business here and uh we'll have to fucking figure out what they're going to do."

The defendant then told the OCE he intended to poison the Synagogue again and invited the OCE to participate. He explained that he could get arsenic from a friend who worked for a company that makes water filters. The defendant cautioned the OCE that everyone needed to wear masks "when we do the synagogue" to hide their identities and stated that he intended to "[g]o out with a final act for the movement." The OCE then told the defendant that she had friends who would be in the area of Colorado Springs the following week, and the defendant responded that he was interested in meeting them.

On October 12, 2019, an FBI undercover agent (UC-1) established contact with the defendant, presenting himself as one of the friends the OCE mentioned to the defendant. UC-1 told the defendant that he and some friends planned to be in Colorado Springs, Colorado, the following week. The defendant sent several pictures of himself with various images, paraphernalia, and clothing associated with white supremacy and Nazi ideology. The next day, the defendant explained to UC-1 his plan to poison a synagogue in Pueblo, Colorado, on Halloween. Over the next several days the defendant continued to send images related to white supremacy and Nazi ideology, and the defendant and UC-1 made plans to meet in person.

On October 17, 2019, three undercover FBI agents ("UCs") posing as the OCE's friends met with the defendant and a friend of the defendant in Colorado Springs. Agents audio-recorded the meeting. At the meeting, the defendant brought white supremacy paraphernalia as gifts for the UCs, including a flag, several patches, a metal Thor's hammer, and a mask. Throughout the meeting the defendant repeatedly expressed his hatred of Jewish people and discussed his efforts to drive them out of Pueblo.

The defendant started the meeting by recounting his attempt to shut down the Synagogue last year by paying a Mexican cook to put arsenic in the building's pipes.[1]  The defendant falsely claimed that the Synagogue was shut down for months and recently re-opened, much to his dismay. The defendant began talking about repeating the arsenic plan on October 31 of this year to shut the Synagogue down and "make them know they're not wanted here."  He then raised the possibility of using different tactics to accomplish his goal.  The defendant mentioned welding the doors shut and suggested that he could put together Molotov cocktails to throw through the building's windows.  The defendant was the first person to mention the use of explosives during the meeting – he brought up Molotov cocktails in response to one of the UCs asking an open-ended question about what other methods he was considering.  Regarding the use of explosives, the defendant told the UCs, "I'm as down as everybody else is . . . I want something that tells them they are not welcome in this town.  Better get the fuck out, otherwise, people will die."

The defendant, his friend, and the UCs then drove to Pueblo to visit Temple Emanuel and assess what type of attack would be most effective.  While on site, the defendant observed that Molotov cocktails would not be enough to condemn the entire building, stating "simply busting out the windows is not gonna be enough."  The defendant and the UCs then discussed using pipe bombs.  The defendant stated that he and his friend would go to the Synagogue when no one was there to try to determine where they could place explosives.   The UCs offered to supply the pipe bombs, but cautioned that it would take some time because they would need to bring them in from out of state.  The defendant stated, "Let's get that place off the map."  The defendant

---

[1] Subsequent investigation did not uncover any evidence that this incident ever occurred.

further explained, "This is the big center here for them here in town.  Thing is, why not hit the heart, right?"

The defendant continued to take steps to plan the bombing after his meeting with the UCs.  Two days later, on October 19, 2019, the defendant sent UC-1 a video that shows him walking around the exterior of Temple Emanuel and commenting on various features of the building.  He also explained that the attack on the Synagogue would be "phase two" and that "phase three" would be outside of Pueblo and "bigger and better."  Later that day, in a group chat between the defendant and the three UCs discussing the plot, UC-2 wrote, "Let me know what you want the end result to look like and I'll get to work."  The defendant responded the next day with a picture of a church, half of which has crumbled to the ground, and stated, "Let's have it look something like that."  The defendant also sent a picture of an anti-Semitic caricature of a Jewish man.

On October 21, 2019, UC-2 stated in the group chat that he was in the process of collecting supplies for the bombing, which the group at that time was planning for Halloween night.  The defendant responded with a picture showing a Halloween mask and various white supremacy paraphernalia, including the book "Mein Kampf" and a flag with a Nazi swastika.  He wrote, "Everyone have a mask for 'TRICK OR TREATING,'" followed by a skull and cross bones emoji, "If not, I got extras."  Two days later, UC-2 sent two pictures to the group chat of what appear to be pipe bombs with the message "wanted to show you a little progress.  Prepped several of these last night."  The defendant responded "Sieg Heil brothers."  Later, the defendant sent an audio file to the group chat stating ". . . I'm honored to be a part of history and, more importantly, the future of our folk.  Heil."

On October 27, 2019, the defendant sent an audio file to the group chat in which he stated "Hey guys, I'm in front of you know where. And the lights are on in the building and there's definitely movement in there. That means, like, literally they're definitely back in business. So it's a good thing we're going to do what we're going to do."

On October 31, 2019, the defendant met again with UC-1. They discussed the plan to attack the Synagogue and agreed that the defendant would meet with the UCs at a motel around 9:00 p.m. on November 1 to examine the explosives before going to the Synagogue. At the defendant's request, they went to a store to purchase gloves to use during the attack. The defendant repeatedly affirmed that he was prepared to go through with the attack the following night. When UC-1 raised the possibility of someone being inside the Synagogue when they set off the explosives, the defendant stated that he did not think anyone would be there but that if they were, the defendant would not care because they would be Jews.

The evening of November 1, 2019, UC-1 picked up the defendant and drove him to the motel, where UC-2 and UC-3 were waiting. During the drive the defendant was animated and displayed a Nazi armband. When they arrived at the motel, the defendant addressed the UCs: "I wanted to thank each and every one of you for your time here tonight, I want to thank you for your utmost effort. Like, this is a move for our race. One of these days, we're probably gonna do something where one of us, couple of us even, probably won't come back." The defendant removed several items from a backpack he was carrying, including a knife, a mask, and a copy of "Mein Kampf." UC-2 showed the defendant two pipe bombs and two bundles each containing seven sticks of dynamite. The defendant examined the explosives and declared, "this is

absolutely gorgeous." The defendant then explained that they should carry out the attack at 2:30 or 3:00 in the morning, to avoid the police.

Though the UCs told the defendant that the pipe bombs and dynamite were functional and "high-grade explosives," they were all inert. The UCs also told the defendant that UC-2 and UC-3 brought the pipe bombs and dynamite to Colorado from out of state. In fact, the dynamite and simulated black powder contained within the pipe bombs were shipped to Colorado from Quantico, Virginia, by the FBI to be used in the undercover operation.

The defendant was arrested and transported to a police station where he waived his Miranda rights and agreed to speak with the FBI. The defendant admitted that he had been planning to blow up a Synagogue that night with the pipe bombs and dynamite in the motel room. He referred to the plan as "my mountain" and to Jews and the Synagogue as a "cancer" to the community. Although the defendant stated that he had not planned to hurt anyone, when asked what he would have done if there had been someone inside the Synagogue when he arrived that night, he admitted that he would have gone through with the attack because anyone inside would be Jewish.

## VI. ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree

14

about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate.  The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range.  To that end, the government may make legal or factual arguments that affect the estimate below.

**Offense Level**:

A.  Count One: Under § 2H1.1, the base offense level for this offense is **24**.  § 2H1.1(a)(1) (cross referencing § 2K1.4(a)(1)).

    i.  Because the defendant intentionally selected Temple Emanuel as the object of his offense because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, there is an increase of **+3** levels.  § 3A1.1(a).

B.  Count Two: Under § 2K1.4, the base offense level for this offense is **24**.  § 2K1.4 (a)(1).

    i.  Because the defendant intentionally selected Temple Emanuel as the object of his offense because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, there is an increase of **+3** levels.  § 3A1.1(a).

C.  The two counts group pursuant to § 3D1.2(a).

D.  No role-in-offense or obstruction adjustments apply.

E.  Defendant should receive a decrease in the offense level by **-2** based upon his acceptance of responsibility.  § 3E1.1(a).  Defendant should also receive a decrease in the offense level by **–1** for timely notifying the government.  § 3E1.1(b).  At sentencing, the government will make the appropriate motion for the one-point reduction.

F.  The parties agree adjusted offense level is **24**.

G.  The government reserves the right to argue for an upward departure consistent with the Terrorism Enhancement.  *See* § 3A1.4, n.4(B).  Such a departure is limited to the equivalent of an increase of **+12** levels, to **36**, and an increase of the defendant's criminal history to Category **VI**.  *Id.*

**Criminal History Category**

H. The parties acknowledge and agree that the estimation regarding Defendant's criminal history is tentative. Defendant acknowledges that the criminal history will be further investigated by the United States Probation Department and ultimately determined by the Court. Defendant further acknowledges that any additional facts regarding the criminal history can greatly affect the final guideline range and result in a longer term of imprisonment. Based upon the facts known at this time regarding Defendant's criminal history, the parties believe that Defendant falls within Criminal History Category ("CHC") **I**. § 4A1.1.

I. The career offender and repeat and dangerous sex offender adjustments tentatively do not apply. § 4B1.1; § 4B1.5.

**Guideline Ranges**

J. The guideline range resulting from the estimated offense level of **24** and the estimated criminal history category of **I** is **51** to **63** months of imprisonment, subject to the mandatory minimum sentence of 60 months (resulting in a range of **60** to **63** months). However, the imprisonment range for offense level 24 could be from **60** months (bottom of CHC I) to **125** months (top of CHC VI). The guideline range resulting from offense level **36** and criminal history to Category **VI** is **324** months to **405** months of imprisonment.

K. Pursuant to § 5E1.2, assuming the estimated offense level of **24**, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

L. Pursuant to 18 U.S.C. § 3583(j) and § 5D1.2(b)(1), if the Court imposes the term of supervised release, that term shall be at least 3 years but not more than life.

## VII. ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements, (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 10/15/2020

Richard Holzer
Defendant

Date: 10/15/20

Mary V. Butterton
David Kraut
Attorneys for Defendant

Date: 10/15/20

Julia Martinez
Assistant U.S. Attorney

Michael J. Songer
Trial Attorney

# ATTACHMENT A

| |
|---|
| Knife with Nazi logo |
| Book "Mein Kampf" |
| Swastika arm band |
| 24 blue vinyl gloves, including packaging |
| Five Halloween masks, including two packaging tags |
| Dark blue Cricket cellular telephone, IMEI#: 352168105998362 |
| Kilt with attached Thors Hammer/Ax pendant |
| Silver colored Thor hammer pendant |
| Black FASCES emblem with Ax logo |
| White circular Triskele symbol patch with red trim |
| Black Irminsul Patch with Gold Trim |
| New World Order, Aryan Knights KKK Card |
| Confederate flag hockey mask |
| Framed photo with Sonnerad runic symbol attached |
| Framed photo with Nazi Waffen SS collar patch pin attached |
| Adolf Hitler photo with text "My boss is an Austrian Painter" |
| White teardrop shaped flag with black trim with picture of raven |
| Green bomber jacket with 14/88 patch, Anti SHARP pin, and Irminsul patch |
| Circular pin displaying "88" |
| Black t-shirt with "14 words" logo |
| Green bomber jacket with Wolfsangel button, Circular Life Rune black patch, and Iron Cross patch |
| Red flag displaying swastika and "National-Sozialistische - D.A.P" |
| Animal horn |
| "White Devil" patch |
| Knife sheath with Nazi symbol |
| Celtic Cross Pendant |
| Thors Hammer pendant on black rope necklace |
| Black jacket with Sonnerad patch and an Irminsul patch |