1    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 19-cr-488-RM
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
RICHARD HOLZER,
7
     Defendant.
8    _____

9              **REPORTER'S TRANSCRIPT**
                SENTENCING HEARING
10   _____

11        Proceedings before the HONORABLE RAYMOND MOORE, Judge,

12   United States District Court for the District of Colorado,

13   occurring at 9 a.m., on the 26th day of February, 2021, in

14   Courtroom A601, United States Courthouse, Denver, Colorado.

15                   **APPEARANCES**

16        Julia Martinez, Assistant U.S. Attorney, 1225 17th

17   Street, Suite 700, Denver, Colorado, 80202, appearing for the

18   Government.

19        Mary Butterton and David Kraut, Assistant Federal

20   Public Defenders, 633 17th Street, 10th Floor, Denver,

21   Colorado, 80202, appearing for the Defendant.

22

23        TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
              901 19th Street, Denver, Colorado 80294
24        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer
25

1                    **P R O C E E D I N G S**

2          (In open court at 9:04 a.m.)

3              *THE COURT:*  Please be seated.  All right.  We're here

4    today for sentencing on 19-cr-488.  Before I take appearances,

5    I just want to go over, if you would, the ground rules at

6    counsel table.  Nobody gets up.  I don't need anybody standing,

7    and in fact, there are various participants that are listening

8    ... okay, that are listening on the audio line, and so speaking

9    into the microphone is crucial to help them understand,

10   especially since, myself excluded, everyone is wearing a mask.

11           Number two, I have done something a little unusual at

12   defendant's table, and counsel can see what it is.  What I have

13   done is, Mr. Holzer, please understand I'm not trying to put

14   you in some kind a penalty box, but what I have done is to

15   avoid crowding at the table, I have put him in the jury box,

16   near to counsel table.

17           I want to be clear, Ms. Butterton and, Mr. Kraut, at

18   any time, regardless of even if I'm talking, if you feel the

19   need to go and -- go over to the box and talk to Mr. Holzer,

20   you are free to do so.  You don't have to ask permission.  You

21   don't have to wait.  Just go ahead.  And, Mr. Holzer, if you

22   ever want your attorney to talk to you or come over to you,

23   just motion to them, and they will come over, and no one should

24   be shy or reticent or reluctant to work with the arrangement

25   that I have set.

1       All right.  Let's take appearances, starting with the

2  government.

3       MS. MARTINEZ:  Good morning, Your Honor.

4  Julia Martinez, on behalf of the United States.

5       THE COURT:  And?

6       MS. MARTINEZ:  And with me at counsel table is FBI

7  agent, who worked on this case, as well.  John Smith, if

8  Your Honor wants his appearance.

9       THE COURT:  For the defendant.

10      MS. BUTTERTON:  Good morning, Your Honor.  Mary

11 Butterton and David Kraut.  We are here on behalf of Mr. Holzer

12 who is present.

13      THE COURT:  Good morning to all of you.

14      THE COURT:  Before I begin let me say some things that

15 are unnecessary, but I'm going to say them anyway.  This is a

16 hard case, and what I mean by that is, there -- there are a lot

17 of emotions and strongly held beliefs on each side.  I just

18 want to acknowledge that with regard to this case, which I

19 recognize is difficult, both sides, at least in their pleadings

20 that have been filed with me and in my observations have been

21 extraordinarily professional with each other.  While you don't

22 agree with each other at all, there has been nothing but

23 strongly held professional disagreement, and I acknowledge it

24 and want to commend both sides for that.

25      I also, while I'm in the rare mood of just kind of

1    gratuitously complimenting people, I want to send another

2    gratuitous in the direction of Ms. Means, who is here from the

3    probation department.  It's a difficult PSR to write, to try

4    and encapsulate all of the various things that are going on,

5    into limited pages, and I have said to her privately, and I say

6    to her publicly, essentially, from my perspective, that's one

7    damn good PSR.

8            *PROBATION:*  Thank you.

9            *THE COURT:*  And I just want to acknowledge it

10   publicly.  That doesn't mean that I agree with everything that

11   she said or everything else, and she would be the first to tell

12   you, she wouldn't expect that out of me, ever, but I just want

13   to acknowledge the quantity and quality of the work that has

14   been put in at this time.

15           So, before proceeding to sentencing -- well, we're

16   here for sentencing, based on the earlier pleas of guilt to

17   Counts 1 and 2 of an Indictment charging Attempted Obstruction

18   Of Persons In The Enjoyment Of Their Free Exercise Of Religious

19   Beliefs Through Force and Attempt To Maliciously Destroy By

20   Means Of Fire and Explosives A Building Used In Interstate

21   Commerce.

22           At this time I formally accept the Plea Agreement,

23   pursuant to which the plea of guilty was made back in October

24   of 2020.  It is also the case that I am required to do

25   something, and I don't -- I want to get it out of the way now

1    so that I don't forget about it.  What I am required to do is

2    under US -- United States Sentencing Guideline 3A1.1, I am

3    required, at sentencing, in light of the fact that this is a

4    plea, to make a determination, beyond a reasonable doubt, that

5    the Hate Crime Motivation Guideline applies, the 3A1.1.  It

6    specifically says that I'm required to make a finding and to do

7    so beyond a reasonable doubt.  There is no -- I make the

8    finding that the requisite motivation is present and evident

9    beyond a reasonable doubt.  I rely on the statement by -- the

10   factual stipulation in the Plea Agreement, and I note that

11   there's never been any quarrel or dispute between either of the

12   sides as to whether or not that enhancement applies, but,

13   technically, I am required to specifically and affirmatively

14   address it, and so I do.

15          All right.  Having said that, let me ask,

16   Ms. Martinez, have you received a copy of the Presentence

17   Investigation Report that's been prepared in this matter,

18   including the addenda, and had sufficient time to review those

19   materials?

20          *MS. MARTINEZ:*  I have, Your Honor.

21          *THE COURT:*  Same true for the defendant?  I know it's

22   hard.  I know it's hard.

23          *MS. BUTTERTON:*  It's very hard to break the habit of

24   *not standing.*  So I will try not to do that too many times.

25          *THE COURT:*  Let me also tell you, before you answer,

1   that I -- I understand that you and Kraut -- Mr. Kraut, excuse

2   me, may have divvied up, if you would, who is going to respond

3   to what, and it may be that because of; one, where you are

4   seated, Ms. Butterton; and two, that you were the first lawyer

5   from your office that was on the case, at least in my view,

6   that I look to you.  Mr. Kraut, I mean no offense by it, and

7   what I would tell you is don't worry about it.  Whoever is

8   going to answer, answer.  You can tag team, double team, you

9   don't have to tap out or anything else.  I'm fine with

10  adjusting with whoever wants to talk to me can talk to me.  All

11  right.

12          So with that, have you received a copy of the

13  Presentence Report and the addenda and had sufficient time to

14  review the material, as well as discuss it with your client?

15          *MS. BUTTERTON:*  As to each question, Your Honor, the

16  answer is, yes.

17          *THE COURT:*  All right.  There have been a number of

18  things filed.  I hope to be able to get them all.  What I will

19  say is, in general, what has been filed in this case is an

20  enormous amount of data to where I feel better informed than I

21  have on most changes of pleas.  I have seen, obviously, the

22  various filings, I have seen transcripts of all of the

23  conversations that occurred between Mr. Holzer and the

24  undercover agent who came out to Colorado, posing as Mike, JD

25  and Red, I think is what their names are.  I have seen upwards

1    of 2,000 pictures of Mr. Holzer's various multimedia accounts.

2    I have seen the video from his parents.  I have seen the

3    entirety of his postarrest statement to the agents.  The

4    mischievous part of me can't help myself.  I have to pause and

5    say something that's unnecessary, which I subtitle three hours

6    of mansplaining by the FBI, but that's neither here nor there.

7             The point is, I have an enormous amount of

8    information.  Let me confirm with you, before I go through what

9    I understand each side to have filed, whether you have also

10   received three things that I have attempted to provide.  The

11   first is an email from the Sentencing Commission, and the way

12   that works is, if I ask probation to make a request for

13   information from the Sentencing Commission, probation will do

14   so, but the Sentencing Commission does not deem the probation

15   department worthy of receiving an answer, and so what they will

16   do is they will send the answer to their inquiry to me to

17   protect against the fact that, perhaps, they have run off on

18   their own and started asking questions that I have no interest

19   in.

20            In any event, there was an interest trying to

21   decide -- trying to see whether there was data there, that was

22   broadly useful to this case, and they sent back an email which

23   I consider to be worthless, because they are the Commission,

24   they think like the Commission, they narrowed it down and

25   sliced the salami so thin that they were looking for,

1    essentially, cases that matched on every identifying fact --

2    feature and they came up with nothing.

3          The second thing that I provided, and I did this on

4    the docket, and I just want -- and I know I have had a

5    conversation with both counsel on the phone, so I know you both

6    have seen this, but I want to put it on the record, when I

7    consider the information from the Sentencing Commission to be,

8    essentially, worthless, I tried to get a broad sense of other

9    cases that might be out there, that might be similar to this,

10   and I tried to do that by seeing if I could slice and dice

11   Pacer in certain ways.  I failed miserably, and then I

12   contacted the law library, and asked whether or not they could

13   help, and the response that I got was that they could provide

14   some information by doing a Lexus search, that it would not be

15   complete, and it would be both open and closed cases.

16         They sent me that information, and I looked at the

17   docket in each of the closed cases on that list; my view being,

18   open cases, doesn't mean anything, and oddly, if you read it,

19   you think they are all closed cases, but it's only the

20   highlighted ones that are closed, but nonetheless, because I

21   had done that, I presented that information to the lawyers, as

22   well; and then, thirdly, somewhere along the line, as I noted

23   that there were beginning to be concerns with the supervised

24   release conditions, special conditions.  I drafted some of my

25   own, and again, I know that those were provided, as well, or

1  should have been, because they were attached to the addendum,

2  to the PSR.  But with respect to these three things that

3  originated from me, I want to also confirm, government you got

4  them all?

5          MS. MARTINEZ:  Yes, we did.

6          THE COURT:  And defendant, as well?

7          MS. BUTTERTON:  Yes, Your Honor.

8          THE COURT:  All right.  So now I'm going to go through

9  and see -- and recite what I understand to have been filed by

10  each side, to make sure I'm not missing something.

11          In terms of the government, the government has not, to

12  my knowledge, filed any objections to the Presentence Report,

13  as filed.  The government has filed a Motion For Upward

14  Departure or Variance.  The government has filed a response to

15  the defendant's objections to the Presentence Report.  The

16  government has filed its statement of its position, with

17  respect to sentencing.  As we will see, the defendant filed a

18  response to the government's request for upward departure or a

19  variance, and the government filed a reply to that response.

20  The government also filed a response to the defendant's Motion

21  For A Non-Guideline Sentence, and then finally, a response to

22  the defendant's supplement to the Presentence Investigation

23  Report Objections.  Those latter objections being objections to

24  the special conditions that I have crafted, and that were

25  revealed, if you would, for the first time, in the addendum.

1          I think that covers everything that you have filed,

2     Ms. Martinez.  If I have missed something, please.

3          *MS. MARTINEZ:*  That's certainly the extent of the

4     substantive pleadings.  There were a couple of notices and

5     minor procedural motions, but this is the substance.

6          *THE COURT:*  Yeah.  I mean, there are, obviously,

7     pleadings about who could attend.  There were pleadings filed

8     about extensions of time and a variety of things, but

9     substantively, with respect to this proceeding now, I want to

10    make sure I haven't missed anything?

11         *MS. MARTINEZ:*  That is correct.  Those are the six

12    pleadings.

13         *THE COURT:*  In terms of the defendant, what has been

14    filed are objections and responses to the Presentence Report.

15    There have also been filed a -- a supplement, to the

16    Presentence Report objections.  There has been filed a response

17    to the government's Motion For An Upward Departure.  There has

18    been a Motion For A Non-Guideline Sentence filed.  A supplement

19    to the motion for non-guideline sentence.  A response to the

20    government's position, with respect to sentencing, and I think

21    that includes everything from the defense side.

22         Ms. Butterton, if I'm missing something, again let me

23    know?

24         *MS. BUTTERTON:*  Your Honor, I believe that's

25    everything.

1        *THE COURT:*  All right.  So the best place to start is

2    ... let me start with this.  Neither side has made any

3    objection to the guideline calculations that are in the

4    Presentence Report.  The guideline range in the Presentence

5    Report is 60 to 63 months, because there's a mandatory minimum

6    that applies to Count 2, what I will call the arson count.  The

7    fine range is 20,000 to $200,000, the supervised-release range

8    is limited to three years on Count 1, but it is a lifetime

9    maximum, essentially unlimited as to Count 2.  I make those

10   findings, and I now shift to the substance of the objections,

11   because the objections went to matters of ... that were thought

12   necessarily tied to the raw guideline calculations.

13        So, let me -- give me a moment to figure out ... where

14   we are.  I'm dealing with the defendant's objections to the

15   Presentence Report, specifically I'm looking at **ECF Number 44**.

16   I'm going to skip over the objections to the supervised-release

17   conditions, that are contained in that, because they were

18   focused on the concept of what was an extremist view and

19   whether or not that was vague and things of that nature.

20        Obviously, I removed that language from the conditions

21   that I crafted and which are attached to the addendum, and so I

22   will deal with the objections there, and if, in the course of

23   declaring the objections as to the release conditions,

24   contained in **44** as moot, to the extent that I am overbroad in

25   that, let me be clear, Mr. Kraut, Ms. Butterton, the door is

1    wide open as far as I'm concerned, both in terms of raising

2    matters that may be subtly placed or planted in these

3    objections, as well as in more direct objections that were

4    subsequently made, but for the time being, I intend to just

5    skip over this and declare these as moot.  Any objection with

6    that?

7              MS. BUTTERTON:  No, Your Honor.  We're prepared to

8    address the Court's conditions.

9              THE COURT:  All right.  And then, there is a host of

10   conditions -- or objections that do not affect the guideline

11   range or the conditions of supervised release, but are relating

12   to various paragraphs of the PSR.

13             The first one is paragraph four, and that paragraph of

14   the Presentence Report is one which, as originally crafted, in

15   the draft of the report noted that swastikas were drawn on the

16   cell of Mr. Holzer's during the time that he has been detained

17   at the local jail.  The response to that has been an objection

18   saying that Mr. Holzer did not draw those swastikas, but he did

19   clean them when he was directed to clean them.

20             In response to that, there was a revision to paragraph

21   four in the final report that notes that the defendant denies

22   drawing the swastikas on the cell wall, but he cleaned them, as

23   instructed, and it notes that there were other occupants of

24   Mr. Holzer's cell at the time.

25             With the additional information that's inserted into

1   the final PSR, is there any further ruling that you want from

2   me?

3          MR. KRAUT:  No, there's not, Your Honor.

4          THE COURT:  All right.  So I will call that objection

5   moot.  The next objection relates to paragraph 30 of the

6   Presentence Report.  The objection is ... well, my inclination

7   is to overrule it.  The objection is that paragraph 30 lists

8   various examples of social media -- more specifically --

9   Facebook postings, and Mr. Kraut, do me a favor, please, at

10  that point -- okay.  There's a switch on the base of the thing.

11  It takes a second.  Try it again.  There you go.  Okay.

12          There's a description of various photographs contained

13  in paragraph 30 -- excuse me -- there's a description of

14  various Facebook messages and postings in paragraph 30.  There

15  is an objection as to the fifth example that is listed, where

16  it, essentially, is a caption *getting ready to cap people* and

17  then the message includes three pictures, all of which involve

18  Mr. Holzer holding some form of firearm or another.  The

19  particular pictures, I -- well, this section, this paragraph

20  30, is really simply extracting and putting into the

21  Presentence Report information that was contained in a search

22  warrant for Mr. Holzer's home, and so it is information that

23  was presented to the Court under oath.  It's information that

24  was relied upon, and it's not some summary of information by

25  the probation department.

1              Nonetheless, the objection is that Mr. Holzer did not

2    own any of these firearms, did not use them for any purpose,

3    and that no firearms or ammunition were found during the search

4    of Mr. Holzer's residence.  I would note that there has been,

5    in response to that, an objection -- a -- a footnote added to

6    the Presentence Report, indicating that these firearms did not

7    belong to the defendant, and no firearms were recovered during

8    a search of the residence.

9              Beyond the addition of the footnote, I'm going to

10   overrule the objection.  The reason I'm going to overrule the

11   objection is it is absolutely an accurate description.  I have

12   seen the photographs, they have been provided to me in one or

13   the other of the government's responses.  It's probably in the

14   government's response to the objections, but regardless of

15   whether it's there or in the government's sentencing filings, I

16   have seen the photographs there, and I have seen them in the

17   collection of images, and they are exactly what these things

18   say.

19             To the extent that the notion is to say that he did

20   not own -- own the firearms, to some extent, the objection is

21   not really an objection, because all that the PSR is doing, is

22   saying what was examples of his various accounts and postings

23   and this is exactly what he posted.

24             Now, I understand, and it is absolutely true, no

25   firearms were found in the home, and I understand that,

additionally, that the parties are taking the position that he
did not own the firearm.  I'm also dropping a footnote saying,
I don't believe he owned the firearms, but I also want it to be
clear that to the extent that we're talking about firearm
imagery, there's a lot of it that is across the landscape of
Mr. Holzer's social media, and even within the context of this
particular paragraph, the notion that, Oh, there's something
terrible by describing these descriptions of guns next to the
caption *getting ready to cap people*, there is no objection to
*I'm going to get dead by suicide by cop; I'm going to cause a*
*shoot out and just die in it*, there's no objection that *I might*
*use my gun on Ralph*, because Ralph, whoever Ralph might be,
accused him, Mr. Holzer, of being Southern Poverty Law Center,
and his belief that Southern Poverty Law center has killed or
imprisoned, quote, our, unquote, people.  There's no objection
to*, I would like to go kill a bunch of pedophiles*.  There's no
objection to*, I'm going to kill some spics there's too many,*
*here, LOL*.  And I note that the Presentence Report, says *spies*,
it should say *spics*, because that's exactly what it says in the
search warrant, which I independently reviewed.  So -- and oh,
by the way, when the three undercovers, Mike, JD and Red were
asking about firearms, my recollection is that Mr. Holzer told
them that he owned the handguns, but not the rifles.

        Do I believe that he owned the weapons?  No.  But I
want to be clear that, to me, the purpose of this objection is

1    to set something else up, and it's a little bit ... well,

2    there's no there, there.  It's an absolutely accurate

3    description of what was on his social media posts.  To the

4    extent that there's some concern as to what inference I might

5    draw from it, I do not draw an inference of ownership from

6    this, even though many of these other posts speak of ownership

7    and conversations he has had with undercover, speaks of

8    ownership, and probation has included a correcting, if I should

9    say -- or expansive footnote indicating their position.

10        So if there's anything -- so, I'm going to overrule

11   the objection, in light of what I have said, and further, in

12   light of the additional footnote, if defendant wishes to make

13   any further record, now would be the time.

14        MR. KRAUT:  No thank you, Your Honor, in light of the

15   footnote that was added, there is no further record.

16        THE COURT:  The next is paragraph 32, and let me just

17   say this, for the most part, as I deal with objections, I tend

18   to have my focus on the defense side.  Ms. Martinez, it is not

19   that I'm ignoring you, if, in my discussion, there is some

20   point in which you wish to make a record, make -- make that

21   known to me, and I will give you the opportunity to do so.

22        MS. MARTINEZ:  I will, Your Honor.

23        THE COURT:  All right.  As I said, the next objection

24   is as to paragraph 32, and the objection to paragraph 32 was

25   that the statements regarding explosives is incomplete.  Again,

1      I look at this more as a set up for future argument than an

2      actual objection.  What I mean by that is, the description is a

3      quote.  It's something he said.  It's quoted accurately, that's

4      what he said, and the notion that there are additional

5      statements, that he made, that needs to be considered, well,

6      that's argument as to what inference I draw from the

7      statements, but to whatever extent that that may be too

8      restrictive, the probation department has revised paragraph 32,

9      to note that the defendant asserts that he had no experience

10     with explosives and deferred entirely to the undercover agents.

11          Again, we will get into all of this later.  It may be

12     that that additional statement is satisfactory.  If it's not,

13     that's the most it's going to happen, because I'm going to

14     overrule the objection.  It is, in fact, an accurate statement,

15     and I'm not precluding the defendant from presenting me, as

16     they have, with a variety of information that further

17     elaborates on what his capabilities are.  This is one of those

18     areas where there's going to be dispute between the parties,

19     because, if you're saying to me he probably did not have the

20     wherewithal to make a pipe bomb himself, I'm inclined to agree

21     with it.  If -- but the facts are that he was talking about

22     Molotov cocktails, he was talking about Molotov cocktails with

23     other individuals, even before the three undercovers arrived,

24     and in the course of the conversation, he did bring up Molotov

25     cocktails, and again, there's some discussion or some provision

1    of information made to me by the government of conversations

2    between, and I will just use first names, because I'm not

3    trying to drag others into this, but, between his student

4    Brandon, or "Skeeter", I'm not sure which, off the top of my

5    head, where there was discussion of explosives that predates

6    this event, but do I think that he has the wherewithal to go

7    off and make pipe bombs?  No.  But again, that's not what this

8    is saying.  It's just simply quoting what it is that he did and

9    what he did say is exactly what probation says he said.

10         So, if there's something more that you want from me,

11   Mr. Kraut, you are going to have to help me out here.

12         MR. KRAUT:  Yes, Your Honor.  The only further

13   request, with respect to paragraph 32, would be that in the

14   parenthetical, that probation added --

15         THE COURT:  Pull that bad boy in closer, please.

16   There you go.

17         MR. KRAUT:  Is that better?  In the parenthetical that

18   probation added, we would ask probation to also add language

19   indicating that the government agrees that Mr. Holzer had no

20   experience with explosives, and it appears that they agree with

21   that, based on their statement in **Document 52**, which was their

22   response to our objections to the PSR, at page 13.  They note,

23   *It is undisputed that the defendant had no specialized*

24   *knowledge of explosives*.

25         Now, the reason for this request is that, looking to

1    the footnote at paragraph 30 that probation added, they clarify

2    that the government and defendant agree that the firearms

3    didn't belong to him, and so we would just ask for a very

4    similar language, whether it's a footnote or a parenthetical

5    noting that the government agrees with that particular

6    assertion.  Nothing further.

7         *THE COURT:*  And I am not going to require that, and

8    the reason I'm not going to require that, is we're now getting

9    into things, areas, where you will get plenty of opportunity to

10   argue to me, but first, I don't have any misunderstanding as to

11   what anybody's position is.  So any notion that there's some --

12   something here that is unfairly stated, I don't think is true,

13   but there's a difference between saying he has no experience

14   with explosives and he has no specialized knowledge of

15   explosives.  Those are two different things, and I don't

16   interpret what Ms. Martinez' position is, to say that he has no

17   experience, whatsoever, with explosives.  I think she is not

18   saying anything much different than I am, which is, he probably

19   couldn't have built a pipe bomb -- well, he just -- he probably

20   couldn't have done it, period.  But to say that there's no

21   experience when there is -- are statements being made ... it's

22   been a little bit different.  In one instance I thought it was

23   "Skeeter" who had a Molotov cocktail in his refrigerator, and

24   in another instance it seemed to be that the defendant was

25   saying it.  Of course, do I believe that?  I don't believe that

1  either.  Who the heck is going to stick a gasoline-filled

2  bottle in their refrigerator?  It's just stupid.  And I suppose

3  I will pause now to say, there is a recurring problem here.  I

4  know what it is, I'm going to acknowledge it now, but I'm not

5  going to require any further change.

6          The recurring problem is that Mr. Holzer says a lot of

7  things, and one cannot necessarily take everything that he says

8  as being true, because he has constructed a history for himself

9  that is just simply made up.  It's just wrong.  Everything from

10 his age, to his parentage, I would go so far, although I

11 understand that he will be concerned by this, to say, his

12 ethnicity, although he has a way of kind of moving the pieces

13 around so that he is, quote, a hundred percent white; to

14 whether he has been in custody before; to whether he has killed

15 people before.  A lot of what he says is -- the parties'

16 generously say there's no evidence to support.  It's not that

17 there's no evidence to support, it's just not true.  It's made

18 up stuff that, oddly, he seemingly believes, and his parents

19 have indicated that he tends to believe the things that he

20 says, and I will put the rest of it out there.

21          This is not someone sitting in the basement basically

22 crafting a story of a better life and a better background.  He

23 was born with Fetal Alcohol Syndrome, and has been afflicted

24 with that his entire life.  There's a Gordian knot of issues

25 here, and what I mean by that Gordian knot is that it is very,

1    very difficult to unravel, whether it's a lie that's influenced

2    by the fact that he has limitations or whether it's a culpable

3    lie or whether it's something in between.  And that's why I say

4    this is a very difficult case, because there are these issues

5    that extend all the way through, every conversation, and I

6    recognize that these objections were the very first of a set of

7    filings that were made, and so to the extent that I'm

8    responding to them by saying, in many respects, *No, that's*

9    *accurate, no that's accurate*, I also get that what you were

10   doing was trying to preview to me a position that; simply

11   stated is, please don't believe everything that he said to be

12   true, because much of it was not.  I get that.  But I'm not

13   going to change what's been said with paragraph 32.

14        The next objection is paragraph 33.  Again, this one I

15   don't understand at all, and I am just going to flat overrule

16   it.  What I mean by that is this, the statement that is

17   objected to is that, *The defendant told the agents that he paid*

18   *a Mexican co-worker to place a hex on and poison a synagogue,*

19   *Temple Emanuel, back a year prior, and that he, Holzer, paid*

20   *this Mexican witch doctor $60 to $70 in cash to poison the*

21   *synagogue, and he knew that it was shut down for awhile, and he*

22   *told them he had been incarcerated for hitting someone with a*

23   *hammer when he was 17 and he was released when he was 20 or 21.*

24        Well, the objection is, *Well yes, he said these things*

25   *but there's no independent evidence that either of these things*

 1    *occurred.*  As to the first, my answer is extraordinarily

 2    simple, you included this in the stipulated facts on which the

 3    Plea Agreement was based, that he said this.  So, to somehow

 4    say to me, now, that there's something wrong with including it

 5    in the Presentence Report, a statement that the defendant made

 6    that the parties stipulated that he made, I just can't process

 7    what the problem is, with regard to that, beyond the fact that,

 8    again, you're previewing to me that you don't want me to accept

 9    the fact that there was a, quote, *Mexican witch doctor*, *who*

10    *placed arsenic in the water supply of Temple Emanuel, the year*

11    *prior to the events of this case.*  It goes back to the issue

12    that I said before, which is that I accept it as previewing.  I

13    don't find there to be to be anything that's incorrect in the

14    Presentence Report.  I'm not going to require that it be

15    changed, and I overrule the objection, but you can make

16    whatever record you wish.

17         *MR. KRAUT:*  Thank you, Your Honor.  The Court really

18    has honed in on the issue related to these factual objections.

19    Our position, in general, regarding the remaining factual

20    objections is basically that they fall into two categories;

21    one, claims by other people regarding misconduct that

22    Mr. Holzer allegedly engaged in, that are not supported by

23    evidence.  We will get to those when we get to those; and the

24    second category is claims by Mr. Holzer that he engaged in this

25    conduct that is not supported by evidence.

1            So, with respect -- and this falls into that second

2    category.  With respect to this paragraph, and really all

3    others, in which his claimed, but false claimed, misconduct is

4    reported, our request is for the PSR to contain some clarifying

5    language indicating that these things didn't happen.

6            Now, given the Court's record a moment ago, and the

7    additional filings that have happened since the PSR objections

8    were filed, it seems that the Court fully understands and

9    really agrees with us that there's no evidence that these

10   things occurred and isn't going to sentence Mr. Holzer, in this

11   case, based on the belief that he actually committed these

12   other previous bad acts, and so as long as that is clear, and

13   that is the way the Court will use this information, as it

14   reflects on his mental statement, not on his actual conduct in

15   the past, we would have no further requests, but, um --

16           THE COURT:  Well, I mean, look, I understand, you have

17   got your record.  My response to it is, it's a broad summary of

18   what I said.  I don't necessarily -- well we will -- what I

19   believe and what you believe we will get into in more specifics

20   later.  I don't disagree with you that it will not take much to

21   convince me, for example, that there was not a Mexican witch

22   doctor with arsenic.  It's also not going to take much to

23   convince me that he was not in -- what's the story -- that, he

24   hit a man in the temple with a hammer, the claw side of a

25   hammer, because the man was performing pedophilic acts on the

1    young brother of a friend of his, and that he went to juvenile

2    custody at 17, and then was transferred to an adult facility in

3    California and released when he was 21.  It's nonsense.  But

4    I'm not going to take it across -- and I don't think -- well,

5    if anybody wants to convince me that it's anything other than

6    nonsense, they are going to have a hard time doing that, but

7    I'm not going to go so far as to say, that, you know, all of

8    these statements are not true or not relevant.  It's not

9    simply -- and this is where I think the problem comes.  It's

10   not simply the truth of it or not, it is the fact that he is

11   wrapping himself in images and expressions and interests in

12   violence, and so to say that I recognize what's true and not

13   true, I hope that that's the case.

14            I certainly, narcissisticly, at least, believe that I

15   recognize what's true and not true, but the significance of

16   that doesn't go away, simply because I say, *Oh, well he didn't*

17   *really hit someone in the head with a hammer*.  It's got to be

18   viewed in a much broader context, and I think that is the

19   source of much of the disagreement between the parties, and we

20   will get to all of that once we finish working through the rest

21   of this.

22            So, I understand, you have got your record.  I'm just

23   pushing back, a little bit, to the extent that there's any

24   inference as to what I intend to do with this.

25            All right.  Next one is paragraph 38.  Again, we are

1    referring to a statement that "Skeeter" made, about Mr. Holzer

2    keeping firearms in a safe-house.  Again, the statement is that

3    he made the statement, but it's not true.  As I have already --

4    I'm not going to require the PSR to change it.  He made the

5    statement, that's what they are saying.  Now, I understand --

6    let me back up.  The objection is that I shouldn't believe

7    "Skeeter", because Mr. Holzer didn't make -- because it's not

8    true.  Having said that, it is clear to me, from the broad

9    amount of information that I have, that he was professing, at

10   various points in time, both through imagery and through words,

11   to have connection with and association with and access to

12   firearms.

13        There are pictures of him holding multiple firearms,

14   with Nazi memorabilia on his hat at the time he is doing it.

15   As I said, in the conversations with the undercover agents

16   there are -- there are comments about *Well, yeah, the guns*

17   *aren't at his house, they are somewhere else*, and that *he owns*

18   *the handguns, but not the rifles*.  So, given what I have seen,

19   I have no doubt that the statement was made.  It's absolutely

20   consistent with everything else that I have seen.  If the

21   notion is that it's not true, he didn't have the proverbial

22   pot, by way of personal property.  So, I don't have much

23   problem in saying it's unlikely that someone who sleeps in a

24   closet didn't have the funds to acquire these firearms that are

25   depicted in various images that I have seen.  Beyond that, I

1    overrule the objection.  If there's a further concern?

2         MR. KRAUT:  Your Honor, this particular objection

3    would fall into that first category, I said, of statements of

4    others, rather than statements of Mr. Holzer.  Now, if this was

5    a statement attributed to Mr. Holzer, I would agree, the Court

6    could consider the fact of the statement as it may relate to

7    Mr. Holzer's mental state, as the Court has described, but when

8    we're looking at statements made by other people, in this case,

9    "Skeeter" or Seth Batts, I believe that the Court should

10   analyze whether that's included in the PSR, based on whether

11   there's adequate indicia of reliability of the truth of that

12   statement.

13        THE COURT:  And I am telling you that I think there

14   is.  I'm telling you that his -- that the report by "Skeeter"

15   that the statement was made to him, is entirely consistent with

16   the conduct and statements he made to others.  So I'm

17   overruling the objection.

18        MR. KRAUT:  Understood.

19        THE COURT:  All right.  The next one is called an

20   Objection To Paragraph 38.  It is not an objection to 38.  I

21   think it's a typo, and I think it's referring to paragraph 42.

22        MR. KRAUT:  That's correct.

23        THE COURT:  All right.  In terms of paragraph 42, the

24   objection here is ... this is the individual that I referred to

25   as his student.  The objection here is that that individual was

1   interviewed by law enforcement, and he claimed to have *put*

2   *someone to sleep*.  Mr. Holzer denies making the statement to

3   his student and denies in engaging in that conduct.  There's no

4   evidence to support the claim.  He objects to the inclusion of

5   the statement in the PSR, because he didn't make it, and its

6   content is false.  Where I am on this, is again, I'm going to

7   overrule the objection.  I mean, I'm not going to strip this

8   PSR down to a skeleton, based on the fact that there is a

9   dispute, as to whether or not some of the things that he said

10  occurred.  What the PSR is reporting here is what the student

11  reported, I believe, to law enforcement and giving a history of

12  how they came together.

13          I will also tell you that I believe that the report is

14  correct, because much of it I know to be.  There was discussion

15  of building a bomb.  Well, there was interest in bombs, if you

16  look at the whole case, broadly.  There was discussion about

17  poisoning the water supply.  I know that statement was made.

18  There was discussion about trying to figure out how.  There was

19  a statement, *They need to leave our city alone and never come*

20  *back*, that statement and various permutations of it were made

21  during the FBI interview and a multitude of other contexts.

22  There was discussion of Molotov cocktails.  There was.  And

23  so -- the defendant introduced to him Asatru.

24          Again, I know that is the case based on the fact

25  that -- that the student has said this, and I have heard that

1    confirmed by Mr. Holzer, himself, during the course of the

2    three-hour statement/confession/however you want to

3    characterize it, when he was at the FBI's offices.  So, you

4    know, this notion of there's a piece of it, *to put somebody to*

5    *sleep*, do I think that he said it?  Well, it falls into the

6    same category as before.  So much of what the student said is

7    true, I believe.  The notion that he said *he put someone to*

8    *sleep*, in other words killed them, is absolutely consistent

9    with other statements that he made about hitting somebody in

10   the side of the head with a hammer and just moments ago we were

11   looking at things that were posted to his Facebook accounts

12   about, *I'm going to kill pedophiles; I'm going to kill spics;*

13   *I'm going to use my gun on Ralph*.  I mean the fact that he

14   made -- the question is, do I believe he made the statement?

15   Yes, I do believe he made the statement.  Do I believe the

16   statement is true?  No.  But I'm not going to have it removed

17   from the Presentence Report simply because now it is a

18   secondhand statement, that it was made, allegedly, by Holzer to

19   the student, and then by the student to law enforcement.  Much

20   of what the student says I know to be true, therefore I

21   consider the entirety of it sufficiently reliable, and again,

22   context matters.  In this instance, the student was explaining

23   why he was afraid of Mr. Holzer.

24           So the objection is overruled.  You can make whatever

25   record you want.

1          MR. KRAUT:  Again, Your Honor, the request here would

2     be for the Court to direct probation to clarify that no

3     evidence suggests that the claimed conduct occurred.

4          THE COURT:  Understood.  Denied.  Paragraph 53

5     footnote two is the next objection.  And here it was an

6     objection to a footnote, the footnote has been removed, so I

7     assume the objection is moot?

8          MR. KRAUT:  That's correct.

9          THE COURT:  Paragraph 74, footnote three.  This is the

10    Jennifer issue, and the Jennifer issue I'm going to hear about,

11    I suppose, in a multitude of ways.  What the objection is is

12    that there is conflicting -- well, that it's not relevant, this

13    whole episode with Jennifer.  With regard to that, I think that

14    that is not true, not by a long shot.  His interactions with

15    people, his... you want to put a word on it that others have

16    used, including his parents, his weirdness, all of it is

17    relevant, and there's no limitation on what I can consider.

18    So, to extent that it's -- I'm being asked to kind of exclude

19    this event or information about this event, based on relevance,

20    it's overruled; and then we get to, well, it lacks sufficient

21    indicia of reliability for consideration.

22          Again, I will tell you my sense of things, but I'm not

23    going to have it removed.  What this is about is a woman,

24    Jennifer, with whom -- or into whom's house the defendant moved

25    for awhile when he was caring for Jennifer's father.  At some

1    point, thereafter, there is a woman who comes to live with

2    Mr. Holzer, and according to the Presentence Report, she later

3    says that she is uncomfortable with staying there.  Around the

4    same time, yet another woman appears and suggests that

5    Mr. Holzer sexually assaulted her, and at that point, Jennifer

6    tells Holzer that he is no longer welcome and has him leave her

7    home.  It then goes on to discuss other things about the

8    relationship, which is that the defendant has a completely

9    different view of Jennifer.  He believes, frankly it's

10   minimized in the footnote, but he believes that she was a

11   federal agent of some sort that struck him with a truck and

12   tried to kill him and that it all ends up having to do with a

13   variety of lies that were told about him, about eating eight

14   white children and sleeping with a Mexican woman, and even

15   though there's elsewhere references that he made to others

16   about cutting up Mexican children, he is concerned about this;

17   and there is a fascination, an infatuation with, whatever these

18   events are.  This is not a random thing for him.

19          Out of this comes this belief, that he consistently

20   expresses, which is, that he is short timer.  He is going to

21   die, because he has these injuries that she caused, and in many

22   respects, that influences considerations of how dangerous he is

23   or he isn't.  He is going to get caught; well, he is going to

24   die anyway.

25          At various points in time words to that effect were

1    expressed to various of the undercover personnel.  I understand

2    what you are saying, and I do not consider him to have sexually

3    assaulted this woman, because I have not enough information

4    there for me to say that, but to say that the episode should be

5    removed, is, I think, equally wrong.  He was -- his -- frankly,

6    it cuts both ways.  It establishes that his relationships go to

7    hell in a handbasket over the course of time, repeatedly, and I

8    think that's what it's ultimately there for, and telling me

9    that his interactions with people, they crumble and they

10   crumble with accusations and beliefs and stories, and so that's

11   how I'm interpreting this.  I'm not interpreting this as

12   someone who sexually assaulted her.

13          If I wanted to go the FAS road, it would not be

14   uncommon for people with FAS to have poor reads of what's

15   permitted or not permitted, if you would, in -- in

16   interpersonal relationships, and it would not be necessarily

17   unusual for somebody to do something that was the product of a

18   bad interpretation, but I'm not even doing that here.  I'm just

19   saying this is a central episode in a lot of his thinking.

20          He brings it up with law enforcement over and over

21   again, and I am not going to take something that's that

22   important, sanitize it, toss it out of the report, because

23   there's a disagreement.  I understand it to be a report.  It is

24   an accurate report of why Ms. Stephens acted as she did.  It

25   does not say that he sexually assaulted anyone.  It does not

1   say that he is guilty of that conduct, and I am not reading

2   that inference into that footnote, and I am not having it

3   removed or changed.  The objection is overruled.

4           You will now understand how I view it, though, and you

5   can make whatever additional record you wish to.

6           *MR. KRAUT:*  Thank you, Your Honor.  We view this

7   footnote as fundamentally different from much of the other

8   information that we've objected to here, for a few different

9   reasons.  First, this claim from Ms. Stephens --

10          *THE COURT:*  You keep using last names and I keep

11  trying to avoid doing it.

12          *MR. KRAUT:*  I can say Jennifer.

13          *THE COURT:*  Yeah, that would help me feel better.

14          *MR. KRAUT:*  So Jennifer -- this footnote is based on a

15  law-enforcement interview with Jennifer.  Law enforcement did

16  not interview either "Triona" or the unnamed woman who Jennifer

17  reports talking to.  So this statement, unlike others, contains

18  multiple levels of hearsay that law enforcement didn't verify.

19  There was no other interview with these other two women.  In

20  addition, unlike the other information that the Court has so

21  far reviewed and deemed I suppose consistent with Mr. Holzer's

22  claims about his past or false claims about violence or claims

23  regarding white supremacy, these particular allegations are

24  inconsistent and unlike those other claims.  So I don't think

25  that the Court can use the other things that Mr. Holzer has

1    said to other people as evidence of, *Oh, this probably was said*

2    or there's some indicia of reliability regarding this hearsay

3    statement, as well.

4          And in addition, there's no corroboration, at all,

5    provided in discovery or in the Presentence Report, to support

6    the idea that these -- even those conversations with Jennifer

7    actually occurred, let alone that the events that they

8    described actually occurred, and so if what the Court is saying

9    is, it matters to the Court in imposing a sentence that

10   Mr. Holzer had a relationship with Jennifer that fell apart,

11   and as a result, Mr. Holzer believes that the car accident that

12   happened in December of 2018 was somehow related to that failed

13   relationship, if that's what the Court is using this for, and I

14   see you shaking your head no.

15         *THE COURT:*  I'm saying no, that's not what I'm saying.

16   What I'm saying is, is that ... this is a complicated

17   individual with a multitude of issues and that his

18   relationships -- and let's be clear about it, you are going to

19   be relying on his relationships.  You are going to be telling

20   me that this is what matters, that he gets into situations

21   where if someone shows him love and affection in relationships,

22   that this is -- that he will immediately fall into their view.

23   I may be simplifying, and to the extent that I am, we all

24   recognize that you will have an opportunity to say it.  But you

25   are putting his relationships into context for me, and asking

1    me to make certain assumptions or draw certain conclusions

2    about how this case should be viewed, based on his

3    relationships.

4          All that I'm saying is, this is one of these

5    relationships, and it's not going to be the case that I'm going

6    to let you melon ball out of the Presentence Report those odd

7    and weird and strange relationships that he has had across the

8    course of his life, and we haven't even gotten to this wife

9    yet, that's not a wife and not dead, but that he apparently can

10   win an academy award on, in terms of expressing the sorrow and

11   the choking up and all of the rest of it.

12         This is part of who he is, and I am not going to

13   sanitize it.  I am not.  I mean, if you are saying that I can't

14   consider it, look, no one in this footnote is saying here is

15   what happened, and no one is saying, and probation is not

16   saying, for example, that he sexually assaulted someone.  No

17   one is saying that.  I'm not drawing that inference.  Probation

18   is writing, there was a relationship, here's what it is from

19   the woman's perspective, and that's all I'm doing is taking it

20   as -- from her perspective what it is, is she doesn't know, she

21   is not claiming it happened.  She is saying, she starts getting

22   weird reports and she wants him out of her house, and that's

23   what I'm taking it for.  But I'm not going to go beyond that

24   and start, kind of, going, *oh this relationship, you know let's*

25   *just take this all out* and then later on you are going to be

1    talking to me about relationships.

2         I'm saying, it all is into the pot, and we will see,

3    at the end of the day, where it all leads, but I'm not adding

4    words into a Presentence Report to create an inference that the

5    Presentence Report is not trying to make in the first place,

6    and then saying, *Now take it out.*

7         MR. KRAUT:  So, if I can reply, please.

8         THE COURT:  Yes, please, please.

9         MR. KRAUT:  My reply to that, Your Honor, is if the

10   Court and probation and everyone agrees that there's not

11   sufficient evidence to support any type of finding that the

12   sexual assault actually occurred of anybody --

13        THE COURT:  There's no statement that it occurred.

14        MR. KRAUT:  Well, there is.  I mean --

15        THE COURT:  There's a statement that -- that a woman

16   showed up and reported; that's it.

17        MR. KRAUT:  Right.  And our position is, given the

18   lack of reliability regarding that claimed report, the content

19   of that claimed report, that a sexual assault occurred, all of

20   the reasons the Court would use this particular relationship

21   can still be present and communicated in this PSR if that

22   particular aspect of this relationship is excised, and so it

23   doesn't matter why, in this case, Ms. Stephens believes, you

24   know, he was kicked out.  What matters is what happened

25   afterwards, and that's what the Court has just described, and

 1   what it meant to Mr. Holzer and the fact that his relationships

 2   fail.

 3           THE COURT:  Look, I'm not going to take it out.  I

 4   understand what you are saying, but I mean, again, you are, in

 5   my view, removing things that I think are related to a variety

 6   of things.  Part of it is, as I said, his relationships with

 7   women is an issue here.

 8           There is the woman that he asserts is dead, and it's

 9   his wife; that is not dead; that is not his wife; that refers

10   to him as her stalker.  There is -- neither of the lawyers has

11   said it, the -- in their various pleading, but the entire

12   relationship between him and the three undercover agents has a

13   tinge or a thread or frankly a rope running through it, where

14   he is terribly interested in what Missy thinks, and is Missy

15   going to be there, and at various points in time, *Can you get

16   me a woman*, is what he is saying to these agents when they are

17   talking about moving there.

18           I mean this is all -- it's not some random thing

19   that's completely unrelated to everything else that's there.

20   His relationships fall apart, relationships with women are

21   particularly odd, and that's all that I consider this to be.

22   Do I -- am I saying that, you know, he did something to a

23   woman; sexually assaulted her?  No.  I don't interpret this as

24   saying that either, and I understand what you are saying.  I'm

25   overruling the objection.  I will shut up, let you make your

1    final record and then we will move on.

2           *MR. KRAUT:*  Nothing further on that, given the Court's

3    record, Your Honor.

4           *THE COURT:*  All right.  The next one is one that

5    honestly I can't process.  I don't understand.  It's paragraph

6    103.  This relates to an incident where, as a teenager, he is

7    in Bible study, holding a knife, a butcher knife, saying words

8    to the effect, again I'm going off of memory, *I will defend*

9    *their faith to the test* or something of that nature.  It is an

10   odd event.  The objection is really, *Well, he was 13; he didn't*

11   *use the knife to threaten; he didn't hold it in a threatening*

12   *manner; it was never reported to law enforcement; he was never*

13   *charged with any crime*.  So what.  First, you don't have to be

14   charged with a crime or have something reported for it to be

15   included as a factual statement in a Presentence Report.

16          More than that, here's the background, this is part of

17   a report that was made to a... I will say mental-health

18   professional, but I can't remember whether it was a -- for a

19   learning issue or mental-health issue, but in any event, you

20   gave that report to probation, and so now you give the report

21   to probation that contains the statement, and now you're

22   objecting that probation took what you gave them and told me.

23          Moreover, you took that report and gave it to your

24   expert, and your expert relied on it in his report that you

25   gave to me.  So from where I'm sitting it looks like you want

1   people to interpret things the way you want them to interpret

2   them, and I honestly can't understand how you can give the --

3   the item to probation, give it to an expert who relies on it,

4   and then ask me to excise it from the Presentence Report,

5   because there wasn't a charge.  Especially when, who did this

6   come from?  This report?  It came from his mother.  It's not

7   some random person.  It's his mother.  And again, you are

8   presenting to me videos of his mother explaining him,

9   Mr. Holzer's childhood, and various other things.  It's -- it

10  is the epitome of having your cake and eating it too, and

11  there -- I'm dumbfounded and I overrule the objection.  Make

12  whatever record you want.

13        MR. KRAUT:  Your Honor, the goal here was to clarify

14  some additional information that wasn't included in the report,

15  and wasn't necessarily included in Dr. Schiltz report

16  originally, and by including the parenthetical that probation

17  did, we believe they accomplished that.  We have no further

18  requests, with regard to that paragraph.

19        THE COURT:  Paragraph 116 is close, but again, I think

20  it -- paragraph 116, this is the ice-skating rink.  What it is

21  about is a circumstance where the Presentence Report is

22  accurate, in terms of what it extracted and reported from the

23  discovery materials.  What it is about is essentially the

24  following.  There is a woman who worked at a place called The

25  Learning Center who taught Mr. Holzer when he was about

1   10-years old.  She reported that he would make threats to her

2   and the other children when she was not in the classroom.  In

3   other words, he is threatening people, as early as the age of

4   10, and she had his parents remove him from the school.

5           Some time later, five years later, in fact, a former

6   student contacts her and says that she bumped into Mr. Holzer

7   at an ice-skating rink, and he said something about -- along

8   the lines of working late, he was going to come to the school

9   and kill her and then himself.

10          The police were called, they investigated it, they

11  talked to the children who were at the rink, and there was --

12  as well as Mr. Holzer.  Mr. Holzer acknowledged that he wanted

13  to, quote, get my revenge on her, unquote, but that he did not

14  want to hurt her nor did he threaten to kill her.  Ultimately

15  it ends up in a nonpros.

16          The objection is similar to other objections.  It's an

17  unproven, uncharged report, conflicting statements and I deal

18  with it the way I deal with the others, which is, it's

19  relevant.  I grant you that the -- and then you also, at

20  various points in time, I think you told me in more detail what

21  is contained in the police report, and the two of the three

22  girls essentially said, *No, he didn't make the statement*, and

23  the other made a statement that was consistent or seemingly

24  consistent with what Ms. Alm had to say.

25          The fact of the matter is there's no objection to the

1    fact that at the age of 10 he is threatening a teacher, and so

2    whether five years later he said something or again was

3    misinterpreted by the teenage girls, this entire incident is in

4    no way out of line with what goes on with him.

5        You know, again, I'm picking the ones that are most

6    recently mentioned.  I could sit here and give a trove of

7    things.  He has made statements allegedly about killing people.

8    He has made statements about shooting people.  He has made

9    statements that could only be interpreted as threats.  He wants

10   to kill these people.  He wants to kill those people.  All of

11   this is relevant, not because it is some aberrational event.

12   It's relevant because it is part of this entire picture and

13   pattern of who he is, and that's why it's presented to me.

14       Nothing in this is presented to me to say that he said

15   definitively, quote, I'm going to kill her, unquote, and I

16   don't take it that way.  I take it the way that -- I take it

17   this way, something was said that sufficiently alarmed people

18   who heard it, that they went and reported it to Ms. Alm, and

19   Ms. Alm, herself, reported, not through what she was told by

20   others, that she had him removed from the school, because he

21   was making threats.  These things go together hand and glove.

22       I'm not interpreting it as somehow being a fact that

23   he, quote, threatened to kill her, unquote, explicitly, or that

24   the girls took some innocent comment and lied to the police or

25   to Ms. Alm or anything else.  It is part -- these -- this is

1    one of a series of lifetime events that are entirely consistent

2    with his conduct.  There's nothing that happened here that is

3    so different from anything that has happened since.

4         Now, let me be clear, what I mean by that is, he makes

5    threats.  Does that mean that he was going to kill Ms. Alm?

6    No.  And I don't take it that way.  But the relevance of he

7    makes threats, is central to this case, and the fact that the

8    police decided not to charge it, because this teenager said one

9    thing and that teenager said another, okay, I acknowledge that,

10   but I'm not removing it.  It is an event that is consistent

11   with his conduct throughout his life, and I am not misreading

12   it and probation is not doing anything other than reporting

13   this as yet another odd/weird/relevant event in his life.  The

14   fact that it was not charged is no importance to me.  It's not

15   the case that the only thing that can go in there are things

16   that are charged or proved or convicted.

17        I just -- I understand the concern.  The concern is

18   that it makes him look like somebody who has been trying to

19   kill people since the time he was 10-years old.  I don't take

20   it that way.  I do take it as, there was reason to be concerned

21   about him threatening people pre-adulthood, and I think that's

22   a fair inference.

23        So, make your record.

24        *MR. KRAUT:*  Thank you, Your Honor.  In a general

25   sense, we agree with the Court's interpretation of the events

1    and the police reports described in paragraph 116, in

2    particular, the, clearly, something was said that was alarming

3    enough for these people to report it to law enforcement and for

4    law enforcement to followup.  We agree with that, and we

5    further agree with the Court's interpretation that, in general,

6    there were concerns during childhood and adolescence about

7    Mr. Holzer's language and interactions with other people.

8         Our request here, and the purpose of the objection is

9    that the way this is described in the Presentence Report, is

10   not entirely consistent with the way the Court has just

11   articulated its own understanding of these events, and so we

12   would like the Presentence Report -- we are asking for the

13   Presentence Report to be changed so that it tracks the way the

14   Court has, in our view, accurately interpreted these events,

15   without noting that there were conflicting statements of other

16   witnesses who were there at the ice rink, and without noting

17   that, you know, there was no corroborating evidence to support

18   that he actually made this particular death threat, this

19   paragraph reads like and suggests that the death threat

20   happened, and the Court is not viewing it that way, we think

21   correctly.  So all we're asking is for the Presentence Report

22   to be modified so that it's more in line with the Court's

23   accurate interpretation.

24        THE COURT:  I mean, let me say this, the inferences

25   that I'm drawing from this paragraph, are based on the fact

1    that the paragraph is written exactly -- it's not trying to

2    tell me that this happened.  I will, in this one instance,

3    direct the probation department to drop a footnote that says

4    that there were conflicting statements, that, *when interviewed,*

5    *the three teenage girls who were present at the ice rink gave*

6    *conflicting statements and that no charges were ever filed.*

7    Anything else?

8              *MR. KRAUT:*  Nothing further.

9              *THE COURT:*  All right.

10             *MS. MARTINEZ:*  Your Honor, if I may?

11             *THE COURT:*  You may.

12             *MS. MARTINEZ:*  Just to note, there is a parenthetical,

13   apparently the defendant was issued a citation.

14             *THE COURT:*  You are right.  You are right.  So it's

15   just the three girls.

16             All right.  The -- the next -- from here we go into

17   the realm of objections to the justification section, and I

18   guess I want to say several things with regard to that.  I

19   don't ever want probation to not tell me why they think what

20   they think.  In fact, I have said to them, to particular

21   officers, I can't remember whether it's Ms. Means or not, that

22   if they want to say that they are recommending X, Y and Z,

23   because they don't believe the defendant or they don't -- or

24   they think he is X or Y or Z, that's their right.  They get to

25   express an opinion.  I don't take it as anything more than

1    their opinion.  But I'm not going to try and restrict it, and I

2    am not sure what the point of objecting to their opinion is

3    when I only take it as opinion.

4           Now, to the extent that you may feel -- there are

5    facts being reported, as the basis for the opinion, that are

6    incorrect, I don't quarrel with your -- with your ability to

7    highlight those.  I don't.  But overall, you know, much of this

8    is really argument, and what I mean by that is -- let's just

9    walk through, for example, some of this is, *Mr. Holzer wasn't*

10   *prepared and ready*, probation thinks he was.  You then go on to

11   give me quotes and statements from transcripts and to argue

12   your position that he wasn't.  There's nothing inappropriate or

13   objectionable as to what Ms. Means said.  You just disagree

14   with it.  I get that, but that's not an objection.  It's just a

15   disagreement that's resolved in a sentencing statement and

16   argument that gets made here.

17          Another argument, there is only -- there is only,

18   quote, reason to believe -- and this quoting what Ms. Means is

19   saying that*, If the defendant found actual individuals who*

20   *shared in his hate for Jewish people, then the bombing would*

21   *have occurred*.  You say, *That's only true if there was an*

22   *ability to procure explosives*, and you go on to disagree, or

23   to, if you would, counter her justification.  You get to

24   counter her justification.  You get to file a complete

25   sentencing statement, and you have, but this is not an

1    objection.  It's just disagreement.

2           So, and to some extent the only thing there, that

3    struck me as perhaps an incorrect factual statement was that

4    there was a reference to *seven*, as opposed to *several* sticks of

5    dynamite, but, I also note that the justification section was

6    revised, and so as revised, I don't know whether there's

7    something objectionable.  If there is -- and by objectionable I

8    do not mean that you disagree with, but I mean that it is wrong

9    for some reason, inappropriately relied upon, I don't know.  If

10   there's something objectionable in the rewritten

11   recommendation, please tell me now.

12        *MR. KRAUT:*  The objections to the rewritten

13   recommendation section are to facts reported in that section,

14   which I believe all of those facts are reported and objected to

15   elsewhere in the report.

16        *THE COURT:*  Right.

17        *MR. KRAUT:*  And, essentially, what we did not want to

18   have happen was to object to a fact that appears in one place

19   and not object when it appears somewhere else.

20        *THE COURT:*  Fair enough.

21        *MR. KRAUT:*  That's where this was coming from.  We

22   have addressed, in the course of reviewing the rest of the PSR,

23   we addressed these factual objections.  It remains our position

24   that even the recommendation section should be subject to the

25   requirement that any factual information reported therein is

1    sufficiently reliable to be viewed at sentencing and relied

2    upon at sentencing, and some of the factual information here is

3    not, and so it is our request for the Court to direct probation

4    to change the recommendation section to note that, much of the

5    factual information on which they rely, especially statements

6    attributed to Mr. Holzer, are true, and it doesn't seem that

7    the probation department is --

8            THE COURT:  You want a different recommendation,

9    that's what you want.  You are not going to get it.  I mean,

10   you know, okay, I understand, *Ms. Means, recommend that I*

11   *dismiss the case*; not going to happen.

12           I just -- I understand what you are saying, but

13   ultimately what it comes down to is you don't like the fact

14   that she recommended a particular outcome and/or you don't like

15   the reasoning that she used to get there.  It's her reasoning.

16   It is what it is.

17           You will also have an opportunity to give me your

18   reasoning.  Ms. Martinez will have an opportunity to give me

19   her reasoning.  I'm not going to force the probation department

20   to recommend something that they don't recommend or to support

21   it by something that they don't believe.  It's their

22   opportunity, essentially, to give, to me, their neutral

23   sentencing statement.  That's how I view it.  And I am not

24   going to muzzle them.  But I don't take it as anything more

25   than her statement.

1              MR. KRAUT:  In general, Your Honor, I absolutely agree

2    with everything that the Court is saying, which is that

3    probation should be free to make whatever recommendation they

4    want to make, and they are here, and yes, we disagree with

5    their ultimate recommendation, but the important point of these

6    objections is that we believe it's important for probation to

7    ensure that the factual basis for their recommendation is, in

8    fact, true, and much of what they base their recommendation on

9    here is disputed and we believe untrue, and so we wanted to

10   make that very clear in this pleading, and again here at --

11             THE COURT:  I get that.  I get that.  And I am not

12   going to engage in any further back and forth between you and

13   probation, because I think what's really happening is you're

14   reading events that are reported in the PSR as if Ms. Means

15   believes them to be true, as opposed to believes that the

16   occurrence of the event is a relevant occurrence.  That's the

17   way -- I mean she, no more than I do -- I have not sat down and

18   asked her.  I don't meet with probation before coming out to

19   kind of have a secret meeting and exchange views.  I have no

20   doubt, in my mind, she doesn't believe for a second the hammer

21   to the head and some of these other things, but what she is

22   ultimately saying, and this is the part you really don't like,

23   is *he is dangerous as hell*; that's what she is saying to me and

24   that's her opinion.  She has got that opinion.  I'm not going

25   to ask her to change it, and I am not going to reach a decision

1    just because she has that opinion.

2         I mean she has balanced that danger along with the FAS

3    and tried to explain why she believes what she believes, that's

4    as far as we are going.  The objection is overruled.

5         THE COURT:  All right.  My court reporter will start

6    objecting to me if I don't give her a break.  So, going to take

7    a break.  We are going to go into the PSR -- excuse me, the

8    special conditions.  Before we do that, do you have them at

9    your table?

10        MR. KRAUT:  Yes we do.

11        MS. BUTTERTON:  Yes, yes, we have them.

12        THE COURT:  I tweaked, and let me just give -- they

13   are not substantive -- they are not massively substantive.  Let

14   me give you what the tweaks are.  Okay.  Number two, I took out

15   the last sentence.  Honestly, it's just kind of jibber-jabber

16   that doesn't mean anything or add anything.  First, it says

17   this condition does not apply to monitoring data or reports or

18   social media accounts.  I don't need to say it, because when I

19   get to those other things, I say what they can do there.  It's

20   just unnecessary.  And then the use of the word condition is a

21   poor choice, because what it really should have said is

22   limitation, but -- and then the more I looked at it, it's like

23   it's completely unnecessary.  So I'm done with it.  I have

24   taken it out.  So, just scratch out the last sentence of two.

25        In number four, and I don't think this is going to be

```
 1   a big issue, one, two, three, four lines down, about in the
 2   middle it says computer device.  It should be computer or
 3   device.  Over on the second -- well number -- the changes next
 4   come in number seven.  Let me explain what the change is and
 5   then I will give you the language.  I will read it to you
 6   slowly.  It's not a massive change.  The more I looked at the
 7   word associate with, in the context of statements, symbols or
 8   material, the more I wanted something that was a little firmer
 9   and a little less fuzzy, because different people can say
10   different things associates with, from whose perspective.  And
11   so I have opted to -- for the word support, as opposed to -- at
12   least in my view -- the somewhat less firm associates with.
13           Now, let me read to you what it is that -- how it now
14   reads, You may not post to the Internet (including any board,
15   chat or community meeting room or to any social media group or
16   account any anti-semantic statement, material or symbolism.
17   Nor may you post; one, any statement, material or symbolism
18   which, insert, supports, advocates, improves of, insert the
19   word or endorses, strike or associates with.  So that it reads,
20   any statement, material or symbolism which supports, advocates
21   approves of or endorses Adolf Hitler or, strike the word the
22   Nazi ideology; or two, any statement material or symbolism,
23   which, again, insert supports, advocates, approves of, again,
24   insert the word or endorses, strike or associates with, and
25   then pick it up with white supremacy.
```

1    So the list of verbs is support, advocate, approve of,

2    approves of or endorse, as opposed to, advocates, approves of

3    endorses or associates with.

4    Number eight I have changed to read as follows, You

5    shall not visit any Internet site which, insert, *you know or*

6    *have reason to believe supports, advocates, approves of or*

7    *endorses,* strike the words *or associate with*, antisemitism or

8    white supremacy; and that's for two reasons; number one, it

9    tracks what we typically do, with respect to putting the

10   knowledge element in there; and then finally, in number nine, I

11   use the word Nazi memorabilia or logos.  I don't know what I

12   was thinking of in terms of logos.  Strike the word logos, put

13   the word symbolism.  I think it's a better read.

14   I don't think it changes, materially.  There's some --

15   there's some things that might be viewed somewhat differently,

16   but I don't think it's a complete -- well, to the extent that

17   it is a slight alteration from what you had before, I think

18   it's a slight alteration that works in the direction of -- of

19   the defendant's interests, at least as I was understanding the

20   objections, and we will get to the objections after a

21   ten-minute break.

22   Let's make it 15 and air the room out; 15 minutes.

23   *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

24   (Recess at 10:42 a.m.)

25   (In open court at 10:59 a.m.)

1          THE COURT:  Please be seated.  We are now moving to

2     the supplemental objections **ECF Number 74**, and the supplemental

3     objections relate to, as I said, the supervised release

4     conditions that I wrote and that were attached to the addendum

5     with the little tweaks that I told you about here today.

6          So, Ms. Butterton, I -- I'm assuming it's you, because

7     I'm reading body language here, and what I think is the smile

8     under the mask, but you're saying that seven, eight, nine and

9     ten are impermissibly vague; and honestly, I don't see it that

10    way.  I don't know what, in particular, is vague.  Let's look

11    at number eight -- well, let's look at number nine, for

12    example.

13          MS. BUTTERTON:  Your Honor, I may be able to save us

14    some of this discussion.

15          THE COURT:  Okay.

16          MS. BUTTERTON:  As the Court's recent edits may affect

17    our argument, so that might --

18          THE COURT:  So let me hear from you, in terms of the

19    what the vagueness issue is with seven, eight, nine and ten.

20          MS. BUTTERTON:  Your Honor, as I think is clear from

21    our filing, one thing that is very important to Mr. Holzer is

22    being able to maintain his religious practice, and I think

23    that's sort of woven through the objections for impermissibly

24    vague and the First Amendment concern, which was our third

25    objection, and they are all addressing, just so the record is

1    clear, conditions seven through ten.

2        The *associates with* language was -- raised concerns

3    with us, and I think changing that to *supports* makes it more

4    clear.  It's important to -- the purpose of these objections is

5    to ensure that Mr. Holzer can still practice his religion, that

6    admittedly has, in some aspects and through some

7    interpretations been -- and by some practitioners, although not

8    all, been sort of highjacked by white supremacism.

9        The bigger question, the most important question, I

10    think, especially with the Court's edit, is who decides?  Who

11    decides that a particular website or literature supports white

12    supremacism.  I think Naziism is probably a little more clear,

13    Adolf Hitler maybe a little more clear, but white supremacism

14    is a phrase that, unfortunately, has been in political

15    discourse a lot, depending on one's political views; people

16    have -- media outlets have referred to our former president as

17    a white supremacist, or major political figures as engaging in

18    white supremacy.  I -- the accuracy of that is not relevant at

19    all.

20        What's important is who decides if Mr. Holzer is going

21    to be -- is accessing, viewing, associating with, although that

22    language as now been removed, meeting with people who promote

23    white supremacy.  And we had an opportunity at the break to

24    sort of discuss, especially, given the Court's edits, a

25    possible proposed additional condition, if the Court will --

1    and I did not have an opportunity to discuss this with the

2    government.  We had 15 minutes.

3              THE COURT:  She is quick.

4              MS. BUTTERTON:  Because our main concern is a

5    probation officer being the person who decides that something

6    is inappropriate, when some of these can be very gray,

7    particularly when it comes to Asatru, Odinism, and the Norse

8    Pagan Religion that Mr. --

9              THE COURT:  I'm going to listen to you, but I'm going

10   to tell you right now that I think you are building a great big

11   old strawman to knock down.

12             I have not, in any way, shape or form said anything

13   about Asatruism, Odinism, Christianity, Buddhism.  I don't care

14   if he practices Pastafarianism.  I don't care.  I'm not trying

15   to control, in some broad sweep, religion.  And so, in some

16   respects you are reading something into this and then reading

17   it out.

18             You are reading into it the notion that, essentially,

19   not saying it quite this way, one can not practice Asatru --

20   the religion of Asatru, without being accused of being a white

21   supremacist.  I will tell you right now, that's not true.

22             There are differences that I have seen, and I am not

23   professing to be an expert on anybody's religion, but I mean

24   there are those who view Asatru as being an inclusive religion,

25   because the Norse were wanderers and they would incorporate the

1    traditions or beliefs of the lands that they visited to parts

2    of their religion.  There are other people that believe that

3    Asatru is more geographically confined or constrained, if you

4    would, to, kind of, the Scandinavian area, even perhaps more

5    broadly Europe.  Then there are some people who make a

6    subsection within Asatruism or Asatru of what's called Odinism

7    or Wotanism, I think, and that, to my understanding, is a more

8    aggressive religion, at its core.  What I mean by that is this,

9    one can describe Christianity as turning the other cheek, one

10   can describe Wotanism, where one does not turn the other cheek

11   but one fights back.  And then, of course, the Odinism, much of

12   it comes from or at least began gaining popularity as it was

13   espoused and professed by white supremacists connected to the

14   Order and Heil, and some of the others.  And one of the draws

15   of Odinism is that it isn't built on the... well, it isn't

16   centered around or built upon a Jewish guy.  It's built around

17   Odin; who's white, Norse, whatever, and you know, we're not

18   going to have a Jewish guy being someone that we have to kneel

19   down to.

20        I understand what you are saying.  Nothing in here

21   says anything about how you practice.  I have seen him playing

22   pan flutes, if that's what you call it.  The little pipes.  And

23   the -- the big horn that he blows, and pictures of things that

24   I believe to be associated with Asatru.  I'm not telling him he

25   can't play his pipes or do his horn or have a bloat or blot.

1   I'm not quite sure how to pronounce it.

2          *MS. BUTTERTON:*  I think it's blot, Your Honor.

3          *THE COURT:*  I think it's blot too.  I have seen it

4   written over and over again.  It's B L O T, and it's long O.

5   Okay.

6          There's not a word of any of that in there.  But let

7   me be clear about something, the notion that there is this

8   separation in Mr. Holzer's mind between Odinism and this

9   conduct here, that is more ... your craftsmanship, than

10  reality.

11         What do I mean by that?  Well, for starters, very

12  first thing he does when he meets the agents for the first time

13  in Colorado Springs, within a matter of some minutes, while

14  they are talking about, you know, ordering this and that and

15  introducing each other, whatever, out of nowhere, now mind you

16  it's in the context of people who are meeting together to

17  attack a synagogue, moments into this, and *As you know, here, I*

18  *am now nearly 32, I have been moving for so long, um, um,*

19  *everybody here an Odinist?*  Pause*, Not really*?  Imagine that we

20  change it to, various coconspirators getting together to blow

21  up, I don't know, an abortion center, whatever -- pick

22  something.  It doesn't make any difference to me, the notion

23  that very early in there, someone would walk in and say,

24  *Everybody here a Christian*?  I don't really see it.  *Everybody*

25  *here Buddhist?*  I don't really see it.  It just continuously

1    comes up in the context of meetings and discussions to destroy

2    Temple Emanuel.

3            Later on, in one of these meetings, again, the

4    meetings are about the destruction of a synagogue, and we

5    raise, out of left field, *Have any of you, like, in terms of my*

6    *Odinist folks here, anybody ever done a ritual to Loki*?

7            Later on, *I'm a full-on Odinist.*

8            Now, he is saying these things to impress people who

9    have come here to help him take down a synagogue.

10           Later on, *Red is very much an Odinist, because I have*

11   *talked to him, like, immensely about this.  He has held blot*

12   *before, so he knows*.

13           When he is talking to the agents there's discussion

14   about his student, and the agents are trying figure out whether

15   there are other people involved in this plot or attempt to take

16   down Temple Emanuel, and so they are suggesting to him various

17   people that they know who it is.  He does not yet understand

18   that the people he was dealing with were -- the undercovers

19   were, in fact, law enforcement.  But one of the people did

20   bring up is his student, and they say, in essence, *Is he in on*

21   *this*?  And the answer is, *No.  He has not done an official blot*

22   *yet.  He has not had the mental advancements.  He has mental*

23   *advancement to do before he is ready*.  He puts the performance

24   of the blot in the evolutionary chain to get to where you blow

25   up a synagogue.

1          In fact, as you know, in this case, at some point very

2     early after the meeting, in the Springs, there are exchanges on

3     the encrypted text system called telegram -- telegraph --

4     telegram, and he sends a picture, and if I could --

5     Ms. Martinez, if you know or your agent knows which of the

6     documents it is that you filed, where that picture appears.

7     It's the picture of what he sent to the undercovers in support

8     of ... their efforts, and it contains an open picture of

9     Mein Kampf.  It contains a Nazi armband.

10         MS. MARTINEZ:  Your Honor, it is **Document 56**, on page

11    six.

12         THE COURT:  I got.  I got.  I got it.  So as he is

13    communicating with them, and he just sent a picture of a church

14    where the steeple is standing, nothing else, is basically a

15    pile of rubble with a sign that says, *Let's have it look*

16    *something like this*, he then sends this picture that he has

17    taken, and what's there, the mask that he is going to wear,

18    14/88 magnet or something with inscribed with 14/88, and to be

19    clear 14/88 is the 14 words and 88 is the hate symbolism for

20    Heil Hitler, because H is the eighth letter of the alphabet, a

21    Nazi armband, and sitting right in the middle is what?  Thor's

22    hammer.  As we know, before the -- the takedown of the temple,

23    there was going to be a blot performed, which is part of this

24    Odinistic ritual.

25         So, the notion, the notion that there is, and frankly

 1    there is a tremendous irony here that we're -- but I get it he

 2    has a First Amendment right, regardless of what he is charged

 3    with, but the irony is remarkable that where it's being

 4    suggested that I'm doing something that is trying to inhibit

 5    the practice of his religion, when he is trying to blow up a

 6    synagogue and preclude Jews from the practice of theirs.  It's

 7    remarkable.

 8             But let's put the remarkableness aside.  The notion

 9    that this religion is some thing that stands separate and apart

10    from his conduct and his belief structure and his hatred, is

11    fanciful, because it is interwoven repeatedly, throughout all

12    of these interactions, and the way he describes it, when he is

13    speaking with regard to his student, is this is how you

14    progress, and you know you have got to get through -- you start

15    with the -- with the Asatru or Odinism, depending upon which

16    way he is saying it, I heard it said both ways, and then you

17    progress to the point where you understand these other things,

18    frankly, it's consistent with what the PSR reports that the

19    student said that he begins by introducing him to Asatru, then

20    it moves on from there.  So you know, that these are somehow

21    separate things, I will tell you, I sat and spent many a

22    minute, many, inquiring or wondering or doing mental gymnastics

23    over whether or not I was just going to prohibit it, because

24    this is all a spectrum, and I decided I would not, because

25    there may be ways that are disconnected from supremacy.

1        If he wants to be around people who just want to be

2    European and enjoy that, fine.  But that too is a practiced

3    response, a very much practiced response.  What I mean by that

4    is, when he is interviewed with -- by the FBI post-arrest

5    somewhere early in there, and again if I say anything that's

6    incorrect, I'm looking at the agent, but I'm saying you were

7    there, I think it was you.  I'm looking down and I earlier said

8    mansplaining.  What I meant was that you had a wide appearance,

9    in term of your knees, but there was camera angles and a lot of

10   things impacting that, that's beside the point.  If I say

11   anything that's different than what you remember, I don't want

12   to continue.  If I'm wrong, I want to be corrected.  But you

13   know, he says immediately, or not immediately, but some time

14   very early on, in this, *Hey look, you know, I'm just into --*

15   *I'm just into pride*.  Essentially saying, *Look, Blacks, are*

16   *into Black Pride, gays are into Gay Pride; this is just*

17   *European Pride; that's all it.  I don't have anything against*

18   *Blacks.  I don't have anything against Hispanics, and I just*

19   *want you to know.*  In other words, *I'm not a supremacist*.  I'm

20   this other thing that's just a prideful person.  It's nonsense.

21       He did the same thing with Ms. Means in the

22   Presentence Report.  At first I thought that him highlighting

23   the fact that he doesn't have anything against

24   African-Americans was meant for my benefit, but no, I think

25   it's because he said the same thing to the agents.  This is

1   just how he presents, which is, *Hey, this isn't hate, this is*
2   *just pride*.   No.   Because when you get into it, and he is not
3   talking to someone connected to law enforcement or he is not
4   talking to someone who is connected to having authority over
5   him, all of a sudden the conversation changes.

6          When he meets the agents in Colorado Springs for the
7   first time, out of nowhere, no one is really -- I'm not going
8   to dig it up, but essentially, it is there's a black woman
9   there, and he says something along the lines of, that's meant
10  to convey this impression, *If her hair, which reassembles*
11  *pubes, were anymore tight we could stick her in the ceiling* or
12  something like that; she would hang there.   Throughout the
13  remainder of his encounters, and let's be clear, I don't care
14  on a personal level, *Nigger across the street.   When the nigger*
15  *was giving him an issue, he was like, man, go fucking swing*
16  *from a fucking tree.   She is surrounded by all niggers in*
17  *there.   Hey, there's a lot of niggers here.   There's no niggers*
18  *in fucking Pueblo; they are all Mexican*.   You know, *White*
19  *pride.   We are not just going to stand there and watch their*
20  *moms get raped by a bunch of niggers*.

21         Sees a woman in a store, working there, seems like a
22  nice lady, according to the undercover.   *Yeah, but like how*
23  *much nigger dick has been in her*.

24         The notion that he does not have anything against
25  other ethnicities is absolute nonsense, but he presents this

1    way.  Protect my -- my -- my pride.

2         I have gone so far as to spend hours with these

3    pictures, that profess to be the rune language of the folk.

4    It's not all that complicated.  You can go online and see what

5    the translation are.  It's always bit about -- about a little

6    bit more advanced than Pig Latin.  So he will have a shirt that

7    says White Pride.  He also has one written in the runic

8    language that says, White Pride Worldwide.  It's centered

9    around a Celtic Cross.  The Celtic Cross is used across other

10   articles of clothing, which is, for example, Ku Klux Klan

11   symbolism.

12        There are instances with regard to the T-shirt, with

13   the runic symbols of his religion, simply expressing pride,

14   pictures where he is giving a Nazi salute to them.

15        There is a flag where these -- these words, again, are

16   being used on a flag, and right beneath that is a KKK flag.

17   And I am sorry, I can't view the KKK as not being -- having

18   something against other ethnicities.  I just -- I just don't

19   think that that's a fair characterization of that group.

20        So I understand what you are saying, that you don't

21   want his religion inhibited.  What I'm saying to you is, in

22   this case, with the danger that comes out of the back end of

23   this case, I might well be able to say, *He doesn't get to*

24   *practice that religion*, but I didn't.  And there -- and I

25   expressly didn't, and you can take every word that's been

1    included here, there's nothing that says that he can't practice

2    his religion, but if that religion is going to be used as a

3    cloak to be discussing or associating with supremacists and

4    supporting Naziism and supremacism, then he is going to find

5    himself back here.  It's as simple as that.

6          So, I understand what you are trying to protect, but

7    I'm saying two things, number one, first, I reject the notion

8    that these things are, in fact, disconnected, and I have spent

9    way too much time getting up to my elbows in the facts of this

10   case to come to the conclusion that these things are

11   disconnected.  But more than that, notwithstanding that,

12   there's not a single word here that prohibits him from

13   practicing any religion, any religion.  What is prohibited here

14   is endorsing ... as -- the litany of verbs that I have used

15   before, supporting, advocating, approving of, endorsing,

16   Hitler, Nazi, and white supremacy.  If we're going to say that

17   white supremacy is a term too ambiguous then you are going to

18   have to get the Circuit, because I don't think it's ambiguous.

19   I don't think it is.  I don't think there's some vagueness to

20   the concept of white supremacy.  I gave you and agreed with

21   you, that extremist is -- goes too far, and that's why I backed

22   away from what was originally proposed, even though, again,

23   with irony, because I know that his clothing includes a great

24   big T-shirt with *right-wing extremist*, so he seems to know what

25   an extremist is, but I pull away from that, because the point

1    that you make is well taken, but I think that now you are

2    building a strawman to create this impression that I'm trying

3    to inhibit his religious practice.  I am not.

4         I'm simply saying that I don't care if he is a

5    Catholic.  If he is a Catholic that goes to a church where

6    everybody sits around and says, Heil Hitler, and you know,

7    Jews are awful and Blacks are awful and we are the only race

8    that's worth having in this country, and they all ought to go

9    back to where they came from, and all of the rest of it, he

10   can't do that either.

11        I'm not focusing on Asatru at all, in any way, in any

12   shape, in any form.  I'm focusing on Naziism and supremacy.

13   Why?  Because this case is dripping with Naziism and supremacy.

14        So, I'm sorry, I go on, but I just want my position

15   clear, because I don't think that anything that's in here, now,

16   is vague or requires probation to make some interpretation, I

17   mean, may be that, ultimately, they say that he has visited

18   some site that supports white supremacy, you say it's not, and

19   they file a violation report, and ultimately will decide.  It's

20   not the case where I'm saying, for example, I'm saying to

21   probation, *You approve what sites he can visit*.  No.  They have

22   no role in this.  None.  I have listed what he can do and what

23   he can't do and it is me and me alone, and nothing has been

24   delegated to them, and to the extent that there's some

25   interpretation there's always interpretation.  Every day we

1    have cases, *You shall not associate with gang members*.  All

2    right.  What is it?  Are they interpreting, does he meet them

3    at church?  Do they revoke him for that?  No.  He is hanging

4    out in the bar with them?  Well, now it's getting worse.  There

5    are always going to be questions of some small degree of

6    interpretation or else I'm going to write something that says,

7    you cannot associate with someone who says, I hate Jews.  It's

8    a condition that's functionally worthless.

9         All right.  I have a tendency to talk.  Let me shut

10   up.  Ms. Butterton, please.

11        *MS. BUTTERTON:*  I want to be very clear about

12   something, because the Court sort of went on at length --

13        *THE COURT:*  Absolutely.

14        *MS. BUTTERTON:*  That wasn't a dig.  I mean there's

15   lots to talk about in this case, about the interaction of

16   Mr. Holzer's religion in the conduct of in this case.  I want

17   to be very clear, we agree, and I think when we get to the

18   argument portion of this hearing, you know, we have sort of

19   said this in our filings, that, in many ways, Mr. Holzer is

20   more invested in the religion, the religious part, the -- the

21   bolstering that gave him -- the sense of importance that he

22   felt that gave him to other people, than the violence.  We can

23   talk about that further.  I just want to make that clear.  I'm

24   not in any way saying that the conduct wasn't related to his

25   religion, because who could say that.  It's clear throughout --

1    as the Court has laid out, it's clear throughout the facts of

2    this case, the unchangeable facts of this case, that the

3    religion was tied to this conduct.  We concede and agree.

4          I -- I want to make it clear that Mr. Holzer remains

5    as interested in his religious beliefs.  I think over the past

6    18 months he has begun to sort of divorce that from the

7    violence.  The violent interpretations some have in it.

8    Another reason I think this is really important, and I know, I

9    understand what the Court is saying, the irony of us talking

10   about religion in a case.

11         THE COURT:  We have to.

12         MS. BUTTERTON:  I get it, and I acknowledge the irony.

13   But one important piece about this, and I think we are going to

14   get into this further when we talk about future dangerousness,

15   something I'm certain we are going to be talking about.

16         THE COURT:  You got that right.

17         MS. BUTTERTON:  Is some of the principles of

18   deradicalization and Mr. Kraut and I really had the opportunity

19   to research and think about what that looks like, and one

20   important element that has -- a lot of the academic literature

21   talks about in deradicalization, is involvement with more

22   educated or deeply invested people in your religion that can

23   teach that this violence is nonsense.  You know this -- this

24   has been used before, in say people who are deradicalizing

25   Muslim extremists.  When you have someone who says, *I know the*

1   *religious text and I am telling you, you are reading it wrong*,

2   that's a really valuable tool.

3         I'm not saying I have a person here, I don't have an

4   Odinist priest here, you know, to call and say I'm going to

5   teach Mr. Holzer the right way.  I'm just saying I think

6   that -- that is something to consider.

7         THE COURT:  But what in here prohibits that?

8         MS. BUTTERTON:  Well, I think the Court's edits

9   greatly -- it's clear it doesn't.  So to the extent that our

10  interpretation was that it does, the Court has made clear, on

11  this record, that it's not the Court's intent.

12        So I have a couple of just last thoughts about

13  other --

14        THE COURT:  I'm not going to go on forever and then

15  cut you off.  Go ahead.

16        MS. BUTTERTON:  So perhaps it may be appropriate to

17  make it clear, Mr. Holzer shall be permitted to practice -- to

18  practice, study, engage with others in the practice of his

19  religion, whether we want to name it or not, as provided such

20  conduct does not support, advocate, approve of or endorse Adolf

21  Hitler, Nazi ideology, or white supremacy; that's a suggestion.

22  The other suggestion and where I think it becomes ticky-tacky,

23  and the Court has said, it's going to be up to you, now

24  typically, you know the way this works, is probation -- the

25  probation department or the probation officer files a petition

1    to revoke, right, and then we have a hearing about whether or

2    not the violations rise to the level of being a violation or

3    how we are going to move forward.  One proposal to, sort of,

4    avoid that whole process -- or I should say, not avoid it, but

5    avoid it in certain circumstances, would be to add a condition,

6    that says, *Upon reasonable suspicion to believe that Mr. Holzer*

7    *has violated condition seven through ten*.  Again, I want to be

8    clear, those are the ones that, specifically, entail the

9    limitations on his access to materials and associations.  The

10   probation officer shall notify the Court of the conduct alleged

11   to violate the conditions, and provide Mr. Holzer an

12   opportunity to address the conduct, or even find, in the

13   meantime, he can't do it.  You know, if there's a question, the

14   essence of this is, present it to the Court, he can't do it in

15   the meantime and let the Court decide, and not a probation

16   officer decide that this or that is offensive or associated

17   with white supremacy.  I understand the condition doesn't say

18   offensive, but I think you understand what I'm saying.

19          You know, we concede that this should -- we strongly

20   believe this should be decided by the Court, and not by a

21   probation officer, especially when we're dealing with what are,

22   as the Court has laid out, at length, unpopular and frankly to

23   most people offensive, you know, racial positions.  I get it.

24   It's offensive.  I mean there's no question about it.  You

25   know -- I prefer that decision be with the Court --

1          *THE COURT:*  And I understand.

2          *MS. BUTTERTON:*  -- not with the probation officer.

3          *THE COURT:*  I understand that.  Look, the law that's

4     developed with regard to improper delegation to the probation

5     officer, has been where the probation officer approves in

6     advance or it's up to the probation officer to say, you can or

7     can't do this or you can or can't do that, rather than having

8     the Court delineate what is -- what is prohibited and what is

9     not.  Simply leaving it -- one that would be clearly

10    inappropriate is, you shall only visit websites which have been

11    disclosed to the probation officer and approved by the

12    probation officer in advance of visitation, that would be

13    absolutely against where the Circuit is going, in terms of

14    things that may be considered improper delegation is going, has

15    gone, is at.

16          But there's nothing like that here.  The conduct that

17    is prohibited, is prohibited.  The notion that, somehow, if

18    they start to worry or wonder, they have got to now come to me

19    and I'm not doing that.  I mean, first, it is now changing the

20    entire structure of what probation officers are tasked with

21    doing, and then, number two, that almost happens anyway.  I

22    mean, the -- what doesn't get seen by lawyers is, as issues

23    come up that raise concerns, probation officers can and

24    frequently do submit a report on a -- on an offender's conduct,

25    and it's just saying, *Look, there's an issue here.  He is doing*

1  *this.  We're not inclined to do anything.  If you have a*

2  *different position let us know.*

3          I don't know that any such report would be filed, but

4  the notion of building in for Mr. Holzer a whole new approach,

5  where probation doesn't simply respond to the PSR conditions,

6  but instead, says, Is this prohibited?  Is that prohibited?

7  No.

8          I have said what I have said.  It's clear, he can't do

9  what I have said he can't do, and I'm not going to ask them to

10 do a mini, can-we-revoke-him kind of approach.  I'm just not

11 doing it.  I understand what you are saying, but every single

12 defendant could ask for that.  Hey, if you think there's a

13 violation here, can you bring it to the Court first and make

14 the Court say yes or no, in advance of whether or not a

15 petition is filed.  I'm not doing that.

16          In terms of the other thing, which you said, I

17 understand it better, in terms of saying the Court is putting

18 no limitations on the practice of religion unless the religion

19 supports, whatever the wording is.  I don't need to say it.

20 There's nothing in here that is religious limitation, and in

21 fact, the way you say it, there is, because now I'm prohibiting

22 religion, except those religions that fall within this

23 definition.

24          I'm not touching that issue.  I have not prohibited

25 religion.  I'm not going to craft an additional sentence that

```
 1   permits him to exercise a particular religion.  There's nothing
 2   here that says that nonviolent -- which is what you are really
 3   going after -- religious assemblies are inappropriate.  It
 4   doesn't -- it simply doesn't suggest that he could be violated
 5   for things that have nothing to do with Naziism and supremacy,
 6   and -- that etiology.  There simply isn't.  So why do I need to
 7   say I'm not prohibited something that I'm not prohibiting?  Why
 8   shouldn't -- if I start down that road, do I need to say that
 9   he can practice Catholicism?  Do I need to say that he can
10   practice Buddhism?  Do I need to say that he can practice, I
11   don't know, witchcraft?  I just am not going down that road.
12   There is no religious prohibition here.  There isn't.  There
13   are prohibitions on types of associations, and the two do not
14   necessarily go together to the point where the practice of the
15   religion, as you have described it to me, is in any way
16   implicated by anything that I have written here.
17           So I get it, I understand it, I overrule the
18   objections.
19           MS. BUTTERTON:  Then I don't have anything further,
20   Your Honor, on that issue.
21           THE COURT:  All right.  Let's -- I think that's all of
22   the objections that have been submitted.  Let's talk about a
23   new topic.  We can talk about this a little bit, and then after
24   lunch get to the core, which is, all right, what do you want,
25   what do you want, what do we got to say and that is going to
```

1    take some further fleshing out of these issues that I have

2    alluded to, which on one hand is dangerousness and on the other

3    hand is disability, if I can use those as the tent poles for

4    each side's position and it's not entirely correct as to either

5    side.

6            The thing I want to talk about is these other cases,

7    because I may have inadvertently led you to believe something

8    that's not what I believe.  Obviously, I have asked the

9    Sentencing Commission, give me some sense of how common this

10   circumstance that I see before me is.  And I got nothing.  And

11   then I expanded out and looked at and went through the dockets

12   on these -- on roughly 66, 67, I don't remember what the count

13   is, number of cases, that I disclosed and said here I have

14   looked at all of these.  My notion or suggestion that I have

15   looked at those should not ever be interpreted as anything

16   beyond my belief that gathering widespread information is

17   valuable, and considering what other people have -- how they've

18   approached things is valuable.  It doesn't mean that I'm

19   looking for a case that I look to and go, Oh, there's that

20   case, they did this, so now I should do that.  I don't believe

21   that that's ever right, because each case is going to be --

22   each individual case is going to be -- have marked differences,

23   and my view of these 60, whatever the heck number of cases it

24   is, is essentially this, all right, I have looked at a whole

25   bunch of cases and this case stands on its own, and is

1   generally unlike many others.

2          The government has said, Hey, we found three cases;

3   one of which I had already looked at, and those Courts gave

4   this kind of a sentence in that case, and so you should give

5   this kind of a sentence, basically X minus Y in this case.

6          The defendant has said, Hey, we've look at these 66

7   cases that you have looked at and hey the average sentence is X

8   in this case, and so you should give a sentence of X in our

9   case.

10          I have never intended to and will not be bound to give

11   a sentence in this case that is predicated on what another

12   Judge did or didn't do.  They have their cases, their cases

13   have their facts, they have their presentence reports, I have

14   access to none of it.  And some of it, I might not even agree

15   with, just as I guarantee you there are many judges who will

16   not agree with some things that I do.

17          I think it's all very useful information, and I think

18   you are all well within your rights to say, Look, we argue by

19   analogy with those cases.  But it will not be the case that

20   anything I ever do in this case is going to be because those

21   Judges over there did this and therefore this case is worth,

22   you know, the square root of two, times whatever.  I'm not

23   going to do it that way.  It's just not what I think is

24   appropriate.

25          My take from all of this attempts to get information

1    from the Sentencing Commission and my docket reviews of various

2    cases is essentially that arson, which is the driver here,

3    because of the terrorism enhancement, slash commentary, that

4    that -- those charges are typically of a sort that's different

5    than what we have here.  Typically, meaning, the most common

6    scenarios involve men who believe that they are God's gift to

7    women and who believe that the appropriate response when being

8    told I don't want you anymore is to burn down your house.

9    There are also, typically, cases where there's an insurance

10   scam of one sort or another that's going on.

11           Thirdly, there are employment disputes, where there's

12   a, kind of, a personalized revenge motive that's going on.  But

13   the case before me is not typical, and I have nothing, from the

14   Sentencing Commission, which says that it is, and I have

15   nothing from my review of 65, 66, whatever you want to call it

16   cases, that says that it is, and I closed the book and say,

17   It's not typical, fine.  I have extracted what guidance I can

18   from reviewing these matters, but make no mistake, I am not

19   going to approach this, as some kind of a mathematical formula,

20   where it's well the average number of cases, or the average

21   sentence given in this case, that case, the other case is X, so

22   therefore I observe the average, or the average minus two, or

23   as the government says, *Well, over here in these particular*

24   *cases those judges gave X to completed offenses and therefore,*

25   *the sentence that you give should be lower than that*.  I, in a

1    general sense, accept the notion that attempts should be lower

2    than completed offenses, particularly where there's violence

3    involved, and there's no violent impact on an individual,

4    although I won't go so far as to say that's what happened here,

5    because violence is more than physical violence, but I'm just

6    not going to approach it that way, even though you are all very

7    much legitimately entitled to present your arguments to me,

8    premised on your interpretation or ability to ferret out cases

9    that you think are relevant.

10         Having said all of that, I am previewing, I suppose, a

11   portion of sentencing argument, but I'm going to start with the

12   government.  You tell me what it is that you -- you have given

13   me three cases, *Matthews* out of Louisiana, you know the others,

14   I just don't have them off the top of my head.

15         *MS. MARTINEZ:  Perez*, out of the Southern District of

16   Texas, *Matthews*, as you said, out of the Western District of

17   Louisiana, and *Allen et al*, out of the District of Kansas.

18         *THE COURT:*  I just, to some extent, the way I read

19   your argument to me, is, okay this is -- this is where you

20   start, and then since these were accurate, I should go down.

21   My reaction, and I am just going to tell you this, at the

22   change of plea was, Huh, the government is agreeing to put a

23   ceiling on this.  I don't know whether I will or I won't.

24   Maybe I will, maybe I won't.  And I suppose that's my way of

25   saying, I don't necessarily accept or agree with the fact that

1   the sentences in those cases were, quote, right.  I'm not

2   saying they were wrong, I'm just saying, those are individual

3   judges in individual cases and it is weak, intellectually, to

4   say, Okay, rather than work this out myself, that Judge said

5   this, I'm going to embrace that Judge's decision, and that

6   stands for the proposition that completed offense is equal to X

7   value.  I may, if I had that case, have valued it very

8   differently.  Is it information that's valuable to me?  Yes.

9   But I'm not going to go down that road, and so while I don't

10  fault either one of you for pitching it, I'm not going to do it

11  that way.

12          Having said that, I don't want to preclude you.  So

13  recognizing that it's part of a bigger argument, what is it

14  that you want me to take, or if you would, make your pitch to

15  me, now, based on other cases?

16      *MS. MARTINEZ:*  Your Honor, the purpose of bringing

17  those three cases to the Court's attention is, recognizing that

18  the Court has an obligation in fashioning a fair and

19  appropriate sentence, to consider all of the 3553(a) factors,

20  one of which is to avoid unwarranted sentencing disparities

21  among defendants with similar records, who have been found

22  guilty of similar conduct.

23          In the government's review of the cases that

24  Your Honor also reviewed, and then the government's review of

25  other cases that the government could find, the government

1    agrees with Your Honor that this is an unusual case.  That's

2    precisely the reason, I think part of the reason that the

3    government has moved for a departure or variance.  This case is

4    not like other cases.  This case is not like other arson cases.

5          However, in light of the 3553(a) factors, the

6    government felt that it was appropriate to do its best to find

7    cases that come the closest to defendants with similar records

8    who have been found guilty of similar conduct.  The government

9    does not believe that someone who burns down his

10   ex-girlfriend's house, out of personal animus, is similar

11   conduct to what this defendant did.  The government doesn't

12   believe that insurance disputes or employment disputes, the

13   vast majority of the cases that the Court commented on are

14   similar conduct.

15         These three cases were the government's best attempt

16   to provide Your Honor with three examples of somewhat similar

17   conduct.  More similar conduct than the 60-plus cases that were

18   on that list, or the majority of the 60 cases.  That's the

19   extent of the government's argument, Your Honor.

20         There are other 3553(a) factors.  There's nothing in

21   the statute or the case law that says Your Honor has to give

22   all of those factors the same weight.  There are others that

23   the government thinks are far more important than this

24   particular factor, but the Court has an obligation and the

25   government saw an obligation to highlight its best attempt to

1    find those that are most closely related.  Were it not for the

2    obligation to consider that factor, the government probably

3    would not have raised these cases, because I agree, Your Honor,

4    can't just look at one other individual, and say, 25 years,

5    okay this guy gets this.

6            However, it's the other factors that the government

7    has used in analyzing both its original agreement to not

8    recommend more than 20 years, and that was written to allow us

9    to recommend less, and after considering everything, of the

10   information that was available to us at the time of the Plea

11   Agreement, and all of the information that was made available

12   since then, the government has come to the conclusion that the

13   government's recommendation that a fair and appropriate and

14   just sentence is 20 years and that's what the government has

15   recommended.  A very small part of that has to do with this

16   attempt to look at these other cases.

17           *THE COURT:*  And to be clear, I'm not critical of the

18   effort.  I just want to be very clear that it's not going to be

19   a scenario where I look at some other Judge's opinion as right

20   or wrong, and say, if that, then this.  That's just simply --

21   it's just wrong.  It is not wrong to be broadly informed.  It

22   is wrong to consider the approaches that other jurists have

23   taken, the things that they have thought about, because they

24   may think about something that I would not, and so I don't have

25   any quarrel with anything that anybody has done.  I just want

1    to be clear that it is not going to be, Well, these cases set

2    the ceiling, and therefore, it should be, I don't know, X off

3    of that ceiling.  Nor am I going to say, Well, the average

4    number of cases is -- your average number of sentence -- or

5    years given is X, and therefore, you should give X, because

6    that's avoiding unwarranted disparity.  It might be.  But these

7    cases, the bulk of the 66 that I found, I mean it's all over

8    the map, and it really, I don't think, given that there are

9    very few cases that factually line up in the ballpark of this

10   one, and very few cases that involve the statutes that we're

11   dealing with, that line up, factually, that I should be

12   particularly guided by any of it.  I have looked at it, I have

13   put the spade in the dirt, and I have tried to dig and dig and

14   dig, and what I ended up doing was, and what I ended up

15   realizing was that I was digging a hole that went nowhere.

16        So, I let Ms. Martinez speak to that.  Defense side, I

17   don't know who wants to speak to that.  There you go.

18   Mr. Kraut, please.  Again, just on that limited issue.

19        *MR. KRAUT:*  Yes, Your Honor.  We plan to ask the Court

20   to use these comparison cases for really two reasons.  First,

21   it's our position that even in the absence of a closer match or

22   a closer matching set of cases, the Court is still obligated to

23   consider 18 U.S.C. 3553(a)(6) and essentially what the Court

24   has done, we believe, is the right thing to do, to look for the

25   cases that are, at least, somewhat similar and to identify from

1    those cases what information can be helpful and can inform that

2    that particular sentencing factor.

3         So even in the absence of a closer match or a closer

4    matching set, we believe that factor still requires some

5    analysis of some of the other cases, and it seem like that has

6    happened and will happen here.

7         The second reason that we will argue -- or the second

8    way we will rely on these cases is that even if there aren't

9    any cases that perfectly track the facts of this case, which,

10   of course, we all agree, it's an unusual case, there are

11   different components of these other cases that are similar, and

12   so especially in identifying the culpability of Mr. Holzer,

13   based on his intent versus his conduct, which are really two

14   separate aspects this was case, some of these other cases can

15   be quite helpful.  There are cases that have defendants with

16   similar intent, and then there are cases that have defendants

17   with somewhat similar conduct, maybe there's not one that has

18   everything exactly the same, but we also plan to make some

19   brief argument, with respect to those particular aspects of

20   these comparison cases.

21        THE COURT:  That's fine.  I guess what I'm saying to

22   you is, look, if it would be helpful to do it now, do it now,

23   but if you want to hold it, because it's melon balling out

24   something that's part of a broader message than that, I'm fine

25   with that.

1          Look, this is what I think this comes down, I'm going

2     to tell you one more thing about my disagreement with the

3     probation department, and that's just for your information, and

4     you can have it and do with it whatever you want to.

5          After lunch, I want to deal with, first, the

6     objections to the use of the terrorism commentary.  I don't

7     know whether we are calling that ... a legal challenge, an

8     objection, whatever you want to call it.  We're going to deal

9     with that first, and then I think that that is the last matter

10    that needs to be, quote, resolved, by way -- in terms of how

11    I'm looking at the -- the information that's been provided to

12    me, and then we will get right into, all right, what do you

13    want?

14         Let me tell you now that the difference I have with

15    the probation department is this, I don't quarrel with anything

16    that they've done, by way of recommendation, in terms of, as I

17    said, they get to recommend.  And I am not suggest -- well,

18    what Ms. Means did was look at the terrorism enhancement, say,

19    all right, if that's applied, it takes us up to, I could go as

20    high as 324 to 405 months.

21         She believed that it was too harsh, and that there was

22    something that was unusual in the terrorism enhancement and

23    that is that everybody begins at -- not begins.  Everybody is

24    treated as if they were a Criminal History Category VI.  So

25    what she did was she took that line of the chart, which is 36,

1   and said, Well, what I'm going to do is I'm going to pull

2   down -- I'm going to go down that chart and look to the

3   Criminal History Category I, which is what Mr. Holzer is, and

4   that's what I'm going to use to inform myself as to what I

5   think the appropriate sentence is, because that feels closer to

6   right.

7            Again, these are not her words.  These are my

8   interpretations of her words, but I'm not seeing her

9   disagreeing with that.

10           My difficulty or disagreement is -- with that

11  approach, not necessarily with the landing spot, but with the

12  approach is this, it fundamentally says that there's something

13  wrong with assuming that there are some crimes that are so

14  serious that they should be treated as top-of-the-chart-type

15  crimes, and this -- the terrorism enhancement may be one that

16  puts us there, but there are crimes, for example, homicide, and

17  I am not saying this is a homicide case, it's offense level 43,

18  doesn't matter.  Guess what?  You're Criminal History Category

19  I, it's life; Criminal History Category III, it's life;

20  Criminal History Category VI, it's life.  There are some crimes

21  where the landing spot on the guideline is that it is so

22  serious that there is not a distinction between those with

23  lesser records, than those with greater records.

24           In other words, they are so serious that the -- the

25  significance of the crime overrides what would otherwise be

1    called the criminal-history determination, and we're not going

2    to let these things get watered down, in that vein.

3           Now, homicide is one of them, but frankly, there's lot

4    of places -- not a lot -- there are places on the chart where

5    it makes no difference.  Offense level 43, offense level 42,

6    frankly, at various points in ways -- until you get up to

7    offense level 37, there are at least portions of the chart

8    where the criminal history distinction gets erased.

9           I think this is a type of crime where it is legitimate

10   to say, it is so serious, it is so significant that I'm not

11   going to analyze it by reference to the guideline implication

12   of not giving you a break or reduction in exposure, based on

13   your criminal history category.  I don't think that a people or

14   an ethnicity that is attacked is one of those crimes where you

15   should get to do it and have the sentence be driven by whether

16   or not you had, I don't know, some marijuana possession charge

17   that you got two points for three years ago.

18          There are some crimes that are vulgar enough, that are

19   dangerous enough, that are serious enough that I think it is

20   appropriate for the Sentencing Commission to say, No, we're not

21   going to be influenced by criminal history on this.  We're

22   going to treat everyone as being in the same pot, and come up

23   with a single guideline or single guideline approach.

24          Having said that, I'm not disagreeing with anything

25   more than the fact that I don't necessarily go along with the

 1    approach that probation used, because I, fundamentally, view

 2    this as something that does not -- that is not appropriate to

 3    that approach, that speaks, not at all, to the landing spot or

 4    to anything else.  It's just simply, no, that's not the

 5    approach I'm going to take in resolving this, because I don't

 6    think that it is always the case that it is -- it is unusual, I

 7    give you that, but I don't think it is always the case that it

 8    is wrong to say that there's some error or mistake, because

 9    there's not gradation of guideline recommendations based on

10    criminal history or criminal record.

11         There are some things where those gradations are

12    trumped by the seriousness of the crime, and attempting to blow

13    up a synagogue is one of those for me, and that's all I will

14    leave you.

15         We will pick it up at 1:15, and we will see where we

16    go.  All right.  Thank you.

17         *THE COURTROOM DEPUTY:*  Court is in recess.

18      (Recess at 12:03 p.m.)

19      (In open court at 1:16 p.m.)

20         *THE COURT:*  Please be seated.  All right.  Objections

21    to the Government's Motion For Upward Departure.  Whomever?

22    Okay.

23         *MS. BUTTERTON:*  Your Honor, we specifically objected

24    in **Document 50**, as to the Government's Motion For Upward

25    Departure, specifically, and narrowly -- can you hear me?

1            THE COURT:  I can.  I can.

2            MS. BUTTERTON:  Specifically and narrowly as to the

3    commentary up to 3A1.4.  And listen, this has been briefed

4    extensively, so I will not spend too much time on it, but the

5    basic points that I would like to make are these.  Congress

6    told the Sentencing Commission, make this enhancement, and then

7    later change this enhancement to only apply to federal crimes

8    of terrorism.  Okay.  That's -- that's clear from the

9    guideline.  What this guideline says is, *Okay.  Congress told*

10   *us that.  We don't care, under specific circumstances, use the*

11   *tenets of this guideline anyway*, and I will say probably in a

12   wildly unnecessary endeavor, I went through every guideline

13   departure in the index, which, you know --

14           THE COURT:  I did too.

15           MS. BUTTERTON:  -- is wildly unnecessary, probably,

16   but.

17           THE COURT:  I agree with you.

18           MS. BUTTERTON:  And made a spreadsheet, and I cannot

19   find another guideline that has these three specific

20   characteristics, another commentary departure.  One, that

21   purports to apply when the parent's guideline which it is

22   appended, does not; two, does not refer to independent,

23   notably, congressionally approved departure in Chapter 5; and C

24   is tied specifically to the -- I don't want to say relief, but

25   tied to the suggestion of the parent guideline.

1         I want to be very clear this Court has plenty of tools

2    in its sentencing tool box, if you will pardon the metaphor.

3         THE COURT:  I make metaphors all the time.  Yours tend

4    to be better than mine, so I'm fine with it.

5         MS. BUTTERTON:  This one doesn't invoke a barnyard

6    animal.  So it's not quite the same as the ones this Court --

7         THE COURT:  All right.  Mine can be a little randy.  I

8    will give you that.

9         MS. BUTTERTON:  We are not saying that this Court

10   can't depart under 5K2.0.  The Court can, case law is clear.

11   We are not saying that the Court can't vary.  Not only can the

12   Court vary, we're suggesting it.  We're saying this specific

13   tool is not one that the Court should use, because the

14   Sentencing Commission, and look, the government agrees with the

15   Sentencing Commission, that this is appropriate, that doesn't

16   you know -- that really doesn't have any moment, that the

17   Sentencing Commission wants this departure, that Congress told

18   them only applies to X.  They want it to apply to Y.  If

19   that -- if they wanted to do that, why not make another

20   guideline or expand the guideline?  They certainly know how to

21   do that and have done that.

22        Now listen, one thing that I can tell you in the wild

23   exercise of going through the whole index, is that the

24   guideline book is, in some ways, a mess, because a lot of it

25   was written pre-*Booker*, right?  So a lot of the language that

1    we're talking about was written at a time when departures were

2    the only tool for this Court to go outside of prescribed

3    guideline range.  So in that way, the guidelines are,

4    sometimes, not that helpful on this issue, because it presumes,

5    in a lot of ways, that if the Court wants to go out of the

6    guideline range, it has to do it in a way that's prescribed in

7    the guideline book, and obviously that's not the case anymore.

8    I don't want the job of rewriting the guideline manual to, you

9    know, fully change its language to comport with *Booker*.

10         THE COURT:  Apparently no one does.  We haven't had a

11   quorum in years of commissioners, but go ahead.

12         MS. BUTTERTON:  Well, I was just mentioning that my

13   guideline book looks like it's been run over by a car and

14   chewed by a dog, because I have had it since it came out in, I

15   think, November of 2018.

16         The point is, is this departure is unique, and for the

17   reasons that we outlined in our pleadings, we think the

18   Sentencing Commission has gone beyond what they are prescribed

19   to do by statute.  Congress told them, *We want you to create*

20   *this enhancement for federal crimes of terrorism*, and they did

21   it.  Then they added this note, post-911, we can all, kind of,

22   recognize the timing of it, right, that, you know, if -- if it

23   doesn't meet the definition, Congress told us this only applies

24   to this definition, but if it doesn't meet this definition and

25   has a slight -- a legal definition, you should still use the

1  force anyway, because these crimes are bad.

2          I don't -- I don't undermine the argument that these

3  types of crimes are bad.  I'm saying this tool should not be

4  the one used by this Court to go above the guideline range in

5  this case.

6          THE COURT:  Let me ask you this question, because --

7  well, let me just ask it.  Are you saying that the analysis is

8  somehow radioactive and can't be used?

9          MS. BUTTERTON:  I think that this Court-

10         THE COURT:  Are you tracking what I'm asking you?

11         MS. BUTTERTON:  Yes.

12         THE COURT:  Ultimately, there's analysis there,

13  whether it belongs there, shouldn't be there, whatever, if I

14  were to agree that I -- that it's -- that I won't, quote, apply

15  it as written, are you going to interpret that as somehow me

16  saying that I could not independently say this is analogous to

17  the federal crime of terrorism, and I am going to vary on that

18  basis.

19         MS. BUTTERTON:  I think the Court can do that.  And

20  you know, the Government, sort of, mentioned that in their

21  pleading, and for once I agree with them.  You know, there's a

22  distinction between using the factors outlined and applying

23  this departure based on this commentary, and I get it,

24  especially to a lay person.  They are listening going, wait,

25  you can consider this in a different context --

1          THE COURT:  No.  People that are listening, lay

2     people, are saying we're nuts.  We are having a discussion that

3     nobody cares about.

4          MS. BUTTERTON:  Agreed.  And much of the guideline is

5     like that.  Right.  I mean many times the government, or my

6     office or other attorneys are arguing about what's the

7     definition of a vulnerable victim.  We all know what the word

8     vulnerable means.  We know what the word victim means, but it

9     has a specific legal definition here.  We think that the

10    application of this commentary in this -- specifically, for

11    this guideline, as a basis for depart, would be improper,

12    acknowledging that the Court can use the same reasons, to

13    depart under 5K2.0 or vary under the statute.  I acknowledge

14    those tools are available to the Court.  We simply think it's

15    inappropriate to apply this specific departure in the

16    commentary for the sentencing statement.

17         THE COURT:  Ms. Martinez.

18         MS. MARTINEZ:  Your Honor, again, this has been

19    briefed, extensively, by both sides.  I will try to keep this

20    brief, but mainly, the government disagrees, not surprising,

21    with defense, and takes the position that the Court absolutely

22    may read this commentary and may do what the Court will with

23    it.  The commentary -- the type of commentary that it is, is

24    actually outlined in the sentencing guidelines, themselves.

25         In 1B1.7, sentencing guidelines distinguish between

types of commentary.  The first type is that which interprets

or explains a guideline or how it is to be applied.  We're not

in that category.  We're in the second category, which is

commentary that may suggest circumstances which in the view of

the Commission may warrant departure from the guidelines, that

is the type of commentary that we have here.

We have commentary from the Sentencing Commission that

acknowledges the fact that the Court can depart in a case that

it finds to be different than usual cases, which I think we've

all concluded this is.  The Court can depart for essentially

any reason other than those that are explicitly excluded, which

don't relate to this case, and don't relate to any of the

arguments either of the parties are making.

Here, the Commission has said here is a type of

circumstance under which the Court may consider departing, and

has analogized to the terrorism enhancement in terms of giving

some guideline about the departure, but notably what the

commentary doesn't do, is it doesn't say, in a circumstance

where terrorism enhancement doesn't apply, apply it anyway,

which would cause the calculation of the sentencing guidelines

to go to a certain range which would cause the criminal history

to go to a certain range.  It doesn't say that the departure

shall be anything.  It doesn't say that the departure shall be

equivalent to the terrorism enhancement.  The only thing that

it says, in terms of departure, is that it shall not be greater

1   than the terrorism enhancement, which, frankly, is quite great.

2   It's a guideline -- I mean, it's a commentary, and it is a

3   suggestion and it is policy.  It's has been analogized as a

4   policy statement explicitly by the Sentencing Commission itself

5   and by the sentencing guidelines, and the Court should look to

6   that under any view of agency deference.

7        Defense counsel's brief wishes Court to rely on *Kaiser*

8   in analogizing under any view of any kind of agency deference,

9   the Sentencing Commission who, which, undoubtedly, has

10  expertise suggesting a particular circumstance, under which the

11  Court should consider things, certain things and perhaps

12  depart, that's a policy statement.  That comes from a body that

13  has expertise and that's something, one thing, that the Court

14  may consider.  There's nothing in the defendant's brief that

15  prohibits, there's nothing in the case law that prohibits the

16  Court from considering that commentary, and the government's

17  position is that the Court should consider it.  Government's

18  position is also that the Court should consider all of the

19  information before it, all of the 3553(a) factors, the ability

20  of the Court to depart for a number of reasons, including under

21  other provisions, within the sentencing guidelines.

22       Court can depart for any reason that it wishes, as

23  long as it's not explicitly prohibited, and the Court may vary,

24  based on its analysis of the 3553(a) factors.  All of these

25  facts, frankly, they add up to the same argument.  The

1    government's argument about why this commentary applies, and

2    why it would be appropriate to recognize this case, this act of

3    domestic terrorism as an appropriate case in which to depart

4    and to consider the commentary to the terrorism enhancement in

5    applying that departure, all of those facts are the same facts

6    that are behind the government's argument about why the Court

7    should otherwise depart, and why the Court, in analyzing the

8    3553(a) factors, should vary significantly from the guidelines

9    in this case.

10           Government's position, essentially, Your Honor, is

11    that you may and you should consider it, but it's not the end

12    of the story and it's not the end of the argument.

13           THE COURT:  Here is where I come out.  I suppose what

14    I'm saying is, ultimately, the ruling with regard to the

15    objection.  I'm going to overrule the objection on its legal

16    merit, but I'm not going to embrace the commentary as -- and

17    again this language meant more in a pre-*Booker* universe, as a,

18    quote, endorsed or -- endorsed is as good of a word as any,

19    endorsed departure.  I think that much of this, the *Kaiser*

20    stuff that's here, I don't need to go through this.  The notion

21    that there's -- I should disregard it, because it's expanding

22    an otherwise nonambiguous provision of the guidelines, that has

23    nothing to do with this.  It's not that kind of commentary.

24           So, to that extent, I just dispense with that off the

25    top.  The second notion, and I -- I am reluctant to call it

1    policy or equity, or -- but, essentially, what I'm being told

2    is this, this commentary, this suggestion is odd and unusual,

3    and it is.

4          I went down the same rabbit holes as Ms. Butterton, in

5    terms of trying to see how many times the commentary contains

6    suggestions or -- that's a poor choice of words.  How many

7    times the commentary makes reference to the Court may depart or

8    otherwise sets a departure provision, whether it be up or down,

9    and I want to say the number was in the high 20s.  One of the

10   good things you can do, is don't try and do it through the

11   book.  Go online, get the PDF then start word searching.  But

12   what's odd about it is this, the terrorism enhancement that

13   we're talking about is 3A1.4.  It is a guideline provision that

14   applies to all cases.  Generally, if there are guideline

15   provisions that apply to all cases, I'm going to look to see it

16   in Chapter 3.  If there are, generally, guidelines -- excuse

17   me -- departures that apply to all cases.  I'm going to

18   generally find those in Chapter 5.  This is in neither place,

19   and yet it is a departure that is saying that -- that's

20   equating a departure, and a Chapter 3 enhancement.  I don't

21   think it's legally impermissible.  I don't think it's some

22   violation of *Kaiser* or separation of powers or anything else.

23         I think 1B1.7 expressly says, and that is a guideline,

24   and Congress has seen it and it's been there forever, that

25   commentary can suggest departures, and that's what this does,

1    and so I'm not viewing it as some kind of unauthorized or

2    beyond the scope of the statute, for -- for the Commission to

3    say, Hey, we think in terms of a departure that you should

4    do -- get -- that you may do X.  I shouldn't say should do X,

5    because it doesn't say should do X.  That you may do X.  It is

6    the only instance in the guidelines where I can find you have

7    that kind of a suggestion, with respect to a guideline, where

8    it's in commentary, it does not expand the guideline proper.

9         For example, in child porn more than 600 images.  They

10   give you, I don't know, five points, six points, whatever it

11   is, for that.  They say if it's substantially more than that an

12   adjustment may be warranted, and what they're saying the limits

13   of our analysis stopped here, but if you continue down this

14   road there may be circumstances where's you want to go higher.

15   That's not what this is.  In almost every other instance, it is

16   something like that, but I don't see anything here, that

17   creates a constitutional issue or anything else.  I do think

18   that it is odd, and it is odd because it is, essentially,

19   saying, *Do by departure that which we did not do by guideline*

20   and, *Oh, by the way, consider it an approved departure from the*

21   *Commission*, and the whole thing feels like it's cutting

22   corners.

23        Having said that, I don't think the analysis is

24   radioactive because did I this.  What I'm saying is that

25   ultimately I'm not going to stand here and say I am applying a

```
 1    Commission-endorsed guideline, or a Commission-endorsed
 2    departure.  I'm not going to do that.  But the analysis, I
 3    think, is still in play, and the analysis is that where the
 4    conduct is, in every way, the same as terrorism, as explained
 5    in the guideline, and for which an upward adjustment is
 6    available, but one.  The difference being that the target of
 7    the terrorism is a group of citizens, as oppose to the
 8    government itself, then, you can, by analogy say, if -- if a
 9    sentence is appropriate -- if the guideline range suggested or
10    recommended by the guidelines, in the case of the government,
11    terrorism is X, then the analogy is that you can also conclude
12    that there is a basis for saying that the privately focused
13    terrorism is also X.  I don't think the analysis or the
14    reference to that 3A1.4, by analysis, is precluded, but I'm not
15    going to hide behind the notion that it's in here, and
16    therefore I am imposing a Commission-sponsored adjustment or
17    commission-approved adjustment.  These things -- these words
18    have less meaning now, than they did back when the guidelines
19    were mandatory.  But I will accept the request of me, but not
20    the legal analysis.  I don't think that it is, I don't know,
21    what you call ultras vires or unconstitutional because it is
22    separation of powers.  It is something that the guidelines,
23    themselves, provide for.  They don't limit it to say that the
24    only policy statements that you can make are those that expand
25    or contract and otherwise congressionally approved guideline,
```

1  but at the same time -- and so I'm not going to find a legal

2  impediment to doing it.

3         I do think that it is an odd corner cutting, that, to

4  the extent that the Commission wants to make a guideline for

5  domestic terrorism, they should do it, and if they want to make

6  broad-based upward departures, they should do that too, and put

7  it in Chapter 5, and just kind of saying that a departure

8  tracks a Chapter 3 guideline, and that this is all endorsed by

9  us, it -- it is unique or almost unique within the guideline

10  manual, and that leaves me a little bit uncomfortable with

11  saying, *Well, it's approved by the Commission, ergo, it can be*

12  *done; and ergo, I'm going do it.*  I'm not going to approach it

13  that way.

14         Having said that, I will tell you now, just to save

15  everybody the agony, I'm not going to 5K2.0 either.  Again, is

16  this different?  Yes.  Is this heartland?  Yes.  But there is

17  this enormous body of case law that has built up around 5K2.0,

18  with things like establishing on the record, and in the

19  statement of reasons, the specific reasons that you're

20  departing and finding, that it is outside the heartland, there

21  are trap words, if you would, built into things.

22         For example, in terms of not adequately taken into

23  account.  Well if the circumstances are not adequately taken

24  into account, I can only depart to the extent that those

25  circumstances are not adequately taken into account, and now

1    I'm down a rathole talking about hate, as in a hate-crime

2    motivation, beginning of Chapter 3, versus hate built into a

3    guideline, upward departure.  I'm not going there.

4            And additionally, to extent that it says that it's a

5    degree not adequately taken into account, of course, 5K 2.0

6    says things like, It's expected that departures, based on

7    unidentified circumstances, will occur rarely and only in

8    exceptional circumstances.  And now I'm trying to argue that

9    this is an exceptional case, as opposed one that is outside of

10   the heartland.

11           All of it is legal gibberish to ordinary citizens.  It

12   is not unimportant in the law.  It is the law.  But ultimately,

13   I think that in this case the better approach, having looked at

14   potential departures, as I'm required to do, before reaching

15   the realm of variance, the better approach is to not

16   characterize what is present in this case as

17   commission-approved basis for upward departure, and look at the

18   entirety of it within the realm of variance, and that's what I

19   intend to do.

20           So I think that's the only legal or quasi-legal

21   argument left.  Let me hear from the government.  What is it

22   that you are looking for and why?  And I will tell you this,

23   Ms. Martinez, I'm going to give you one, then I'm going to give

24   the defense table, I'm not sure how you want to do this, one,

25   because this is complicated, I'm going to give you -- a second

1   round, and I am going to give the defendant a second round, and

2   I don't care whether it's Ms. Butterton does one and, you know,

3   split close, however you want to view it or if you both want to

4   talk.  I don't care, that's up to you.  But I'm going to give

5   you each a -- more than one opportunity to tell me things.

6          Ms. Martinez, please.

7          *MS. MARTINEZ:*  Your Honor, November 1st of 2019, the

8   defendant, Richard Holzer, walked into a motel room with

9   someone he believed to be an accomplice of his and a fellow

10  white supremacist.  He walked in to meet two other individuals,

11  whom he believed to be accomplices and fellow white

12  supremacists.

13         He walked into that motel room fully intending, five

14  hours later, to bomb Temple Emanuel Synagogue, in Pueblo,

15  Colorado, and he intended to do that for the explicit purpose

16  of sending a message of terror to the Jewish community in

17  Pueblo, and beyond.  A message that Jews should get out of

18  Pueblo or they would die; that was what he intended to do;

19  that's what he thought he was going to do; and frankly,

20  Your Honor, it is our contention that that's exactly what he

21  would have done, if the facts were as he believed them;

22  meaning, if those three other individuals in that motel that

23  night, with him, had, in fact, been white supremacists, who

24  believed in his cause, who believed in his plan, and who had

25  agreed to help him, and if those explosives had been not inert

1   explosives, provided by the government, but real explosives

2   then approximately five hours later there would have been an

3   explosion or multiple explosions at Temple Emmanuel Synagogue

4   in Pueblo, Colorado.  That temple would have been damaged; that

5   message would have been sent; the community would have been

6   terrorized.

7        Now make no mistake, the message was sent, the

8   community was terrorized, but fortunately the synagogue was not

9   bombed.  Now, it's the government's contention that the only

10  reason that that is true is because of the defendant,

11  fortunately, for public safety, fortunately for all of us, made

12  friends with the wrong people.

13       These acts, this plan that the defendant made,

14  followed years of him pursuing this hateful and extremist

15  ideology.  It followed years of him seeking out other

16  like-minded individuals, both online and in person.  It

17  followed years of him endorsing hate and of endorsing violence.

18       Now it is certainly true that the defendant has said a

19  great number of things that are not true or that are probably

20  not true or that seem to be unlikely to be true, but make no

21  mistake, he says many things that are true, and he has done

22  many things that he said he has done, even though he has not

23  done things that he has said.

24       For example, he told the online employee, who

25  initially contacted him, that he urinated on the door of a

 1    synagogue, in California.  We have a video of it.  He sent her

 2    a video.  That's the kind of thing that had he said it without

 3    any proof, we might have talked about in the PSR objections, as

 4    Might be one of the things that he didn't do or that he is

 5    exaggerating or that he believes he did and that he didn't, in

 6    fact, do.  I have seen the video, Your Honor, it's a Jewish

 7    Community Center and he pees on it.

 8         The other thing the defendant said that he did was he

 9    marched with the KKK flag.  Yep, he did that too.  We know that

10    because he was seen doing it; marching down the streets of

11    California with a KKK flag.

12         This defendant has endorsed hate, he has endorsed

13    violence, he has endorsed extremist white supremacy ideology

14    for years.  He has tattooed his body in it.  He has collected

15    symbols of it.  He has spewed hate vitriol online and in

16    person.

17         Now, this defendant, he was born to circumstances

18    beyond his control, and there's no doubt that they affected

19    him.  There's no doubt, as I know defense will argue, that the

20    defendant was not individually, on his own, left to his own

21    devices with no assistance, whatsoever.

22         He wasn't capable of building complex explosives and

23    going to the synagogue and destroying the entire building.  And

24    I say, So what.  What he was capable of was planning to do that

25    and finding people to help him.  This was not some individual

1    who was sitting in some cabin in the middle of the woods

2    plotting up a plot that he couldn't carry out on his own.

3           Lone-wolf actors are not the only domestic terrorism

4    threat in this country.  All you have to do is open the news or

5    open a history book to see how powerfully a couple white

6    supremacists, a group of white supremacists, a mob of white

7    supremacists can disrupt our society.  How violent and

8    disruptive that can be.

9           This defendant knew that.  This defendant knew that

10   his power was in interacting with others.  He recruited others

11   into his ideology.  He had this student we talked about this

12   morning, whom he met online.  He had an active online life, but

13   he wasn't one of those guys who lived in mom's basement, was

14   only online and never did anything in real life.  Not at all.

15   His online life bled into his real life.  So he meets this guy

16   online, and then they start meeting in real life and he starts

17   training him.

18           *THE COURT:*  Example.

19           *MS. MARTINEZ:*  This is the individual that we used the

20   first name of Brandon, Your Honor.

21           *THE COURT:*  No, no, no.  I know exactly who that

22   person is.  In terms of bleeding into other real-world

23   examples.  It went beyond Brandon.

24           *MS. MARTINEZ:*  Absolutely, Your Honor.

25           *THE COURT:*  Tell me about, Planer?

1          *THE GOVERNMENT:*  Who, Your Honor?

2          *MS. MARTINEZ:*  Planer.

3          *THE COURT:*  Plainer.  Sorry.  Go ahead.

4          *MS. MARTINEZ:*  Sure, Your Honor.  William Planer, is

5   an individual who is a known white supremacist, a convicted

6   felon.  He is someone you can find news articles on, if one

7   were to do an Internet search on that.  He is an individual who

8   the defendant knew before any of the events in this case took

9   place, and he is an individual whom the defendant --

10         *THE COURT:*  They were together at the anti-Sharia --

11         *MS. MARTINEZ:*  Yes, Your Honor.

12         *THE COURT:*  -- demonstration, in Denver.

13         *MS. MARTINEZ:*  They were.  They were seen together

14  there.

15         *THE COURT:*  There was bragging about, *I was on*

16  *television with William Planer*.

17         *MS. MARTINEZ:*  Absolutely, because William Planer was

18  in the white supremacy community, is known and has credibility.

19         *THE COURT:*  Tell me about Jacob Laskey.

20         *MS. MARTINEZ:*  Before we end on Planer.  Of course,

21  the defendant is still in touch with him, and has been from

22  jail.

23         *THE COURT:*  I understand.  Tell me about Laskey.

24         *MS. MARTINEZ:*  Your Honor, Laskey is another

25  individual who this defendant has had contact with.

1    THE COURT:  And we know this how?

2    MS. MARTINEZ:  We know this from -- from the FBI

3    investigation.  I might need to get a couple of facts.  I want

4    to make sure I'm a hundred percent sure --

5    THE COURT:  Well, let me just see if I can connect the

6    dots, and if I'm wrong, tell me -- I'm serious.  I don't want

7    politeness.  I want accuracy.  Tell me I'm wrong.

8    The defendant claims to have been a student of someone

9    by the name of J. Gray.

10    MS. MARTINEZ:  Correct.

11    THE COURT:  J. Gray is known to be an individual named

12    Jeffrey Thomas, who is part of the Dirty Dog Skinheads out of

13    Portland, I believe.  There are photographs of Mr. Holzer in a

14    picture with an individual who appears to be J. Gray, or

15    Jeffrey Thomas, and it's important because he circled him in

16    red on the far right-hand side, and on the far left-hand side,

17    is Jacob Laskey; and Laskey is, of course, known, at least in

18    the Portland community, for having, I think it was, bricks that

19    were inscribed with swasticas and attacking a synagogue with

20    those bricks and rocks with his brother and other family

21    members; just as Mr. Planer, as I understand it, was putting

22    stickers of some sort on synagogues in Colorado Springs, that's

23    my understanding.  Is any of that incorrect?

24    MS. MARTINEZ:  Nothing that Your Honor said is

25    incorrect.  If Your Honor likes, I can confer with my agent to

1    see if we have additional proof of that relationship, but as

2    Your Honor noted, or that -- the fact that they knew each other

3    or were in the same place at the same time --

4         THE COURT:  And the only point I'm trying to make is

5    it's not somebody who is in the basement and just kind of

6    approves of these things.  It reaches out to form and find

7    alliances or relationships in the real world, and there are

8    real-world meetings with such persons.  Who the person is that

9    has all of these firearms, I don't know.  But that too is a

10   real-world person.  All right.  I accept that.

11        MS. MARTINEZ:  And those real-world meetings,

12   Your Honor, served a number of purposes.  Sometimes they served

13   a purpose, like with Brandon, to find someone who was not as

14   schooled in the ideology of white supremacy, and to

15   indoctrinate him.  Other times, in the example that Your Honor

16   gave, it seems that the defendant is reaching out to those who

17   are more knowledgeable, to learn from them, to associate with

18   them, to build up his own credibility, by his association with

19   them.

20        The photograph that Your Honor mentions, just for the

21   record, and for those who are listening, those are photographs

22   not obtained surreptitiously by the government or some good

23   citizen.  Those are photographs that the defendant himself,

24   posts on his own social media, and that red circle highlighting

25   who this individual is, that's a circle the defendant applies,

1   so that he can send out that photograph as evidence of his

2   credibility of his credits, his *street cred* with white

3   supremacists, *Look at who I hang out with.  Look who I*

4   *associate with.  Look at who accepts me.  Look who I am like*,

5   and then, *Let me tell you all about my extremist ideology*,

6   because he is extraordinarily knowledgeable, Your Honor.

7          You listen to those recordings, you read the

8   transcripts of them, when he starts talking about Odinism and

9   Asatru and the history of *his religion*, as he calls it, he is

10  extremely knowledgeable.  He spent years studying this, and

11  that is a hateful, hateful ideology, the way that the defendant

12  describes it.

13         Today, through counsel, he claims that it's not

14  hateful, and that it's not violent and he has turned a corner

15  and I will address that argument in due course, but what is

16  undisputed is that in the defendant's own words, that ideology

17  that he pushes, is filled with hate and endorses violence.

18         So we can agree, this is not -- this is not a

19  defendant who was a lone-wolf-type actor.  He is not someone

20  who is capable of doing that, but that's okay, because lots of

21  terrorist attacks, lots of acts of violence, lots of acts of

22  terror are carried out by more than one person.  The defendant

23  never thought he could do it on his own, that's why he reached

24  out, and he reached out with a purpose.  This was intentional.

25         The timeline of this case and this investigation is as

1    follows; the very first contact that the government has with

2    the defendant, for purposes of this investigation, is on

3    September 28, of 2019, that's the day that the online covert

4    employee adds him as a friend on Facebook.

5          THE COURT:  Is that -- that's Missy?

6          MS. MARTINEZ:  That's Missy.

7          THE COURT:  Air quotes, Missy, who may, as far as I

8    know, be, you know, a 98-year-old guy, named Victor, but in any

9    event, he was Missy.

10         MS. MARTINEZ:  That is right.  We use the pronoun of

11   the persona that the person was putting on there; the persona

12   was a female, white-supremacist persona on Facebook adds him as

13   a friend, and he responds.  I mean, to be clear, the outreach

14   wasn't even from Missy with any sort of message.  It was added

15   as a friend, and immediately a message from the defendant

16   sending images of white supremacy, and reaching out to her.

17   That was on September 28, the takedown, his arrest was on

18   November 1st, that's the timeline of his interaction with the

19   government.

20         After September 28th, the first time he started

21   talking to the undercovers, the three men who met him in

22   Colorado Springs, online, was October 12th; in person, was

23   October 17th; and then on November 1st he is walking into that

24   motel room, planning to bomb the synagogue; that's the

25   timeline.

1          But let's talk about the timeline of the defendant's

2     interests in bombing the synagogue.  Well, we know from

3     interviews the FBI did of his friends, his real-life friends,

4     whom he knew in Colorado, that he started talking about

5     terrorist -- this is largely Brandon, Your Honor.  He is

6     talking about cherry bombs or making a bomb out of fireworks in

7     April or May of 2019.

8          Then in August or September, and again, he doesn't

9     even have any contact with EOC, until September 28th, in August

10    or September he starts talking about using a Molotov cocktail

11    on a synagogue; that's before he has any government contact.

12    Then, some time in September, yet again, only a couple days in

13    September when he was talking to anyone from the government,

14    that was almost two weeks before he met the undercovers, even

15    online, he starts talking about pipe bombs.

16         Then, after that, he tells Brandon that he going to

17    meet some people in Colorado Springs and see what he can get

18    from them.  So he meets them on October 17th, and while the

19    only thing he said to Missy, and the only thing he had said

20    previously to the undercovers in these online communications,

21    was this story about arsenic.  This idea he paid someone to

22    poison the synagogue the year before on Halloween.  He wanted

23    to repeat history.  He wanted to do it again.  That's what the

24    undercovers knew going in; that's what they heard from him;

25    that's what Missy heard from him, 30 minutes in to sitting down

1    for, you know, a beer and some -- some snacks, talking about

2    Odinism, making cracks about the black waitress or person at

3    the front desk when he walked in, talking about his

4    antisemitism and his hate, 30 minutes in he totally turns the

5    table, and he starts talking about, first, Molotov cocktails,

6    then when you read through that or you listen to it, every

7    time -- so this takes the undercovers by surprise.  No one has

8    talked about explosives.  No one has talked about fire.  Nobody

9    has talked about Molotov cocktails.  No one has talked about

10   damaging the building; that doesn't happen until the defendant

11   brings it up in that in-person meeting; at least between the

12   defendant and the government.

13            THE COURT:  No.  And let me do some pushback, because,

14   again, it's important that I understand your position, it's

15   important that you understand mine.  Again, I don't have the

16   transcripts open in front of me, but I have reviewed them, more

17   than once; likely, not as many times as you, but more than

18   once.  There is discussion about this plan to put arsenic,

19   again, in the water supply at Temple Emanuel.  As that

20   discussion unfolds, the agents begin to say to Mr. Holzer, and

21   "Skeeter" who was at that meeting, that, you know, the stuff --

22   this stuff, because they didn't have arsenic.  They were going

23   to use some like gopher poisoning or something, some

24   substitute, and I am now looking at **ECF 57-1** at page 95, one of

25   the undercovers says, *It can kill you, it can kill you.*  Now,

1    that's assuming that there was a way of getting this into the

2    water supply, and to be clear there was not.  They don't know

3    that, at this point.

4           And the next undercover begins to talk about, *If we*

5    *don't want to do that, and you just want to fuck up the place*,

6    to use his words, then there is some discussion -- another one

7    of the undercovers says *throw bombs*.  So, back before then,

8    there is discussion, on more than one occasion, that this

9    notion of putting arsenic, in and of itself, is a deadly plan,

10   and there is discussion about, *We're not just going to drive*

11   *them out, this can kill you*, and in response to that the

12   conversation turns to *Well, there may be other things what we*

13   *can do to* quote *fuck up the place* unquote, including such

14   things as welding the doors, and some -- something that I call

15   T.V. fantasy, some kind of electromagnetic pulse that would

16   knock out the electricity, and there's even discussion of

17   things like putting feces in the water, but that, at some point

18   in the connection with these other alternatives, it is true

19   that Mr. Holzer is the first one to speak the word Molotov.  I

20   think it -- cocktail.  I think it is also true that as they're

21   going through, talking about how to do this, that and the other

22   thing, it is also probably true that the first one to say the

23   word pipe bomb is the agent.

24          So -- but I'm not suggesting to you that this was

25   something that they were trying to put in his mouth.  I'm

1  saying, organically, the way the conversation went, it went

2  from this plan of poisoning to, *Dude are you crazy*?  If you --

3  *If you don't want to hurt people, this is not the way to do it.*

4  *You will kill them*, and then it's, *Well, what else can we do*?

5  Then the discussion starts shifting to lots of different

6  things, including Mr. Holzer's discussion of Molotovs, and then

7  it continues to discuss, and as they go down to the Temple and

8  look at it, and discover that it is an extraordinarily

9  well-made building out of brick and stone.  They are looking at

10 each other and going, You can't even get Molotovs to take this

11 building down.  What are we talking about?  And then someone

12 mentions pipe bomb, and he says, *Yeah*.  That's how I, kind of,

13 see the evolution of the discussion.  And so I don't know --

14 some of that fits what you are saying, some of that fits what

15 you are saying, but that's how I see it.

16       MS. MARTINEZ:  I largely don't disagree with you,

17 Your Honor.  I will make just a couple factual points.  One is

18 that the page that Your Honor was quoting was I think 90 into

19 91, where the undercovers were talking about how poisonous it

20 is and it can kill you.  Then they switch the conversation

21 your Honor, I think, cited the right page, that was the page

22 Your Honor said and I am tracking.  I'm looking at it.

23       To be clear, when the defendant brought up making --

24 when he says, *We completely mess the place up, I am willing to*

25 *put together Molotovs if I have to*, that's on page 56.  So

1   we're quite a ways in when we start talking about how dangerous

2   that poison is, and the reality is, the government's view of

3   how that evolved is that this came out of the blue, from the

4   government's perspective.

5          Now, now that we know.  Now that we know what he was

6   talking about with his other real friends in person, it didn't

7   come out of the blue from the defendant's head.  He had been

8   thinking about explosives.  He talked about Molotov cocktails.

9   He talked about wanting to make a bomb.  He even brought up

10   pipe bombs before he had this meeting with the undercovers.  He

11   just had not brought it up with the government, he brought it

12   up with these undercovers, because this is the first time they

13   met in person.  The defendant is careful about the difference

14   between what he said online, which was bad enough, and what he

15   said in person, which was his real plan.

16          So, when he brings it up with the undercovers, well

17   yeah, the conversation goes circular.  They were talking about

18   poison, they were talking about some sort or arsenic or gopher

19   poison.  He brings up Molotov cocktails, the conversation moves

20   on.  They circle back to the poisoning idea.  It circles back

21   to bombs.  That's how this conversation proceeds, it continues

22   to go back to explosives, and there's multiple times where the

23   defendant pushes for something more powerful.

24          Was the first person to use the word pipe bomb in the

25   recorded conversation someone from the government?  I think so.

1    I would have to find the cite.  Was the first person to think

2    about or talk about pipe bombs in this context, the government?

3    No.  We know from what Brandon said, was the defendant.  That

4    he was thinking about and talking about pipe bombs before he

5    met them.

6         So from the undercover's perspective, they are showing

7    up to meet a white supremacist, who is real active online, but

8    had sort of a kooky idea about putting arsenic in the pipe of a

9    synagogue.  From his perspective that's kooky idea that he put

10   out online, but in person, to his student, and to himself, he

11   is thinking about explosives.

12        Now these are explosives that he doesn't have access

13   to.  These are explosives he can't make himself, which is why

14   he recruits help, and that gets to the crux of the argument.

15   He had the very fortunate, for everyone else, mistake, of

16   recruiting people that were actually undercover agents, but all

17   you have to do is shift those facts.  These people that he met

18   online, or that he otherwise meets in person, are real white

19   supremacists; that's not hard to believe.  He associated with a

20   lot of white supremacists.  We have named some of the more

21   notorious ones, today.  There are others who share in his

22   ideology to varying degrees, that are discussed in the

23   Presentence Report and were interviewed by the FBI.  These were

24   all people that he knew in person, right?

25        The defendant may have been very socially awkward.  He

1    may have absolutely, like -- I say may as if I disagree.  From

2    all evidence he was socially awkward.  He did have trouble

3    maintaining relationships, but he wasn't a loner.  He wasn't

4    someone who lived by himself, who never saw other human beings.

5    By -- by the mere count of the individuals the FBI was able to

6    interview in the short days that followed this takedown, let's

7    see, he lived with friends of his, in circumstances that no one

8    here, I think, would want to live in.  He was renting,

9    essentially, a closet.  They were friends of his, and they

10   shared some of his ideology.  You can see that from pictures of

11   their house, and flat confederate flags that are hung up.

12        He had a friend who was willing to drive him all the

13   way up to Colorado Springs and sit there with him, while he

14   talked about this plan to bomb the synagogue, with the

15   undercovers, and then drive all the way back down to Pueblo

16   with him, take him to the synagogue, so that they could look at

17   it, walk around, comment on how it's such a big, heavy building

18   with bricks, they need more powerful explosives.  Go across the

19   street to the old mental institution where there is a park, and

20   take a picture with the white power flag; that was a friend of

21   his; that was someone he new in person.

22        He had his friend Brandon whom we have talked about a

23   number of times, whom he was teaching his extremist ways and

24   who, as he explained to the undercovers, wasn't quite ready yet

25   to be involved in a plot of this magnitude, but he was teaching

1    him.  He was getting him there.

2           Let's see, he had his friend Cowboy, who spent the

3    whole day with him, the defendant and one of the undercovers

4    the day before the takedown, when the undercover came in a day

5    early, to spend the day with him, and frankly get a sense of

6    him.

7           Give him as many off-ramps as possible.  He was given

8    so many opportunities to back out of this plan.  That was

9    intentional.  No one wants to -- to push someone to go forward

10   with something they didn't want to go forward with, and yet he

11   was enthusiastic at every step of the way.  At every step of

12   the way he expressed no doubt, no hesitation.  Wanted to go

13   forward with this plan, which, Your Honor, was his.  This plan

14   was his plan.  He selected the target.  He selected the time.

15   He selected the day.  He selected the means and method.  He

16   selected his accomplices, and he certainly selected the reason

17   that he wanted to commit an act of terror.

18          See I think I missed a couple of friends.  How about

19   the couple, I won't use name, male and female couple, who drove

20   him on one of his surveillance rounds of the synagogue.  You

21   know, that's another thing that he talked a lot about, that if

22   we didn't have hard proof of, we might write off as not

23   something that he actually did; that he went and did

24   surveilling of the synagogue.  But we know that he did, because

25   he took video of it, took video of himself walking around it.

1        *THE COURT:*  You are talking about Robert and Carla?

2        *MS. MARTINEZ:*  Yes, I am.  Took video of himself

3    commenting on what he was seeing, commenting on the fact that

4    they are back in business; that really means we have got to do

5    something.

6        *THE COURT:*  Let me just confirm something else that's

7    also in the Presentence Report.  He was lying to the UCs, the

8    undercovers.  The individual with whom he spent most of the

9    time, was the individual who went by Mike, as I understand it?

10       *MS. MARTINEZ:*  Correct, Your Honor.

11       *THE COURT:*  And Mike was, if you look at it through

12   our lens, what I mean by that is we know who he is, and we can

13   see what he is trying to do, he is trying to meet -- meet

14   Mr. Holzer's friends, because he concerned about what's going

15   on.  He is also telling Mr. Holzer to lay low.  I mean, not

16   tell anyone about what they're doing, because otherwise they

17   would be -- this plot would be discovered, for lack of a better

18   term, despite telling Mike that he -- that no one knew but he

19   and "Skeeter", and the three UCs, he was running around

20   bragging about it.

21       *MS. MARTINEZ:*  Yep.

22       *THE COURT:*  He told Robert and Carla that he was going

23   to blow up the synagogue, before November.  He -- there is --

24       *MS. MARTINEZ:*  He told his roommate and his roommate's

25   wife.

1          THE COURT:  Yes.  There's an individual named -- a

2    woman named Jonna, told her -- and I think he lived with her --

3    that he was going to blow up the synagogue.  He was also

4    telling her children that Hitler was God.  He told Victor that

5    he was going to blow up the synagogue.

6          MS. MARTINEZ:  He told Brandon that he wanted to use a

7    Molotov cocktail to blow up the synagogue --

8          THE COURT:  He told Brandon that he wanted -- yeah.

9    It is -- I don't want to create a false impression out in the

10   public.  Many people didn't believe him, and that's why they

11   didn't report things to law enforcement, but in terms of this

12   event, he was embracing it and within his network, before it

13   even happened, saying it was going to happen and it was him,

14   and basically building himself up so that they would know that

15   when that synagogue came down, it was his doing.

16         MS. MARTINEZ:  As he said to the FBI, when he was

17   interviewed, *The event planned for tonight would define me as a*

18   *person who would die for his people*.  Absolutely, Your Honor.

19   He was bragging about it in advance, because although he didn't

20   want to get caught, he wanted certain people to know.  He

21   wanted the notoriety.  He wanted the credibility, because this

22   wasn't the end of his plan.  As he told multiple individuals,

23   including the undercovers, he had something planned after it;

24   this was stage two, and there was going to be a stage three.

25         THE COURT:  Honestly, I have no idea what the heck

1    that was all about.  I mean, there are these terms about phase

2    three is going to be bigger and better and outside of Pueblo.

3    I give you all of that.  It had about as much substance to it

4    as a potato chip.

5        MS. MARTINEZ:  So here is the thing, Your Honor, he

6    says a lot of things that -- he says things -- said things that

7    we know aren't true.

8        THE COURT:  Right.

9        MS. MARTINEZ:  Absolutely.  He wasn't arrested, as a

10   juvenile, and he didn't serve time in prison.  We've got things

11   that we definitively know aren't true.  He also said things

12   that seem highly unlikely, and that there's no evidence that

13   they are true.  You know, as the government, I'm not going to

14   sit here and say it's impossible.  They are not things that

15   couldn't have happened.  I think it is true that it couldn't

16   have happened that he served some juvenile sentence for

17   multiple years and somehow we can't find records of it, right?

18   But there are things that he says that sound unlikely and that

19   if I was a betting person, I would say that didn't happen, and

20   I think we would all agree on that.

21       THE COURT:  And this stuff that he says that is just

22   flat-ass crazy.  I mean he believes that Adolf Hitler is alive

23   living in a hotel in Argentina.

24       MS. MARTINEZ:  Absolutely, he says things that sound

25   odd and extreme, but are they true or are they not true?  But

then he says things that also sound odd and extreme and we know they are true, and so that's the problem, Your Honor, and we're talking about an aspirational statement, that in addition to bombing the synagogue, he was going to do more later.  Maybe.  Maybe not.  Maybe it depends on how successful it was.  Certainly depends on whether he got caught, right?  And if he succeeded.  If these had been real white supremacist accomplices, and he had been arrested, which I certainly hope he would have, this would be a very different case, but he would have been stopped from committing his phase three, or if he had ridden off into the sunset and no one figured out who did it, we might be dealing with another bigger attack later, and not because we would have had Richard Holzer the lone-wolf domestic terrorist attack, he goes out and does something entirely on his own that's off the grid and explodes some police station or attacks another synagogue on his own, with pipe bombs that he learns how to build or a detonator with a timer.  No.  No.  He is not capable of that; that's fine, but you know what he is capable of finding people who are capable.  He is capable of finding people who share his hate.  He is capable of finding people who share his endorsement of violence.

Who he found was the government, but if those people had been the people they were holding themselves out to be, then I submit that when he walked into that motel room, that

1  would not have been the end of that night.  If those had been

2  real accomplices with two vehicles sitting out in front, less

3  than three miles from the synagogue, and a plan, hatched by

4  this defendant, to go place those explosives, with his buddies,

5  who built them for him, in the synagogue, less than three miles

6  away, about five hours later, in the middle of the night,

7  there's nothing that suggests that he wouldn't have done

8  exactly that.

9      We were five hours from the event, in his mind, and he

10  had been building for it, for years, months, weeks, days.  If

11  those explosives were not inert, and those people were not the

12  government, he had everything that he needed right there at

13  that motel to go carry out this act of domestic terror.

14      And so he stands before you, Your Honor, and through

15  his attorneys, he has argued to you, claimed to you that he no

16  longer endorses hate or violence.  He does want to practice

17  Odinism, which, in his own words, and as is commonly

18  understood, is closely associated with white supremacy, but

19  he -- he no longer is interested in hate or violence.  Well, I

20  think we all can agree that the defendant lies, and he has lied

21  left and right and up and down a number of different times, and

22  I think that's a lie, but what's more important than what he

23  says through his attorneys, and briefly, is what he has not

24  said.

25      And at no point, Your Honor, has he ever shown any

1    ounce of remorse in this case.  He says that he is not

2    interested in hate or violence anymore, but he never apologizes

3    for the immense amount of hate and violence that he spewed.

4    We've had no apology to the Congregation.

5            His adoptive parents submitted a video of them talking

6    about his childhood and his troubles, and in that video, they

7    apologize.

8            THE COURT:  His mother was in tears.

9            MS. MARTINEZ:  She was was, and defense counsel asked

10   us to make that available to members of the Congregation, and

11   we did, and some of them watched it.  And -- and I will say

12   that one individual who watched it wanted to convey to his

13   parents, I suspect may be listening, that this person

14   associated with the synagogue, at least, accepts their apology,

15   and applauds them for everything they did to raise this person.

16           Your Honor, as a parent, I can -- I can't imagine

17   their pain to have gone through what they did when he was a

18   child and to see him turn out like this, but it doesn't excuse

19   what he did.  His parents apologized to the Congregation.  He

20   doesn't.  He has no remorse.  He has never expressed that what

21   he did was a problem, other than it got him into trouble.  He

22   just says, conclusory, *Well, I now reject hate and violence, so

23   please don't give me too long of a sentence and don't give me

24   too many restrictions when you release me*.  *I would like to be

25   able to associate with people who are like-minded*; that's a

1    problem.

2         Now, defense has -- defense counsel has done an

3    extraordinary job in this case.  They have.  This is a tough

4    case, and they have essentially, done a mitigation case that

5    would be the envy, I think, of defense attorneys in much more

6    serious cases, with much more serious penalties, and they

7    presented to the Court everything that they could possibly find

8    about this defendant's background that should give any of us

9    some empathy or sympathy for what the defendant has gone

10   through.

11        But here is the problem, it doesn't fully explain it.

12   It just doesn't.  Is he susceptible to influence?  Perhaps.

13   But he came to this on his own.  There's a reason that we are

14   here at sentencing after a plea and we didn't go to trial with

15   some sort of entrapment argument, because that's not what

16   happened.  Wasn't the government influencing him to commit this

17   heinous act of violence.  That was his own idea.

18        He seems to get obsessed with ideas.  He gets really

19   interested in the things that he is interested in, and that

20   probably is tied to FAS, and perhaps other things about his

21   biology and his brain chemistry, but he doesn't have to be

22   really interested in things that are so vial and hateful.

23   Those are his choices, and that's not how he was raised.

24        This isn't some kid who was raised in poverty,

25   surrounded by white supremacy, who never knew better and just

1   absorbed it as a child.  By all accounts, he was raised in a

2   warm, loving environment, with parents who cared about him,

3   with good role models, both adults and older children, access

4   to medical care, and none of this ideology.  As an adult he

5   chose it, and he chose to embrace it and it wasn't a passing

6   fancy.  This wasn't something where he got suddenly obsessed

7   with white supremacy for some short period of time and it

8   culminated in this misguided act.  This was his entire adult

9   life.  He lived and breathed this stuff.

10          For him to say, now, *Well, please don't give me too*

11  *long of a sentence, I reject hate and violence, but, I still*

12  *want to practice my white supremacy*, there's no credibility

13  there.  I think the Court should give no credence for that.

14  This person is dangerous.

15          To the extent that he is susceptible to influence, and

16  to the extent that he doesn't understand the consequence of his

17  actions, those are sad facts, but they will remain true.

18  There's nothing on the record, nothing in the defense counsel's

19  able argument, nothing in the evaluations that have been done

20  of him, nothing in the expert opinions that have been cited or

21  summarized in this case that suggests that he is going to

22  suddenly come out of prison or come out of supervised release

23  less susceptible to influence or with a better understanding of

24  consequences.

25          Look, he also understands consequences.  I mean, he

1    went to great length to try to not get caught here.  There's a

2    reason he didn't talk about explosives on online.  There's a

3    reason that he switched from Facebook to a secure messaging

4    application.  There's a reason that he bought gloves, to avoid

5    leaving fingerprints; that he wanted to do it in the middle of

6    the night, where he would be less likely to be detected.  He

7    understood consequences.  He didn't want to get caught.  He

8    didn't want to be sitting here in front of Your Honor.  He

9    wanted to terrorize the Jewish community and get away with it;

10   with some notoriety, on the side, among his white supremacist

11   buddies.  So, he does understand consequence, but maybe not to

12   the degree that he ought to or we wish he would.  That's still

13   going to be true.  He is an adult.  He is 28-years old.  He is

14   going to serve his time, however much time Your Honor deems

15   fit, and then he will be out on supervised release, and he will

16   still have the same grasp of consequences.  He will still be

17   susceptible to influence.

18           Now the conditions of supervised release I think go a

19   long way to help try to protect him from some of those

20   influences, and by protect him, I mean protect the community

21   from what happens with him, when he has those kinds of

22   influences.  Of course, you know, he fought against them, and

23   he still wants to practice his religion, which he characterizes

24   as peaceful and nonviolent, but if you look into it, most

25   people who practice it are white supremacists.  Who he is going

 1    to want to hang out in prison or when he gets out of prison?

 2    Like-minded individuals.  There's been no suggestion -- there's

 3    great studies, really interesting studies on deradicalization.

 4    I see no interest.  There's no interest on the record --

 5             THE COURT:  You know look, in terms of the

 6    deradicalization studies and the science and the whatever, I'm

 7    not terribly sure that any of it means anything.  And all that

 8    I mean by that is, that if you want to show me a study where

 9    the subjects were people with Fetal Alcohol Syndrome, then I'm

10    going to look at it, but the problem -- there are two issues

11    that are dominating my thinking.  They are these.  One, evil

12    explained is still evil; two, can he be fixed?  Because if he

13    can't be fixed, and he is dangerous, the outcome suggests

14    itself.

15             MS. MARTINEZ:  Your Honor, no one wants to throw away

16    a human being.  No one wants -- most of us don't want to throw

17    up our hands and give up, that some person is simply unfixable

18    and irredeemable.  There's no evidence here that this is

19    fixable, and that's not just that there's no medical evidence.

20    There's no magic cure.  Or that there's no Odinist priest

21    that's going to stand up here and say, as an Odinist priest,

22    *I'm not hateful and I don't believe in white supremacy and you*

23    *misunderstood Odinism.  Let me coach you in this peaceful*

24    *Odinism religion,* which by the way, the fact that we are

25    analogizing Odinism to religion is offensive, but I will set

1   that aside.

2          We don't have any of those magic bullets.  Defense

3   counsel has not pointed to it, and not for lack of trying and

4   not for lack of being extraordinary litigators.  But we also

5   don't have a defendant who wants it.  We don't have a defendant

6   who says he has seen the error of his ways.  We don't have an

7   defendant who has expressed remorse.  We don't have a defendant

8   who wants to walk away from this ideology.

9          We have a defendant who has doubled down and said,

10  *Just believe me, that hate and violence those things that, you*

11  *know, Your Honor probably be pretty upset about and are going*

12  *to get me in trouble and a longer sentence, those are gone; but*

13  *then, leave me alone; let me practice my ideology.*

14         He is not going to change, Your Honor.  He certainly

15  not going to change if he doesn't want to change, and even if

16  he wants to change, which he doesn't, which we have not heard,

17  we don't hear that he has any sorrow for anything that he did.

18  I have no doubt he regrets being here; regrets getting caught;

19  but what about the effect that he had.  No, that synagogue did

20  not explode in the early morning of November 2nd, 2019, thank

21  God.  Those associated with that synagogue found out about this

22  from the FBI, not by hearing sirens or by waking up the next

23  morning and seeing their synagogue crumbled to the ground, like

24  that picture that the defendant sent to the undercovers showing

25  them what he wanted to accomplish, but it has had an impact.

1    It does send a message that there were people living, that

2    there was a person living in that community who would do this,

3    who wanted to do this, who tried to do this, who planned to do

4    this, who would have done this had he actually had the tools

5    that he thought he had at his disposal.

6            And the community rallied around the synagogue and the

7    congregation, and that sends a message of hope.  There are more

8    people in the community, in this world, in this country, in

9    this state, in Pueblo, Colorado, who believe that hate should

10   not succeed.  Who rallied around the synagogue and helped them

11   get safer and stay safe and told them that they are welcome

12   here.

13           But you know what, just a few weeks ago, I still saw

14   swastika spray painted around the city.  We live in troubling

15   times.  We live in troubling times, when white supremacy

16   threatens to take over pockets of this country.

17           The sentence the defense is asking for is eight years,

18   and the defendant has been in for about 16 months.  With

19   good-time credit, with the defendant's requests, he will be out

20   in about five and a half years.  I would like to tell you that

21   I believe that the world would have changed in five and a half

22   years, but I don't.  I would like to tell you that there

23   wouldn't be white supremacists that he could find online and in

24   person, to share his hate to share his -- his endorsement of

25   violence.  I would like to, but that would be laughable.  After

1    what we have seen in the past year, in the past couple years,

2    even in the past month.

3              This defendant is dangerous.  He has been dangerous

4    for a long time, and we're lucky that this is the way that he

5    was brought before this Court.  We're lucky that he was stopped

6    at this point.  He is going to be dangerous when he is

7    released.

8              Government is asking for a sentence of 20 years.

9    That's a long sentence, he is a young man, at the end of that

10   sentence, he will be dangerous.

11             THE COURT:  All right.  Let me hear from the

12   defendant.

13             MS. BUTTERTON:  Your Honor, the way we would like to

14   proceed with this --

15             THE COURT:  However you want to split it up, I'm fine

16   with it.

17             MS. BUTTERTON:  Well, I just want to give you a little

18   roadmap.

19             THE COURT:  Okay.

20             MS. BUTTERTON:  Is -- Mr. Kraut is going to speak a

21   little bit about the circumstances surrounding the case, answer

22   any questions that the Court has about that, make some

23   clarifying points, and I am going to discuss a little bit about

24   Mr. Holzer' history, and address some of the Courts concerns

25   about release, future dangerousness.

1          *THE COURT:*  All right.

2          *MR. KRAUT:*  Your Honor, with with a few exceptions,

3     crimes require the meaning of a mental state and an action.

4     Everything that the government relies on in this particular

5     case and cites in aggravation proves that Mr. Holzer intended

6     for this bombing to occur, but that fact was never in dispute.

7     Any dispute about that was settled the moment he pled guilty to

8     attempts, which require, as an element, that he intended for

9     the crimes to occur.

10          We've never argued that he lacked intent.  We have

11    never argued that his intent was never anything but abhorrent.

12    So those points have never been in dispute, yet the government

13    relies on them, as their primary aggravating factors in this

14    case.  Why?  Because that's all they have.  Because

15    Mr. Holzer's actual conduct in this case was quite minimal.

16          What he brought to the table was his desires and his

17    intent.  If, for example, like the Allen, Stein and Wright

18    defendants, he stockpiled weapons or ingredients for explosives

19    or ammunition, they would use that to show how dangerous he is;

20    but he didn't.

21          If like Jerry Varnell, the case out of Oklahoma.  He

22    actually participated in building what he thought was a giant

23    bomb and actually pounded on what he thought was a detonator,

24    they would use that to support their argument, but Mr. Holzer

25    didn't do those things either.

1          If, like Nolan Brewer, out of Indiana, he chickened

2     out about the bombing itself, but still actually damaged the

3     Synagogue's property, in less serious ways, they would cite

4     that type of activity as aggravation, which he didn't even do

5     that.

6          Mr. Holzer did not engage in any of those types of

7     actions; actions that fall short of lighting the fuse but still

8     demonstrate significant, independent dangerousness; and that

9     leaves the government with, his intent.  So they repeatedly

10    emphasize the deeply offensive nature of his words, the memes

11    that he shared, the clothing that he wore.  All of these

12    aspects of the case reflect his mental state, but are never in

13    dispute.

14         For example, the Brandon Linnebur interviews don't

15    prove that he did anything to actually start this plot before

16    meeting the agents.  They proved two things, he had the intent

17    on his own, and he did not have the capability to do any of

18    this on his own.

19         Brandon says Mr. Holzer was asking about building a

20    bomb from fireworks, and Brandon also says that Mr. Holzer

21    talked about wanting to explode a building, but, quote, didn't

22    know how to do it.  Consistent with everything that we've said

23    about Mr. Holzer's inability to actually carry anything like

24    this out on his own.

25         The endless memes and Facebook posts and photos don't

1    prove that he actually did anything.  The relationships with

2    people in Oregon from 2016, that the Court pointed out, don't

3    prove that he actually did anything.  They prove he had the

4    intent, for years, to commit acts like this, but didn't

5    actually have the ability to carry that type of activity out.

6         THE COURT:  Isn't intent a component of dangerousness?

7    I intend to destroy a people?

8         MR. KRAUT:  Yes.

9         THE COURT:  You are ultimately saying to me, his

10   ability to pull the trigger, if you would, effectuate a plan,

11   is so bad that he is never able to accomplish that intent, and

12   therefore he is not dangerous; and that's a tough sell.

13        MR. KRAUT:  I will answer the Court's comment in this

14   way.  By asking for an above-guideline sentence of eight years,

15   we are acknowledging that, yes, intent is a component of

16   dangerousness, yes, in this case, there's indication of

17   dangerousness, based on his intent, for all of the reasons that

18   we've discussed.

19        However, dangerousness is not defined by intent alone.

20   A true and deep understanding of future dangerousness can only

21   be understood if the Court understands both the intent, what

22   led to the intent, what -- how the intent can change, and how

23   the intent --

24        THE COURT:  Let's talk about what led to the intent.

25   And I will tell you that this goes to something that you will

1    later tell me, which is, that he renounced violence.  I can't

2    see how.  His hatred of Jewish people is not just some

3    knee-jerk, *I don't like Jews*; that's not what this is about.

4    He believes, at least he says, and I believe him, in this

5    respect, he believes that Jewish people are a cancer on the

6    white race.  He believes that they are actively attacking the,

7    quote, folk, unquote, and doing things that people don't

8    recognize; such as, they are responsible for autism and other

9    diseases, and his proof of this is that these diseases and

10   conditions and illnesses didn't occur until kosher foods were

11   invented -- not invented -- introduced into the society widely.

12          So he believes that through kosher foods, the Jews are

13   attacking him and his people.  He believes that they want his

14   DNA.  He believes that they are pedophiles.  He believes the

15   latter, because he has seen something online that he interprets

16   in this manner.  Rabbis, at circumcision ceremonies, may, in

17   certain sections of Judaism, choose to sterilize the child's

18   wound by inserting wine into their mouths and sterilizing

19   the -- the circumcised area with a mouthful of wine, which, to

20   him, is fellatio, and they are pedophiles, and all of this

21   conduct or description about wanting to kill pedophiles and all

22   of the rest of it now starts bleeding into it.

23          He believes all of these things.  If you believe that

24   you are under attack, *by a people*, and to be clear, it's

25   nonsense, but if you believe that you are under attack by a

1   people, the notion that, *Well, I'm just going to stop hating*

2   *now*, it doesn't even make any sense.  If he believes these

3   things, to his core, as he seems to, it doesn't surprise me

4   that he tried to blow up a synagogue, and it wouldn't surprise

5   me if he tried it again, because he believes that he is

6   defending, quote, the folk, unquote.

7        So I'm having problems, you know, because I think I

8   really do understand him.  I have spent hours with pictures and

9   statements and the pleadings that each of you have filed.  If

10  he believes these things, how you can sit there and say, *He is*

11  *over it*, I have no idea.  It just does not compute.

12       *MR. KRAUT:*  So first, Your Honor, anyone that has

13  spent the amount of time with this case as we all have --

14       *THE COURT:*  And clearly, the time I have spent pales

15  in comparison to the time that you and Ms. Butterton have.  I

16  don't -- I don't even want to pretend that I have spent that

17  degree of time, nor do I want to pretend that I have had that

18  degree of contact with your client.  I get that.

19       *MR. KRAUT:*  Certainly but one unmistakable reality

20  about Mr. Holzer's mind, that we can all agree on, I think, is

21  that what he says is not always the same thing as what he

22  believes or what is true.

23       Now, the Court has just articulated that those

24  particular statements that he made over the course of years,

25  the Court believes he actually believes and still believes

 1    today.

 2         THE COURT:  Because they go hand in glove with

 3    attempting to blow up a synagogue.  Is he, quote, driving the

 4    cancer out of Pueblo; those are his words.

 5         MR. KRAUT:  What we are presenting to the Court and

 6    presented through our filings, and Ms. Butterton will speak

 7    about here in a minute, is that Mr. Holzer's unique

 8    psychological and cognitive limitations and makeup have -- and

 9    more particularly, his fetal alcohol syndrome disorder, have

10    left him uniquely susceptible to influence by others, with the

11    particular trait of becoming deeply involved in and interested

12    in discredit topics, far more deeply than most people would be

13    at any given time, and he has, on top of that, he has been,

14    since a very young age, very curious and interested in

15    cultures.  He always wanted to learn about these different

16    types of cultures.  So this created a bit of a storm in him.

17    When he was removed -- when he removed himself, I should say,

18    the loving household that he grew up in, and went out on to his

19    own in the world and connected with white supremacists, it

20    affected him in a very deep way, and he absorbed that ideology

21    and to some extent attempted to make it his own and it became a

22    very real part of his personality and who he is.

23         However, part of Mr. Holzer's vulnerabilities also

24    make him, as we've argued in our pleadings, potentially

25    receptive to efforts to continue to grow and change and adopt

1    different types of ideologies.

2         *THE COURT:*  I know you have argued that.  Honestly, I

3    don't know that it's coming from anywhere but you.  I'm not

4    suggesting for a minute you are trying to mislead me.  I'm just

5    saying, this has been who he is and has been for his entire

6    adult life, and it started before he was an adult.  This is

7    baked into who he has become.  However it happened, it has --

8    this is not, you know, the last six months, the last year.

9    This is a decade, or more, of position.  And the notion that,

10   you know, it's just going to change, I don't know where that's

11   coming from, because the notion that -- and I have seen the

12   report, and honestly, it's just drop dead to the end, that if

13   you have a therapist who is loving and kind and takes an

14   interest in him, he can change.  That very same report says

15   that he has all of the characteristics, because of his

16   limitations that make therapy unsuccessful.  There is nothing,

17   by way of prior instance or experience or anything else that

18   gives me comfort that this is going to change with treatment or

19   therapy or whatever the case may be.  He has limitations, and

20   he is where he is.

21        We can't forget that he has been with parents who have

22   demonstrated all of this stuff, loving, nurturing, care, trying

23   to explain to him that this is bad thought.  It doesn't -- it

24   hasn't worked up to now, and yet, for some reason that I have

25   yet to have identified to me, it's going to work in the future;

1    that's the part I don't get.

2             MS. BUTTERTON:  Your Honor, I'm going to jump in.

3             THE COURT:  That's fine.  As I said, tag team, fine.

4             MS. BUTTERTON:  One thing that I want to, you know,

5    not glaze over, is we talk about Mr. Holzer's limitations and

6    that's distinctly different then the mitigation that is

7    typically presented to this Court, and I guess, to the extent

8    that I'm speaking to the people that are listening, on many

9    occasions, especially in the posture as a defense attorney, we

10   present, to this Court, circumstances that have given rise to

11   difficulties for a defendant that ultimately led to bad contact

12   or contributed, right?  Things like, a terrible upbringing,

13   abuse, mental illness, you know, substance abuse.

14           Mr. Holzer's situation is distinctly different, and

15   it's distinctly different in a way that I acknowledge cuts two

16   ways, because we're not talking about psychological damage,

17   necessarily.  We're talking about physiological damage to the

18   brain, that happened to him in utero, and I think that's an

19   important distinction, because, you know, the Court, I

20   respectfully, take umbrage with the term evil that the Court

21   threw out.

22           THE COURT:  I know.  You can change it, dangerous is

23   still dangerous.

24           MS. BUTTERTON:  Then let's talk about dangerousness.

25   The reason I think the distinction that I just spoke of is

1   important, is because we have concrete medical science that

2   told us what has happened to Mr. Holzer, in his brain.  This is

3   not touchy-feely, you know, and I am not discounting the field

4   of psychology, in any way, but we have -- I'm sort of

5   referencing, vaguely, discussions that I have heard, you know,

6   this Court had before, about the weight that the Court should

7   give to certain mitigation factors given the remoteness of say

8   abuse or something like that.

9          This is brain damage, full stop in utero brain damage

10  has affected Mr. Holzer his entire life.  I understand this

11  cuts both ways, because the government says, *But you can't fix*

12  *brain damage*, say bipolar, that you can be medicated, or

13  something like that, and I am sure the Court did do this,

14  because I know, if nothing else, the Court reads everything

15  that we submit, and I greatly appreciate that.

16         We submitted these studies about fetal alcohol

17  syndrome, specifically fetal alcohol adults.  What that science

18  tells us is Mr. Holzer's brain develops differently than even

19  say the -- than the average human male brain.  I'm going to say

20  male --

21         *THE COURT:*  That's fine.  I'm not going to take

22  offense to something like that.  I might even agree with you

23  that the male brain is just weird anyway.

24         *MS. BUTTERTON:*  You know, especially -- I'm sure this

25  Court reviewed capitol mitigation cases that tend to

1     overwhelming be male.

2          Brain development doesn't happen until 25.  You know,

3     these are studies that I'm sure everyone in this courtroom who

4     deals in this profession knows.  When we're talking about a

5     person with FASD, that doesn't happen until 30, later.  So I

6     hear what the Court is saying about*, He has this pattern of ten*

7     *years; his entire adult life*, but the Court has to look at that

8     through the lens of the science of what is the FASD brain looks

9     like, and Mr. Holzer's brain is not even there yet, and that's

10    why Mr. Kraut and I feel so adamantly that this -- this kind of

11    ideology that is rooted scientifically in his deficits, can be

12    retrained, and especially, because this Court is going to put

13    in supervised release conditions, and you know to put it

14    more -- to put it more casually, I guess, very short leashes, a

15    very -- and very tight safeguards to help that happen.

16          Mr. Holzer, in all likelihood, for whatever time that

17    this Court imposes, plus what I anticipate to be a lengthy term

18    of supervised release.  You know, we requested 15 years, as the

19    defense.  He is going to have the kind of structure and

20    services necessary to -- to prevent the sort of dangerousness

21    that this Court is afraid of.

22          And I will tell you what's not going to do that,

23    prison.  The government concedes, and I think this Court would

24    concede, that prison is not a perfect solution for this case.

25    You know in state court, my prior practice, we sometimes

1    referred to prison as *crime school*, right, that's the term.

2    There's a problem with sending influenceable people to prison,

3    because of the influence they can get there.

4         We have laid it out in our filings about some concerns

5    we have about putting Mr. Holzer in prison.  I won't really get

6    into those, deeply, here.  But that's where I think this

7    difference between an eight-year, ten-year sentence and 20-year

8    sentence becomes vitally important.  Because a 20-year

9    sentence, entrenches him for life, for life.  Let's not pretend

10   that the bureau of prison does not have active white supremacy.

11   I think we would all be lying to ourselves to say that's not

12   true.  Has active gangs of, sort of, every stripe, but what my

13   point is, is a shorter sentence, imposing a sentence where

14   there is light, is it provides incentive that shapes his entire

15   prison experience.  To say, *Okay, I have to prepare for my life*

16   *after this*, as opposed to, *This is my life, for 20 years, this*

17   *is my life*.  I think it's -- it's counterintuitive to say,

18   let's send him to prison for 20 years.  No one is saying to

19   send him to prison for life, right?  That's not an option

20   available to this Court, and of course, I don't know, sort of,

21   where the Court is landing right now, but that is his life,

22   that's 20 years.  I'm not saying life, in the sense of, you

23   know, when he gets out and he is 48, he is old, because that's

24   not what I'm saying.

25        My point is for purposes of entrenching these beliefs,

1    of permanently cementing this, the bureau of prisons is not a

2    place for these to be de-trenched, which may be a word that I

3    just made up.

4           The -- the place for this -- this Court can give him

5    20 years and say, not fixable.  Not fixable.  You are not worth

6    it.  We are throwing away the key.  Or we can say, we will not

7    tolerate hateful, violent rhetoric.  We're asking for a

8    sentence well above the guidelines, because we agree that's

9    important, that's important.  It's an important element of

10   general deterrence, and of course specific, but, you will be

11   supported in pursuing a life outside of your prior pursuits,

12   and I think that's really where the difference lies, between us

13   and the government.

14          You know, it is conceded, even in the written filings

15   by the government, that the bureau of prisons is not going to

16   make, you know, feelings of white supremacy go away.  It's just

17   not going to happen.  But the idea of having a life, post-white

18   supremacy and post-prison may, and I think that's a crucial

19   element to when the Court imposes a sentence here.

20          You know, we concede that punishment is necessary.

21   It's important.  We concede that general deterrence is

22   necessary; that's important.  We concede that, you know,

23   considering the -- the impact this had on the Jewish community

24   and greater community of Pueblo is important.  The question is,

25   what can we do to ensure that this doesn't happen again, and I

1    submit that 20 years is not it.

2         *THE COURT:*  Go ahead.

3         *MR. KRAUT:*  Thank you, Your Honor.  To follow up on

4    what Ms. Butterton is sharing, the Court mentioned, a moment

5    ago, that you weren't able to find any deradicalization studies

6    focused on subjects with fetal alcohol syndrome, and neither

7    was I, but we have looked and what we have found in the world

8    of science surrounding deradicalization is a brigading field

9    that is becoming better and better funded internationally every

10   day, unfortunately because of the need.

11        There's a few particular sources that I want to share

12   with the Court that we were able to find, and they really all

13   say the same thing about what is necessary to help a person

14   move beyond this type of extremist ideology and adopt more

15   proper social view of the world, and operate their life in that

16   way.

17        The first source is from 2013, from the Global Counter

18   Terrorism Forum, commonly referred to as the Rome Memorandum.

19   It's a list of best practices that they believe prisons and

20   probation departments should follow when dealing with people

21   who have been convicted of extremism-related offenses.  It's a

22   long list, I won't read all of them, but there are a few here

23   from 2013 that include, the importance of an individualized

24   treatment program.  It says, *Understanding why individual*

25   *inmates have gone down the path of violent extremism is*

1    *critical to the design of their rehabilitation program.  This*

2    *concept of individualizing a treatment program appears*

3    *throughout all of the literature*; and for that reason, we

4    submit to the Court that if a treatment program for

5    deradicalization is truly individualized, it will take into

6    account the client's fetal alcohol vulnerabilities.

7        It also recommends the use of a broad range of

8    interdisciplinary experts, psychologists, religious scholars

9    aftercare experts, family members, law enforcement experts,

10   community members.  All of these people need to come together

11   to bring different types of information to bare on the -- on

12   the client's ideology and perception, and only when that

13   happens can a person begin to change; but they can.

14       There's also recommendation here to provide vocational

15   skills, training and employment assistance.  It's clear that

16   Mr. Holzer has struggled financially, economically.  He did

17   hold down a job at the King Soopers in Pueblo for a significant

18   period of time, but he hasn't really been able to create a more

19   longer term career for him.  He could use assistance in that.

20   That type of help is necessary to generate a pro-social

21   environment surrounding this person, and of course, include

22   aftercare programs and start the treatment in prison, don't

23   wait until they are out.  These are the recommendations from

24   2013.

25       So moving forward to 2020, a book that came out

1    recently called The Routledge Handbook of deradicalization and

2    disengagement, basically says what Ms. Butterton just said,

3    prisons are often a space where offenders become more deeply

4    committed to a culture of crime.

5         *Programming in the prison must be flexible enough to*

6    *respond to the unique constellations of reasons individuals are*

7    *drawn to violent extremism.*  In this case, that unique

8    constellation of reasons includes Mr. Holzer's developmental

9    disabilities, and so he does need an individualized approach.

10   There's not a one-size-fits-all approach to this.  In addition,

11   the Routledge Handbook goes through programs that have been

12   created in recent years and tries to say how well they are

13   doing.

14        Countries, including Saudi Arabia, Sri Lanka, the UK,

15   Germany all have had programs and all claim to have very good

16   results.  In particular, a program called The Violence

17   Prevention Network, out of Germany, has been proven to be

18   highly effective in reducing rates of recidivism, through --

19   and proven through independent evaluations; that's not their

20   self-report, claiming they are doing great.  Independent

21   evaluators.  What are the keys to the VPN program in Germany?

22   Employment assistance, housing assistance, counseling, family

23   members, begin the program in prison and continue outside

24   prison and ensure that the --

25        THE COURT:  Okay.  Let's -- let's say that's true.

1    I -- I don't have any ability to generate programs in prison.

2         *MR. KRAUT:*  Correct.  But by limiting the amount of

3    time that Mr. Holzer has to serve in prison, you create an

4    opportunity for him to engage in these types of productive

5    programming, much, much sooner.

6         The unfortunate reality is that despite those studies,

7    and a recommendation in 2018 from the George Washington

8    University Program on Extremism, that the BOP must create an

9    individualized deradicalization program, and it appears they

10   have not.

11        Despite all of that, there are private programs

12   available throughout the country, and they appear to be

13   growing.  The media is reporting on this more and more for just

14   the reasons that Ms. Martinez articulated; this is a very real

15   and unfortunately growing problem in our country.  Instead of

16   punishing Mr. Holzer more harshly, because our country is

17   suffering from this problem right now, the courts should

18   instead look at this as, *How do we divert resources and use*

19   *resources in this country to address the real roots of this*

20   *problem*?  Addressing the real roots of this problem is not

21   locking away Mr. Holzer for 20 years.  It's identifying the

22   individual constellation of events that led him here today, and

23   identifying a group of experts, scholars, professionals who can

24   help him change and grow.

25        Now, as Ms. Butterton said a moment ago, one of the

1    most important prerequisites to any of this working is that

2    Mr. Holzer's uniquely damaged brain needs more time to develop.

3    It needs more time than the average male brain, and it may need

4    more time that the average fetal alcohol male damaged brain.

5             THE COURT:  My reaction to this is not to deny the

6    science.  I'm not a science denier.  What I am frequently

7    doubtful of is somebody finding some report, somewhere, that

8    says something about the, quote, average developmental

9    timeframe, and then I'm assuming, without anything by way of

10   individual study of this individual, saying, *Oh well, if it*

11   *says the average it takes to develop -- for the brain*

12   *development to complete itself is 30; he is only 27, so*

13   *therefore I should assume that his brain is not fully*

14   *developed*, without any understanding as to whether it's 98

15   percent, 99 percent, 52 percent, whether it is -- these final

16   pieces of development that come into being, have to do with

17   socialization skills or anything else.  It's finding science

18   that makes a generalized statement, and then from that, I'm

19   supposed to leap to some conclusion about the individual before

20   me, and I am given for tools to enable me to make the leap on a

21   really truly factual basis.

22             I mean, at the end of the day everything that you are

23   saying has some truth.  At the end of the day this is also

24   something that has some truth, he tried to blow up a synagogue,

25   and there is that -- that crime is one which has history in

1  this country.  It is a vulgar, nasty offense, that historically

2  reeks of supremacy and superiority and the notion that by

3  virtue of birth, one can tell another community where they can

4  and can't live or how they can and can't worship.

5       It is -- it is a crime which goes beyond the

6  structure.  It affects the people who are part of that

7  congregation, if I can use that term.  I'm not sure it's

8  appropriate in -- that's my ignorance as to the difference

9  between mosque and churches and synagogue, and I am ignorant, I

10  confess, but if goes beyond, for those people, is tears at

11  their soul.  They feel like they are -- and correctly -- they

12  feel like they are hunted; that they are not safe.  It's not

13  just that a building blew up, it's that people want to destroy

14  them, and that's something that sits with them every day, and

15  it's not just when they are near that temple, and it's not just

16  Temple Emanuel and it's not just Pueblo and it's not just

17  Colorado.

18       People, the public, or those who would be inspired by

19  such action, find it as something to emulate or copy.  There's

20  a protection of the public aspect that I'm not inclined to

21  gamble with, and that's ultimately what you are saying to me,

22  is, *There are studies that are kind of developing that are*

23  *saying this, that and the other thing*.

24       At the end of the day, where he is now is he hates

25  Jews, he hates them for a reason.  I have no historical fact

 1     upon which I can say he can be convinced otherwise.  His

 2     parents have been unsuccessful in convincing him.  His

 3     employers, who referred him to counseling or have tried to

 4     counsel him on not saying racist things while working in their

 5     store, they have not been able to reach him.  No one has been

 6     able to reach him, and yet I should somehow take a chance.  I

 7     don't know that I will.

 8          MR. KRAUT:  Let me respond, if I may, in a few

 9     different ways.  The Court began, just a moment ago, by stating

10     he tried to blow up a synagogue, and I don't think that's in

11     dispute here.  He has pled guilty, but it is important to

12     note --

13          THE COURT:  But it's what happened.  I mean, let's not

14     play games, that's what he was going to do.

15          MR. KRAUT:  Yes.  That is what he wanted to do, that

16     is what he wanted this group to do, but I do think it's a very

17     important distinction in this case, to note that what we're

18     really punishing, what the Court is truly punishing here, more

19     than any other aspect of this case, is Mr. Holzer's thoughts.

20     And we agree with the Court and with the government that those

21     thoughts are abhorrent and deserve punishment.  In fact, we

22     agree so much we are recommending a sentence higher than the

23     guideline range.

24          THE COURT:  I get that, and I disagree with that.  I'm

25     not punishing his thoughts.  I'm punishing the fact that he was

1    attempting to blow up a synagogue.  You can call it some

2    thought punishment, or, you know, essentially say to me that I

3    shouldn't punish him more harshly unless he succeeds.  I'm not

4    one who believes that harsh punishment is only reserved for

5    people who manage to succeed.

6          He attempted to blow up a synagogue, to wipe it from

7    the face of the earth and to terrorize a Jewish community.

8    Let's not call this *I'm trying to punish him for his thoughts*.

9    I don't care if he sits in a basement for the rest of his life

10   and believes that Jews are evil.  I don't care if he believes

11   it about blacks, I don't care if he believes that about

12   anybody.

13         The minute this turns into -- this turns from

14   something that he believes, to something that impacts actions,

15   that's when I start caring, and I care a lot, at that point.

16   This is not punishing him for what he believes.  I don't care

17   about what he believes.  I care about what he does, and what he

18   does is he tries to blow up synagogues -- or a synagogue, to be

19   more accurate.

20         MR. KRAUT:  The argument regarding Mr. Holzer's

21   thoughts, is that the particular facts of this case, the

22   transcripts of the undercover recordings, the -- the detailed

23   text messages and Facebook messages, all of that information,

24   all of the communication shows that in this particular case, in

25   this plot, his role was reserved for generating the desire for

1    the crime to happen much more so, than actually putting the

2    details of the plan together, and I think that that distinction

3    is very important to make.

4         By simply saying he tried to blow up the synagogue,

5    the Court fails to take into account the -- the distinction

6    between what Mr. Holzer's true contribution to this plot really

7    was.  Yes, as the government argued, he wanted it to happen.

8    Yes, he selected the target.  However, other than that,

9    everything that made this as dangerous as it was, was provided

10   by the government.

11        Mr. Holzer has no ability to bring in other friends to

12   be a part of this.  He tried and failed.  The government didn't

13   particularly want him to.  At first they are interested in

14   perhaps bringing "Skeeter" in on this, "Skeeter" eventually

15   stopped answering his calls.  Mr. Holzer was ineffectual at

16   bringing in other people to participate in this.

17        *THE COURT:*  He was ineffectual at bringing "Skeeter"

18   into it it.  Even after that, he was trying to bring Cowboy

19   into it.

20        *MR. KRAUT:*  And didn't.

21        *THE COURT:*  And didn't, because the agent said *I'm not*

22   *going to open this up.*  I don't know whether Cowboy would or

23   wouldn't have or anything else, but, you know, the fact that

24   "Skeeter" basically recognized -- "Skeeter" has his own

25   mental-health problems, by the way.

1          MR. KRAUT:  Right.

2          THE COURT:  So, the fact that somebody with a

3     mental-health issue was able to say, No, no, this is -- this is

4     too wrong, and basically distanced himself from it and refused

5     to get involved, does not mean that there aren't people out

6     there who would have jumped at the chance to do stupid things.

7     The world is full of them.

8          MR. KRAUT:  I suppose that's true.

9          THE COURT:  The headlines are full of them.

10         MR. KRAUT:  There are dangerous people in the world,

11    if, on one hand, the Court and the government are arguing that,

12    repeatedly, Mr. Holzer has held these deeply hateful beliefs

13    for years, four or five or six years.

14         THE COURT:  It's not four, five or six.  It's more

15    than a decade.

16         MR. KRAUT:  For a decade, if that's the position of

17    everyone, and in those ten years Mr. Holzer committed not a

18    single crime, didn't actually engage in anything that resulted

19    in criminal conviction, then I don't think it's fair to say

20    that Mr. Holzer is a ticking time bomb of someone who is going

21    on organize another crime like this.  Our argument is that --

22         THE COURT:  No one is saying that he going to organize

23    it.  They are saying he will participate in it.

24         MR. KRAUT:  Right, but --

25         THE COURT:  Look, the world is not comprised of

1   everyone is a leader.  Everyone thinks they are leader.  But

2   there are leaders, there are followers, there are people who

3   will go with the crowd, that's what I'm hearing them saying he

4   is.  Not that he going to construct some plan that involves

5   intricate details and you know architectural planting of bombs

6   in particular places, because this is a fault wall and -- no,

7   that's beyond him.  I get that.  But if there's a bunch of

8   people that say let's go blow up that church or that synagogue,

9   he is going to say, *Yeah*.

10          *MS. BUTTERTON:*  And a sentence of 20 years makes that

11  more likely.  Becuase it makes it more entrenched, that's an

12  important point.

13          *THE COURT:*  That's one position.  I acknowledge that.

14  That it makes it more entrenched, but honestly, he has had

15  those views for ten years.  It's not like -- it's not like

16  I'm -- by putting him in prison, he is going to be taking views

17  that he hasn't had.  He has wrapped himself in this for a

18  decade.

19          *MR. KRAUT:*  And in that decade, having wrapped himself

20  in this, to use the words of the Court, and surrounding himself

21  with, presumably, like-minded people, not once did a true plot

22  of this nature form.  Nobody within that world created a plan

23  that he joined.  He wasn't recruited to do anything like this

24  before the government agents found him online.

25          *THE COURT:*  They didn't recruit him, he recruited

1    them.

2         MR. KRAUT:  As Ms. Martinez pointed out correctly,

3    Missy, whoever that may be, friended him, he contacted her, she

4    introduced him to other agents.

5         THE COURT:  There's a hell of a lot of difference

6    between befriending somebody and recruiting somebody to, what

7    he was trying to do, is put arsenic in the water supply, but

8    okay.

9         MR. KRAUT:  I think if the Court's concern is, he is

10   going to be recruited by real-life white supremacists, with

11   real access to explosives, and he is going to be the guy who

12   sets the bomb off, the Court need look no further than the ten

13   years in which he was involved in that world, in which that

14   didn't happen and nothing close to that happened.

15        That only happened here, in this case, and there's no

16   reason to believe, we think, that that's going to happen again,

17   if he is given the proper treatment, positive environment and

18   therapy that the scientific research suggests that he needs.

19        THE COURT:  Based on what?  That's the problem.  Based

20   on what?  What is it that I can rely on to say, *Oh, this is a*

21   *one off*, as opposed to an evolution to where this is where he

22   is.  He was talking about explosives.  He was talking about

23   looking for Molotovs before the government contacts him.  Based

24   on what?  Why is his influence going to U-turn?

25        MS. BUTTERTON:  Well, I think it's important, and I

1     apologize, Mr. Kraut, I'm not trying to interrupt.  It's always

2     difficult --

3              THE COURT:  That's fine, don't worry about that.

4              MS. BUTTERTON:  The Court keeps referencing the past

5     decade of his racist ideology.  There's no question, I think

6     this is very important, since he has isolated himself from the

7     positive support systems that he was -- that he had as a child,

8     I don't want to say forced into a child, but when you are a

9     minor your parents are there to take care of you and provide

10    certain structures, and when he separated himself from that,

11    all these pro-social things that we think, you know, he had the

12    support as a child, and then he became an adult, and chose to

13    separate.  He was a legal adult.  Who could stop him?  His own

14    mother.  We can't stop him from separating.

15             We think that -- this is not so much a U-turn as much

16    as it is this is the peak of where he is.  This is the peak,

17    because in the future, he is going to have a return to these

18    pro-social resources.

19             THE COURT:  And the only factual disagreement I would

20    have with you is that, of course, it's not that neat.  He has

21    left his parents' home and then he came back to it, and when he

22    came back to it, he had a bunch of supremacist views and it

23    didn't change.  He stayed with them and it didn't change.  He

24    went from in their house to out of their house in California,

25    to back in their house in California, and now, he is marching

1   down the street and peeing on synagogues and carrying flags and

2   it didn't change, and then he goes to Oregon and it doesn't

3   change and then he comes to Colorado, and it didn't change, and

4   he is brought back, for a brief, admittedly brief, period of

5   time for medical attention when his brother finds him

6   essentially homeless, and again it didn't change.

7        *MS. BUTTERTON:*  I agree with the Court, but I would

8   like to say that those *adult returns* to his parents were very

9   brief moments in time

10       *THE COURT:*  Okay.

11       *MS. BUTTERTON:*  That's why I didn't think the length

12  of supervision and the length of the structure is vital,

13  compared -- in conjunction with an appropriately length of

14  imprisonment.  Because this -- you are correct, this is not

15  something that, you know, even the people -- even his mother,

16  who I would submit, like many of us, is a person he loves most

17  in the world.  A month of that, yeah, you are right, it wasn't

18  enough.  But we have an opportunity here to provide long-term,

19  real long-term structure, therapy, services, monitoring.

20       *THE COURT:*  And your own psychiatrist, psychologist, I

21  can't remember which, says that his characteristics are such

22  that they usually don't work with therapy.

23       *MS. BUTTERTON:*  I do think he says -- it's required to

24  be long term.  It would be -- and I can look back.  I believe

25  that was an exhibit attached to the PSR.

1          *THE COURT:*  It's attached to the PSR.

2          *MS. BUTTERTON:*  And he is a psychologist, a Ph.D.

3     psychologist.

4          *THE COURT:*  Okay.

5          *MS. BUTTERTON:*  So, to the extent -- listen, I

6     understand what the Court is saying, but my point is, this sort

7     of grew out of a storm of circumstances, some of which were

8     Mr. Holzer's own choices; choices that arose out of what has

9     been deemed by science to be a -- and I am going to be

10    colloquial here, *broken brain*.

11         The answer is not locking him in a cage with other

12    white supremacists for 20 years.  We submit, the answer is,

13    giving him an appropriate amount of punishment, one that -- one

14    that certainly promotes general deterrence.  I think that's

15    important, absolutely, but that allows him to have long-term

16    structure when he gets out, that the circumstances that are --

17    that this conduct arose out of won't exist again.

18         And again, I don't want -- I want to, once again,

19    emphasize what Mr. Kraut was talking about, about some of these

20    factors that play into extremism, about, you know, economic

21    opportunities, and look, the government made a lot of hay,

22    *Well, he is fine.  He can play piano and he has a high school*

23    *diploma*.  His mom got him his high school diploma.

24         *THE COURT:*  He plays piano by ear, whoopee.  He is not

25    a prodigy.

In terms of graduating from high school.  He graduated from high school only because his mother got the State of California to issue a waiver, because he couldn't pass the tests that are required to graduate from a California high school.  I get it.

He is not as intellectually capable as they see him, but they are not -- his I.Q. is still normal.  It's normal.  It's not below normal.  And you know, I'm not going to come down in any one particular place, other than to say I have tried to look at all of it and I get it.  This is not, you know, an average brain or a normal brain or anything else, nor does he have the same kind of intellect as many other people have.  I get all of that, and those are certainly things to be considered.  I get that as well.  You know, your psychologist's words, not mine, *psychological characteristics that interfere with, but do not necessarily prevent beneficial engagement in psychotherapy, include an avoidant or guarded approach to experience*; that's him; *limited adaptive capabilities*; that's him; *being self-satisfied and set it one's ways*; that's him; *having difficulty recognizing and expressing one's feelings*; that's him, *being interpersonally averse or withdrawn and lacking psychological mindedness*; that's him.  And then, out of nowhere comes, *Well, but if you give him a competent therapist, who is open and loving and social, with warmth and nurturance,* is the term used, *it will help.*

1          MR. KRAUT:  And let's not overlook that Dr. McIntyre

2     concludes by noting, *Supportive of his prospects for meaningful*

3     *therapy are possible encouragements from family members*, which

4     he still has, *and the positive response he gave to a*

5     *speech-language pathology treatment* --

6          THE COURT:  There's one heck of a comment.  Look, this

7     whole report is an interesting document to me.  First, it

8     relies on things that I haven't seen; second, it says, *If you*

9     *want to see the history, look at these documents that I have*

10    *looked at*, and of course I don't have them.  Some of them I

11    have, some of them I don't.  Secondly, it says, *Oh, if you want*

12    *to look at my testing look at the appendix*.  I don't have that

13    either.  And then thirdly it says, *The positive response he*

14    *gave to a speech pathologist's treatment in 2010*.  When I look

15    at the things that he reviewed, he didn't review any speech

16    pathologist's report from 2010, or at least I can't find where

17    he says he reviewed it.  So I'm not really sure what he is

18    talking about, and frankly, the positive report to the speech

19    pathologist, if the information that I have got about that, is

20    in the PSR, and you know the fact that somebody was able to do

21    better at articulating words is one far cry from rejecting

22    hate.  I mean it's ... look, they are his opinions, I give you

23    that, but there's no meat on this.  There's just not.

24          How is a ten-year-old positive response to a speech

25    pathologist indicate that he going to change decades -- a

1    decade-long belief system?  In terms of a speech pathologist he

2    is trying to get help for an area that he acknowledges and

3    recognizes he needs help.  Okay.  I get that.  I don't see

4    that -- it's like -- I don't see the connection, and I don't

5    even know -- I can't even describe where the psychologist gets

6    it, because I keep looking through his report going, *Where is*

7    *it that he telling me about this positive result*?  And the

8    answer is, *I can't find it*.  So, point it out to me.  If you

9    can see in his report what it is he is referring to, because I

10   don't see it.  I see it in the Presentence Report, but I don't

11   see it in his report.

12       *MS. BUTTERTON:*  Your Honor, I believe that was a

13   report that was sort of a social history report that we

14   provided --

15       *THE COURT:*  Exactly, and so you summarize a bunch of

16   documents, and he relies on it without ever looking at the

17   actual result itself, and then makes an opinion that I'm

18   supposed to rely on; that is not persuasive.  You look at it --

19   I'm trying to say you misled him.  I know you didn't.  I'm not

20   saying that.  I'm just saying if you are asking me to rely on

21   an expert's report, and the expert is basically saying, *I read*

22   *what counsel's people said about something, and I didn't bother*

23   *looking myself, but hey that's helpful to how he is going to be*

24   *in the future*, that's weak beer.  It's real weak beer.

25           *MS. BUTTERTON:*  Your Honor I -- it's our position that

1    this -- this evaluation, in conjunction with the scientific

2    papers we have given you, with regard to fetal alcohol

3    syndrome, and the, admittedly, very thorough job that Ms. Means

4    did on the PSR, and we did give her some documents in support

5    of that.  We appreciate her -- there's only like a certain

6    number of ways one submits things, and to the extent it was a

7    mistake, that's ours and certainly not Mr. Holzer's.

8            But we think all of this together, allows the Court to

9    get a global view, and I get it, I mean, you came out in this

10   case from the very beginning and said this is a difficult case,

11   and nothing could be more true, and I -- I even wrote down

12   Gordian knot, although I am sure I misspelled it, because, you

13   know we talk about the -- this danger issue paired with

14   Mr. Holzer's history, and you've sort of referenced this

15   danger-versus-disability thing.  I don't think it has to be a

16   *versus*.  I think there are solutions that acknowledge the

17   potential danger, that acknowledge his disability, that

18   acknowledge the deep hurt this caused to the Pueblo community

19   and the Jewish community, while also not locking up and

20   throwing away the key and essentially saying, *Well, this is a*

21   *lost cause*, because it's not.

22           THE COURT:  And see that's where you lose me.  I mean,

23   basically, if I wanted to lock him up and throw away the key

24   and say it's a lost cause I would give him 40 years and I am

25   done, and no one is talking about 40 years, and I am not saying

1     that giving him a substantial sentence is locking him up and

2     throwing away the key.  What I'm saying is, giving him a

3     substantial sentence might be consistent with 3553's directive

4     that I look at his circumstances, as well as the circumstances

5     of the offense.  I look at deterrence of other like crimes by

6     others.  I look at a number of factors, which go beyond, but

7     include, his condition.  And you want to simplify it to saying,

8     a bunch of time is throwing -- locking him up and throwing away

9     the key.  It's not.  It's not.

10              *MS. BUTTERTON:*  I'm going put it a different way,

11    Your Honor.

12              *THE COURT:*  All right.  Works for me.

13              *MS. BUTTERTON:*  As you know, and I see the Court

14    looking at the statute book, presumably looking at 3553, but I

15    don't want to presume.

16              *THE COURT:*  You can presume.  You are absolutely

17    right.

18              *MS. BUTTERTON:*  If we look at the sentencing factors,

19    of course what Congress has directed this Court to do is give a

20    sentence that's sufficient, but not greater than necessary.

21              *THE COURT:*  Correct.

22              *MS. BUTTERTON:*  And it's a rare day that defense

23    attorney comes in here and says a sentence above the guidelines

24    is that sentence, but here we are.

25              *THE COURT:*  Because we all agree that 60 to 63 months

1   is just ridiculous.

2         *MS. BUTTERTON:*  I agree that for the harm inflicted on

3   the community, which was substantial, and I don't want to

4   downplay the psychological harm.  I think that is really

5   important.  But I don't think that 20 years accomplishes more

6   than eight- or ten-year sentence does, other than -- other than

7   it creates punishment for Mr. Holzer, when this is a person

8   that we believe the science says can be redirected.

9         We agree that a substantial sentence is necessary, and

10  we submit that we're asking for a substantial sentence.  We're

11  not asking for a guideline, not asking for the mandatory

12  minimum or the guideline.  We are asking for above it because

13  we think it's important and we think that the sentencing

14  factors require it, but to the extent that the government says

15  that 20 years is the sentence that's necessary --

16        *THE COURT:*  If he blew up that building, I would

17  likely be talking about a number that begins with a three.

18        *MS. BUTTERTON:*  Of course that's the case.  I mean,

19  that's not surprising in any way.  But I think that the -- the

20  culmination and the global view of the science that we have

21  presented to the Court --

22        *THE COURT:*  You keep using the word, and it's not

23  inaccurate, but it is not entirely accurate either.  You have

24  got some studies, some reports, that people are optimistic

25  about the treatment of people who have been radicalized for, I

1    don't know how long, three years, one year, three months, I

2    don't know, through some particular means, perhaps reading a

3    book, perhaps going overseas and fighting with ISIS, but I

4    don't know, and they are optimistic in reintegrating these

5    people back into their communities.  Are any of them so set in

6    their ways that they have been ten years into this?  I don't

7    know.  Are any of them broken?  I don't know.  I mean, it's

8    science in a sense of there's optimism that certain people can

9    be turned around, in certain circumstances, and from that you

10   leap and say, *You, Judge, are presented with one of those*

11   *people, and such circumstances*, and that ain't science, that's

12   lily pad leaping.

13       MS. BUTTERTON:  I think ultimately it comes down to,

14   Your Honor, what is sufficient, and again, I -- I think it's

15   very important to consider the effects of prison on Mr. Holzer,

16   which we have gone at length, and I think the Court

17   acknowledges that, and the long-term -- the ability of this

18   Court to impose long-term structure.

19       You know, there's a reason why the statutory maximum

20   allows for a lifetime of supervised release.  I can imagine

21   that there was reasons behind that, that's it's not the

22   typical --

23       THE COURT:  It's vulgar.  It's vulgar.  Sentencing to

24   imprisonment is for punishment purposes.  Supervised release is

25   for rehabilitation purposes.  They are not for the same thing.

1    It's not, because I can give him more supervised release -- I

2    certainly can give him less time, but it's not for the same

3    thing.  They are different components or different concepts

4    that have to be balanced and looked at.  I give you that.  I

5    give you that.

6         But ultimately, in terms of what it is that I give, by

7    way of a sentence, I have to look at both pieces; the

8    rehabilitative component and the punitive component, and I have

9    to look at the punitive component not only in terms of what the

10   crime was, but also in terms of punishment, and the, quote,

11   message that it sends to others who might be inclined to do

12   such things.  In addition it -- to deter others, to protect the

13   public.  If I believe him to be dangerous, to protect them from

14   him, and I do believe him to be dangerous.

15        You know, the reality is, as it lines up, it is almost

16   always the case that the government says, you know, look at the

17   offense danger, deterrence, frequently, unwarranted disparity

18   in making the guideline argument.  The defendant says,

19   rehabilitation, rehabilitation, history and characteristics of

20   the offender, and it's not -- neither side really grabs all of

21   it and puts it altogether, and that's what -- that's what

22   advocacy is.  I get that.  I'm not criticizing you or the

23   government for that.  But at the end of the day, just saying

24   your piece is -- it's effective argument, because it makes sure

25   that I consider that piece, but nothing that you say answers

1    the question -- this question.  If I believe him to be

2    dangerous, why should I let him out sooner rather than later,

3    when I'm not confident that anything you have said by way of

4    these, quote/unquote, studies, establishes that things will be

5    any different?

6         In fact, when he comes out in eight years, everything

7    you have told me is that he will likely be further entrenched

8    in the beliefs that he has.

9         So why am I exposing the public to him sooner, rather

10   than later?  I don't know what the answer to that is, from your

11   perspective.  I know what it is from the government's

12   perspective, it's, *Don't*.  I suppose yours is, *Take the risk.*

13   *He is worth the risk, and we believe that he can be treated*.

14        MR. KRAUT:  Part of our answer to that question,

15   Your Honor, is that the existence of a very strict and lengthy

16   supervised release term serves to minimize the risk.  If the

17   Court -- the Court previously spoke about not wanting to take a

18   chance.  There's not much of a chance being taken, if he is

19   released after eight years, after ten years of very serious and

20   deterring penalty, and released to an extremely strict

21   supervised release condition; released, first, to a halfway

22   house, if he can do well there, released to his own residence,

23   where he could be placed on GPS, depending on what he needs,

24   given employment assistance and given some of these tools that

25   we talked about with respect to deradicalization.  If he

1    responds well, then he is more safe, long term, and the

2    community is more, safe, long term, than he would be if he had

3    been warehoused in prison and exposed to *crime school* to borrow

4    Ms. Butterton's term, for an additional 10 to 12 years, and if

5    for some reason, supervision does not go well, the supervising

6    officers will be on him like a hawk, for lack of a better term,

7    they will, and he will be back here, and the Court will have

8    all of the tools that the Court is very familiar with to

9    re-incarcerate him and bring him back on more supervised

10   release, with no cap on how many times that can happen.

11        So, the risk that the Court would be taking, by giving

12   him a sentence that we're asking for is minimized by the other

13   sentencing tools available.  Supervised release is what

14   Mr. Holzer needs.

15        *THE COURT:*  I am being facetious, and I understand,

16   that to some extent that I'm being vulgar, but if what you are

17   saying to me can also be said in this way, if he is released

18   and a temple goes down, I say, *Oops, my bad.  Let me put him in*

19   *prison*.

20        *MR. KRAUT:*  That's not at all what we're saying.  The

21   type of supervised release conditions and the nature of his

22   transition from prison to the community involving a residential

23   reentry center, which will be required, greatly limits the

24   possibility of anything like this crime happening again, while

25   he is under that supervision, and --

1          THE COURT:  And I am trusting in that result, based on

2     some studies that may or may not apply to him, at all, and a

3     report that, basically, just says something based on I don't

4     know what.

5          MR. KRAUT:  And you are trusting that on the fact that

6     nothing like this ever happened before the government agents

7     entered his life.

8          The lack of criminal history, at the very beginning

9     and this morning, the Court talked about, *Well, some crimes are*

10    *so terrible that we can throw out the horizontal part of the*

11    *chart entirely*.  The lack of criminal history category, the

12    minimal criminal history here is important for future

13    dangerousness.  It's not just the guideline calculation, and if

14    we want --

15         THE COURT:  And Ms. Means works on that and builds on

16    that and relies on that and still says, *Give him 17*.

17         MR. KRAUT:  And we disagree with that assessment.  We

18    believe that the lack of criminal history here speaks volumes

19    to his potential for rehabilitation, and the Court should give

20    him a sentence of 8 years, to allow him to take advantage of

21    that potential.

22         He still will have loving family members, who are

23    willing to support him and want to support him.  He will have

24    an opportunity to take advantage of all of those things, but

25    the longer he stays in prison, the -- the less likely he is to

1    have that support when he gets out, and the more likely he is

2    to fall even deeper into this problematic way of thinking.

3              By -- by imposing a shorter prison sentence, the

4    Court, essentially, encourages him to take his future into his

5    own hands in a positive way.  The Court would communicate to

6    him there is a light at the end of the tunnel, what you did was

7    wrong, it must be punished, the community will not tolerate it,

8    and it must be punished harshly and an 8-year-prison sentence

9    is an extraordinarily harsh punishment --

10             *THE COURT:*  Extraordinarily, please.

11             *MR. KRAUT:*  Your Honor, I say that based, in part, on

12   the education that the Court provided by looking at the

13   comparison cases.  I know the Court wasn't overly moved,

14   because they are so different, but at the end of the day it

15   cannot be ignored that in cases in which no explosion or fire

16   actually occurred, a sentence of 8 years is actually longer

17   than any other of the sentences that the Court reviewed.

18   And --

19             *THE COURT:*  In cases of, you know, personal

20   motivation, revenge, economic incentive, all of the rest of it.

21   Yeah, okay.  Chicken and ducks, that's what it is.

22             *MR. KRAUT:*  I think it drives home the point that

23   the -- the result of the conduct matters, and one of the

24   reasons we're asking for a higher-than-a-guideline sentence is

25   because we acknowledge that.  The result of this conduct was

1    incredibly damaging to this community.  We are not dancing

2    around that or pretending that's not the case.  But the

3    damaging result that happened here is much different than, and

4    less serious than, the damaging result of a bomb actually being

5    exploded, which happened in many of those other cases.

6            THE COURT:  I give you that.  And I already said to

7    you that, clearly, I'm not going to sentence him as if the bomb

8    exploded.

9            All right.  Two minutes.  Two minutes.  We're going

10   take a break.  Then I will hear from Mr. Holzer, and then I

11   will impose.

12           Two minutes, Ms. Martinez.

13           MS. MARTINEZ:  Thank you, Your Honor.  Your Honor,

14   nothing that defense counsel has put forward in terms of

15   programming or treatment, nothing is guaranteed to protect the

16   community.  Nothing comes even close to guaranteeing to protect

17   the community, nothing that they have suggested, nothing even

18   most likely or more likely or reasonably likely.  We just don't

19   know the answer to that.  We don't know the answer to whether

20   this defendant will change in response to any kind of

21   treatment, and it's just illogical to say that we have

22   sufficient science in front of us to make that conclusion.  So

23   what defense is doing is asking you to take an extraordinary

24   risk, with the safety of the community, by entrusting that

25   these supposed programs might have any affect, which

1    contradicts all of the evidence we have about the history and

2    characteristics of this defendant.

3            Your Honor, the difference between a prison sentence

4    of 8 years and a prison sentence of 20 years, is 12 years where

5    he won't be able to do this.  Twelve years where the community

6    will be protected, to be frank, with good-time credit about 10

7    and a half years, where he won't be able to take the actions

8    that he did take in this case.

9            Defense counsel says that he took no action.  He took

10   plenty of action in this case.  He -- he was the mastermind of

11   this plan.  Defense counsel also says that he never did

12   anything like this until the government came into his life.

13   Well first of all, Your Honor, he was actively radicalizing, he

14   was getting worse, he was getting more and more extreme and so,

15   he was -- he was going up, and this was higher than what he had

16   done before, whether it was the peak or whether he was still on

17   his way up, fortunately we don't know the answer to that.  But

18   here is the thing, he had never done anything before the

19   government entered his life, mistakes, correlation for

20   causation.  He didn't do this because the government entered

21   his life.  He didn't do it, he didn't succeed, because the

22   government entered his life.

23           If those government agents had been real white

24   supremacists with real bombs who really wanted to help him,

25   that synagogue would have exploded.  There's no evidence to

1    suggest anything to the contrary.

2              THE COURT:  All right.  Sum up it.

3              MS. MARTINEZ:  Let me close with this, Your Honor.  On

4    October 19th, 2019, the defendant hit record on his phone and

5    sent a voice memo to one of the undercover agents, where he

6    told him, *There will never be a day that I wouldn't die for the*

7    *betterment of our race and the death of evil that it's caused,*

8    *not only our race, but the whole world, the Jew.*

9              I have no doubt that that remains true today, that

10   this defendant remains dangerous today, and that he will be

11   dangerous when he is released by this Court from prison.

12   Please protect the community and please send a message that

13   this type of case and this type of act of terror will not be

14   tolerated.

15             THE COURT:  Whomever.

16             MS. BUTTERTON:  You know, I -- I appreciate the

17   government's comments, and what I will say is this, you know,

18   Mr. Holzer is at the most important fork in the road of his

19   life, to borrow sort of old and probably overused metaphor.

20             His big talk, his -- like these grand statements that

21   he said, for years, undisputed for years, all come from both

22   the -- the physiological deficits and also this just unmet and

23   overwhelming need to seem more important and bigger than he is.

24             This Court has an opportunity to both punish him

25   appropriately, acknowledge the hurt of the community, deter

 1    like-minded individuals, and give him the opportunity to put

 2    his life on a different path with every protection allowed by

 3    the law, and I think this life -- this potential lifetime of

 4    supervised release cannot be understated, because this Court

 5    has the potential to, if he does not succeed, when he is on

 6    supervised release, to continue locking him up almost

 7    indefinitely, and that's a tool that this Court can have,

 8    and -- excuse me -- does have and can use, and Mr. Holzer can

 9    either demonstrate that he is willing to change, under the very

10    strict confines that this Court will have him, and if he

11    cannot, the Court has the tools to deal with it.

12         THE COURT:  All right.  Ten minutes.  I will hear from

13    Mr. Holzer, and then I will impose sentence.  Let me tell you

14    something to think about when we come back in.  What I'm going

15    to ask Ms. Butterton and Mr. Kraut to do -- have either of you

16    been with me during a -- a criminal sentencing since COVID?

17         MS. BUTTERTON:  I'm not sure in person.  I was going

18    to say yesterday.

19         THE COURT:  I'm going to have you sit behind

20    Ms. Martinez at the far table in the back.  The reason is --

21    I'm just telling you now -- I give an individual who is,

22    obviously, trying to express and communicate himself to the

23    Court, the opportunity to remove his mask during the period and

24    only during the period in which he is addressing me, because I

25    think it's that important.

1          I want to create additional distance, and so when I do

2     that, if the individual is at the table, I usually send the

3     lawyer to the box.  What I'm telling you is, a couple of

4     things, I want some distance, but I also want you to think

5     about it, because I recognize you may want to be closer.  I

6     will leave it up to you.  We can talk about it, when you come

7     back, but in general, that's the way I would proceed.

8          MS. BUTTERTON:  I appreciate the Court's

9     thoughtfulness about that.  I can tell you, and of course this

10    may change in the next ten minutes, that we do not anticipate

11    that Mr. Holzer wishes to allocute.  So that may make --

12         THE COURT:  Again, I understand.  If it changes, it

13    changes.  Again, if you want to be closer, I'm fine with that,

14    as well.  I just want to let you know what my normal thinking

15    is, with regard to these circumstances.

16         MS. BUTTERTON:  Thank you, Your Honor.

17         THE COURT:  Recess.

18         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

19    (Recess at 3:38 p.m.)

20    (In open court at 3:50 p.m.)

21         THE COURT:  Please be seated.  Please.

22         MS. BUTTERTON:  Your Honor I do not -- I'm sorry -- so

23    habit to stand up.

24         THE COURT:  Don't worry about it.

25         MS. BUTTERTON:  Your Honor, we have advised Mr. Holzer

1    of his right to address the Court, and he does not wish to

2    address the Court.

3         *THE COURT:*  All right.  And I'm just making a record

4    here.  He understands that he has an unlimited right to do so.

5    He understands I will not question him.  He understands that he

6    can speak to anything that he wished to, and that it's his

7    absolute right, and he is not limited, in any way or subject to

8    Cross-examination by me or anyone else.  He gets to make an

9    uninterrupted statement if he chooses to do so; is that what he

10   understands?

11        *THE DEFENDANT:*  Yes, Your Honor.

12        *THE COURT:*  All right.  And with that understanding,

13   is your desire -- well, you elected not to make a statement; is

14   that correct, as well?

15        *THE DEFENDANT:*  Yes, Your Honor.

16        *THE COURT:*  All right.  Thank you.  I said, at the

17   outset, that it was a difficult case, and it is.  It was and it

18   is.  I mean, those who are outside of the well of the court,

19   can see glimpses of the information that is available to the

20   Court and the parties, and the degree of detail that has been

21   poured over by everyone, with respect to Mr. Holzer's life and

22   the -- the crime.

23        I suppose I want to briefly ask Ms. Martinez something

24   that I know the answer to, but nonetheless, let's get it on the

25   record.  There's an opportunity for victims to speak.  My

1    understanding is that the government has communicated that to

2    the members of Temple Emanuel, and that for a variety of

3    different reasons, some having to do with travel, some having

4    to do with conflict with another holiday and just perhaps other

5    reasons, they have elected not to appear and not to make a

6    statement; is that correct?

7         MS. MARTINEZ:  That is correct, Your Honor.  Two

8    individuals did submit letters that are appended to the

9    Presentence Report.  Those are the statements they wish to

10   make.  No individuals wish to be heard, verbally, or to have

11   those statements read to the record.

12        THE COURT:  All right.  So, I don't want to make more

13   of this than is necessary, because many -- much of this has

14   already been covered.  There are, essentially, four questions

15   that serve as a predicate to understanding this case; one, is

16   this a -- is the crime here a product of manipulation?

17   Advertently or inadvertently, in other words, did the

18   government get Mr. Holzer to do something by way of this

19   serious offense?  The answer is no.  We can talk about who said

20   pipe bomb first or who said explosives first, but at the end of

21   the day this is what is the case.  If it were true, them

22   planting the idea in his mind, we would not have had a plea.

23   We would have an argument about entrapment, but, beyond that,

24   it is also clear that wanting to attack Temple Emanuel was

25   Mr. Holzer's idea, it was because he wanted to and had

1    articulated a way of attacking, albeit with arson -- excuse

2    me -- with arsenic, it is because of that, that the undercovers

3    eventually came to meet with him.

4          It is also true that whether he recognized it or not,

5    initially, through conversation with the agents, his arsenic

6    approach was one that could not be successful without leading

7    to some degree of personal injury or damage or death, otherwise

8    it makes no sense.  The Jewish people are not going to leave

9    because of something happens that they don't know anything

10   about or are not aware of.  Ultimately, if you are going to

11   poison a populous I'm not sure that's necessarily better than

12   the notion of blowing up a building at night.  In fact, I'm

13   sure it's not; but, at the same time, I recognize that the

14   arsenic plan was nonsensical.

15         There never was a pipe that anybody could find.  You

16   could not open a water main and stick arsenic or any other

17   substance in there.  Additionally, there was an interest in

18   explosive that predated any involvement by the government.

19         Question number two, would the bombing occur without

20   the government's agents?  No.  And what I mean by that is, if

21   left to his own devices, would this have occurred?  No.  He has

22   poor planning skills, his conceptualization of things are poor;

23   such things as, welding doors shut.  Nobody is even bothered to

24   determine whether or not they are wooden or metal.  Generating

25   an electromagnetic pulse.  I don't know, I suppose if you

1    watched The Matrix, it's the kind of thing that you have seen,

2    but beyond that, it doesn't mean anything.  There's no

3    specifics to it.  And even the arsenic slash gopher poison

4    slash feces thing meant little.  He didn't have the skills to

5    pull it off by himself.  I give you that.

6           Number three, would the crime occur if Mr. Holzer met

7    other persons; meaning, not the agents, but real supremacists?

8    Yes.  His entire adult life has been built around supremacy.

9    He wanted to do something.  I have explained why he wanted to

10   do something.  He is not someone who simply wallows in his

11   hate.  It reaches out, into the real world, in terms of people

12   that he meets with, that are known and can be identified as

13   supremacists, whether it be Laskey, Thomas or Planer, or

14   whoever it is, that owns these gun, that he is posed with.  And

15   then the critical question is, is he dangerous?  That's one

16   that's the $64,000 question; and my answer is, yes, he is.

17          As I said, he has been into the supremacy his entire

18   adult life.  This is something he has wanted to do.  He

19   continuously espoused that he wanted to do it.  He bragged

20   about it to his friends, so that they would know that it was

21   him who would -- who had done it, or they would know when they

22   woke up and found Temple Emanuel in rubble that he was the one

23   who had done it.  This was his mountain, and to use his words,

24   he wanted to *enlist others*, "Skeeter", Cowboy, and it's the

25   agents who kept the conversation tight and narrow.  His entire

1    life is filled with imagery that is violent, that is hateful.

2    There's discussions, albeit these things did not happen, but

3    the discussions about killing people by hitting them in the

4    head with a hammer.  Cutting up Mexican children.  Killing

5    pedophiles.  It goes on and on and on, and when you listen to

6    the conversations, he is exhausting.  I am exhausting, because

7    I won't stop talking, and he puts me to shame.  He just won't

8    get off of it.

9         Throughout the entirety of these conversations, much

10   of it is, *That one is a Jew; you can tell by the nose*.  *This*

11   *one is a Jew*.  *Did you know that Scarlett Johansson is a Jew*?

12   *Did you know that person was a Jew*?  *This one is not a pure*

13   *Jew*, *that's an*, I don't know, *Italian-Jew*.  It just goes on.

14   The degree to which the infatuation is there, cannot be

15   overstated.

16        He believes he is going to die anyway, and is

17   basically looking at a way of going out on top.  And although I

18   have been told that he is now, kind of, moved away from this,

19   now that he has been in prison.  I don't believe it, not at

20   all.  Why?  What's he done since he has been in jail?  Well,

21   swastikas have shown themselves -- appeared on his cell wall.

22   I grant you there's not evidence that would indicate that he is

23   the one who drew them.  Fine.

24        But what do I know?  Well, he filed a lawsuit seeking

25   to have this case dismissed, because the jail authorities put

1    peanuts on his food and that was a violation of his civil

2    rights.  So the view of the significance of this case is that

3    it's on a par with peanuts.

4        I do know that he has contacted Red Fawn Fallis, who

5    was a North Dakota protester on the pipeline, writing her a

6    letter, saying that the government, essentially, screwed him

7    too, and signing that letter, while he is in custody with Nazi

8    swastica an SS symbolism that is not just generic, it is

9    identical to the -- to the writings that he made on the sign

10   for Temple Emanuel; identical to it.

11       So he is embracing the exact same signature markers,

12   while he is in custody, although I'm told that he has turned

13   the corner.

14       Who is he communicating with?  William Planer, who is

15   known supremacist.  What is he doing with regard to Ms. Means?

16   He is trying to convince her, I don't know what, to -- to

17   follow his teachings.  He is asking her to -- look up and

18   research the 88 Precepts.  It's absurd.  The notion that he has

19   turned some corner is fantasy.  It is just simply absolute

20   abject fantasy.  No one, no one who knows him, no one has said

21   that he does not -- that this is not -- that this is

22   aberrational for him.  No one.

23       Even his parents refer to him as having a dark, hating

24   side.  As I said, his whole life has been built around it.  His

25   fancies are built around it.  His identification of himself as

1    a hundred percent white European.  His social history accounts,

2    his clothing, his religion, his food, everything about him is

3    built on and embracing these hateful concepts, and he believes

4    that he is being attacked by the Jewish community, and

5    therefore is responding appropriately.

6          And what I have on the other side of the equation is

7    the notion that, perhaps, I could fix that which has been

8    broken from birth, and I have no degree of confidence that I

9    can do so.

10          So how do I approach this?  It is, at least to me,

11   interesting.  I have, in fact, looked at the terrorism

12   provision of Chapter 3 of the Guidelines, 3A1.4.  It is not

13   terrorism within that definition.  It is only terrorism within

14   that definition, because the definition says, the terroristic

15   activity has to be directed against the government.

16          I find that there is good reason to analogize and say

17   that, well, if the terroristic activity is directed against a

18   group, but it is, in all other respects, the same statute, the

19   same type of motivation, the same type of fear inducement, the

20   same type of terror, that there's no reason not to vary when

21   that is true, as it is in this case.

22          But as I said, I don't do so on the basis of the

23   commentary.  Tear the commentary up, flush it down the toilet,

24   I'm still going to reach the same conclusion, with

25   modification.  I don't think it's appropriate to be where the

1    guideline would put us if I made a direct analogy, because it

2    would be 324 to 405, and the reason I don't think it's

3    appropriate is because if we really are talking about domestic

4    terrorism, with a hate motivation towards a group, then why am

5    I twice punishing him for the hate portion of it?

6          He is getting a three-level enhancement in his

7    guideline anyway, under 3A1.1.  If I'm giving him that bump

8    there, and punishing him for the hateful motivation of the

9    domestic terrorism, I'm, to some extent, double counting, and

10   so I peel off one, two, three levels to avoid that concept.

11         I also believe that terrorism against the government

12   is worse than terrorism against a group of citizens within the

13   country.  I say that recognizing that many may disagree, but an

14   attack on the entirety of the government system brings

15   everything crashing down.  I do not mean to minimize the

16   vileness of attacks directed to individual groups, whether it

17   be on the basis of race, religion or any other basis.  I just

18   simply say that I think if the guidelines are being used by way

19   of analogy, there should be some additional degree of

20   punishment for attacking, if you would, the government, that

21   perhaps, in a minor way, is greater than attacking a section of

22   the communities that live within the government, and so I take

23   off what I consider to be a minor adjustment, two levels; and

24   look at where I land.

25         I started earlier this morning by saying Ms. Means and

1   I had different ways of approaching this, and it's as if we met

2   in front of a house and diverged.  I said, *No, I'm sorry.  I*

3   *don't agree with your approach to build in criminal history*

4   *category*; and she went left.  I said, *I'm going to do it my*

5   *way, in a different way*, *by my guideline analogy, but not your*

6   *guideline analogy*, and I just explained what that analogy is.

7   And so I walked right, and when we got around the back of the

8   house, we ended up standing in the exact same spot; 188 to 235,

9   and what that tells me is, with some degree of comfort, that it

10  is an appropriate landing spot for this case.  Two people who

11  are not involved in this by way of being an advocate, have

12  looked at it and applied completely different analyzes to it

13  and landed in exactly the same spot.

14          The difference between myself and Ms. Means is simply

15  this, I have described this crime, as I have felt about it; it

16  is one of the most vulgar, aggressive, evil crimes that can be

17  committed against an entire group of persons; and at its core,

18  what it is in this case is the discussion, when Mike, the

19  undercover agent, is speaking to Mr. Holzer, and giving him one

20  last chance to call this off, *So what if somebody is in there*,

21  says Mike.  Mr. Holzer, *Then, you know what*, Holzer, *They, they*

22  *get erased too, and then*, Mike, *are we not going do it*?

23  Meaning, are we not going do it if someone is there?  Holzer,

24  *No, dude, are you kidding me?  It's a Jew.  I have got no mercy*

25  *for Jews*.

1        This crime deserves no more mercy than the top of the

2   guideline range, and I intend to impose a sentence of -- excuse

3   me -- I intend to impose a sentence of 235 months, which is the

4   top of that range.

5        I have, in reaching that decision, considered

6   everything that has been presented to me; the matters that have

7   been filed, the matters that have been discussed here today;

8   the guidelines; analogies to the guidelines; the sentencing

9   factors in 3553; all of it has been considered and looked at.

10  Specifically, including those things that have been discussed

11  here today.

12       I also intend to advise that I intend to impose a

13  15-year term of supervised release.  Honestly, if he gets

14  through 15 years without violation, then as far as I'm

15  concerned there's no issue anymore.  The difference between 15

16  and 20 is more window dressing than meaningful distinction, at

17  least in my mind.

18       I do intend to impose the terms of supervised release,

19  as I have crafted them and we have talked about here today.  I

20  do not intend to impose a fine.  I do not intend to -- well, I

21  have to impose special assessments in this case.  I think it is

22  $200 dollars; $100 a count.

23       *PROBATION:*  That's correct, Your Honor, 200.

24       *THE COURT:*  All right.  And I think that covers it.  I

25  will also, subject to Ms. Butterton's wishes, recommend to the

 1    BOP that he be designated to a facility in California.

 2         MS. BUTTERTON:  Your Honor, we actually request that

 3    Mr. Holzer be designated to a facility in Colorado.  He does

 4    not wish to be designated in California.

 5         THE COURT:  So he doesn't want to be back around his

 6    family.

 7         MS. MARTINEZ:  We oppose that recommendation, Your

 8    Honor.  I think that has to do with him wanting to have access

 9    to other white supremacists.

10         THE COURT:  Fine.  He doesn't want to be in

11    California, fine.  I'm not trying to force that on him.  All

12    right.  Any record that you want to make by way of error that I

13    may have made in the -- in the announcement of what I intend to

14    do?

15         MS. BUTTERTON:  No, Your Honor.

16         THE COURT:  I also intend, I should say, to include

17    the 32.2 forfeiture of the various items that were the subject

18    of the forfeiture in the Plea Agreement.

19         So, with all of that being said, I have previously

20    indicated what the guideline ranges are.  I do find that

21    there's a reason to vary from the advisory guideline range,

22    significantly.  I will also say, before I go any further, that

23    I am aware that there's some discussion that has made its way

24    through the case law, perhaps at this Circuit, as well as

25    others, that there's some -- at some point, when you get to be

1    so -- varying so substantially from the guidelines, perhaps the

2    findings that are being made to support it should be by

3    something other than a preponderance.

4           I have seen various references and articles and

5    discussion that maybe there's a point at which it needs to be

6    by clear and convincing evidence.  In terms of the matters that

7    I'm relying on here today, let me just say, in case there's any

8    doubt, I would come to the exact same conclusion if it was a

9    clear-and-convincing-evidence scenario, for whatever that is

10   worth.

11          As I said, I find a reason to vary from the advisory

12   guideline range, as stated herein.  I have explained my

13   reasoning for doing so for sentencing.

14          Pursuant to the Sentencing Reform Act of 1984, it is

15   the judgment of the Court that the defendant, Richard Holzer,

16   is hereby committed to the custody of the bureau of prisons to

17   be imprisoned for a term of 235 months on each count.  The

18   sentences, as to each count, are concurrent with each other.

19          Upon release if imprisonment, the defendant shall be

20   placed on supervised release for a term of -- for a cumulative

21   term of 15 years.  The term consists of three years on Count 1,

22   and a concurrent term of 15 years on Count 2.  All supervised

23   release, by law, must run concurrently.  Within 72 hours of

24   release from the custody of the bureau of prisons, the

25   defendant shall report to the probation office in the district

1   to which he is released.  While on supervision, you must not

2   commit another federal, state or local crime, and you must not

3   unlawfully possess a controlled substance.  You must refrain

4   from any unlawful use of a controlled substance.

5        You must submit to one drug test within 15 days of

6   release from imprisonment, and a maximum 20 tests per year of

7   supervision thereafter.

8        You must cooperate in the collection of DNA, as

9   directed by the probation officer.

10       You must comply with the standard conditions adopted

11   by this Court in General Order 2020-20.

12       I find there are special conditions of supervision

13   that are reasonably related to the factors enumerated in 18

14   U.S.C. 3553 and 3563 or 3583, which, based on the nature and

15   circumstances of the offense, and the history and

16   characteristics of this particular defendant, do not involve a

17   greater depravation of liberty than reasonably necessary to

18   accomplish the goals of sentencing.

19       The special conditions are 11 in number.  They are

20   these:

21       One, you must participate in a program of

22   mental-health treatment approved by the probation officer and

23   follow the rules and regulations of such program.  The

24   probation officer, in consultation with the treatment provider,

25   will supervise your participation in the program as to

1    modality, duration and intensity.  You must pay for the costs

2    of treatment based your ability to pay.

3         Two, you must submit your person, property, house,

4    residence, vehicle and/or storage facilities to a search

5    conducted by a United States probation officer.  Failure to

6    submit to such search may be grounds to revocation of release.

7    You must warn any other occupants that the premises may be

8    subject to search pursuant to this condition.  An officer may

9    conduct a search pursuant to this condition, only when

10   reasonable suspicion exists that you have violated the

11   condition of your supervision, and that the areas to be

12   searched contain any -- contain evidence of this violation.  A

13   search must be conducted at a reasonable time and in a

14   reasonable manner.

15        Three, you must allow the probation officer to install

16   software slash hardware designed to monitor activities on any

17   personally- or family-owned, leased or rented computer or

18   internet-capable device you are authorized by the probation

19   officer to use.  This monitoring may record any and all

20   activity on the device, including the capture of key strokes,

21   application information, Internet-use history, email

22   correspondence and chat conversations.

23        You must not attempt to remove, tamper with, reverse

24   engineer, or in any way circumvent the software slash hardware.

25   Monitoring or data reports may be reviewed by the probation

1     officer at any time to assure compliance with all special

2     conditions of supervised release.

3            Four, your use of personally- or family-owned, leased

4     or rented computers and Internet-capable devices will be

5     limited to those computers and devices you request in advance

6     to use in which the probation officer authorizes.

7     Authorization of any such computer or device shall be based on

8     the ability of the computer or device to be effectively

9     monitored by monitoring software slash hardware, utilized by

10    the probation office.

11           You must disclose any user name or identifications and

12    passwords for all authorized computers or Internet-capable

13    devices to the probation officer and keep that disclosure

14    complete and up to date.

15           Five, your use of other computers and Internet-capable

16    devices is prohibited, except to the extent that such other

17    computers or devices need to be accessed; one, for emergencies;

18    two, for completion of routine transactions at commercial

19    health or religious brick-and-mortar establishments; three, for

20    completion of employment duties and responsibilities; four, for

21    voting or census reporting; or five, as otherwise approved by

22    the probation officer.

23           The probation officer shall approve use of such other

24    computer or -- computers or devices, absent reasonable

25    suspicion that you are using such computer or device to

1    circumvent the monitoring of your personal- or family-owned,

2    leased or rented computer or device.

3         Six, you may not create any social media account

4    without, within 24 hours of creation providing probation

5    officer with identification of the account and all user names,

6    passwords and other information necessary to enable the

7    probation officer to access the account.  Any change in such

8    information shall be reported to the probation officer within

9    24 hours.  All such accounts shall be subject to search slash

10   review by a United States probation officer, at any time.

11        Seven, you may not post to the Internet, including any

12   board, chat or community meeting room or to any social media

13   group or account any anti-semantic statement, material or

14   symbolism.  Nor may you post; one, any statement, material or

15   symbolism which supports, advocates improves of or endorses

16   Adolf Hitler or Nazi ideology; or two, any statement, material

17   or symbolism which supports, advocates, approves of or endorses

18   white supremacy.  For purposes of this condition, posts

19   includes direct posting, any form of tagging, liking or

20   otherwise showing agreement or approval of such posts of

21   others, as well as reposting, linking to or otherwise directing

22   others to such third-party posts.

23        Eight, you shall not visit any Internet site which you

24   know or have reason to believe, supports, advocates, improves

25   of or endorses antisemitism or white supremacy.

1          Nine, you shall not knowingly acquire, possess or

2     otherwise use any photograph, flag, clothing, patch, imagery,

3     jewelry, literature or other material depicting support for or

4     association with antisemitism or white supremacy.  Specifically

5     included in this prohibition, without limitation, are, Mein

6     Kampf; swasticas; iron crosses other Nazi memorabilia or

7     symbolism; Thor's hammer; KKK symbolism; numerical symbols 12,

8     14, 18, 88, 311 or 14/88; the Aryan fist; 14 words; the Celtic

9     cross; the Sonnenrad; the Valknut; and the Blood Drop Cross.

10         Ten, you shall not knowingly associate or have any

11    contact with any individual you know or have reason to believe

12    is a member of any anti-semantic or white supremacist group,

13    association or organization.  For purposes of this prohibition,

14    associate and have contact including online and virtual

15    association or contact.

16         Eleven, you shall not enter upon the grounds of any

17    synagogue or Jewish community center.

18         I should note that in terms of the listing of things

19    that I have specifically prohibited, those are not randomly

20    selected from the air.  They are based on, with one exception,

21    matters that I have seen or observed in photographs online,

22    that have been affirmatively used.  There are others, as well,

23    that I have chosen not to include, because their use might, for

24    example, create ambiguity.  For example there's a deer or

25    symbol that is also used.  It is also used on sports teams.  It

1    is also used by hunters.  The only exception, the one I know he

2    has not used is the number 12.  The reason I have included the

3    number 12 is stands for AB or Aryan Brotherhood.  The reason

4    that I haven't specifically chosen to include it is, although

5    the record developed here may not be clear, this begins, in

6    many respects, in the story that he has created for himself

7    with his father who he understands or at least professes to

8    have been a significant member of the Aryan Brotherhood,

9    bringing him into or encouraging or endorsing or approving of

10   his entry into this universe.

11        So there is a clear connection between -- at least as

12   he expresses it -- his father, the Aryan Brotherhood and the

13   pathway that he has been on, and that's why the number 12 has

14   been selected, every other item has been specifically used by

15   him, and the listing here is not a complete summary of all

16   items that have been listed.

17        You must pay a Special Assessment of $200 which is due

18   and payable immediately.  The Court finds that the defendant

19   does not have the ability to pay a fine, so I waive the

20   imposition of a fine in this case.

21        Pursuant to Rule 32.2 of the Federal Rules of Criminal

22   Procedure, you must forfeit your interests in the following

23   property, to the United States.  The property is that property

24   listed on Attachment A to the Plea Agreement, which has

25   previously been filed in this matter.

1          The defendant is advised of his right to appeal the

2     sentence.  If he desires to appeal, a Notice of Appeal must be

3     filed with the Clerk of the Court within 14 days after entry of

4     judgment or the right to appeal will be lost.  If the defendant

5     is unable to afford an attorney for an appeal, the Court will

6     appoint one to represent him.  If the defendant so requests,

7     the Clerk of the Court must immediately prepare and file a

8     Notice of Appeal on his behalf.

9          Mr. Holzer, I just told you that you have the legal

10    right to file a Notice of Appeal in this case.  I refer you to

11    your counsel, Ms. Butterton and Mr. Kraut for discussion of how

12    the limited waiver of appellate rights that was included in

13    your Plea Agreement impacts the legal right to appeal that I

14    have just advised you of.

15         The defendant is in the custody of the United States

16    Marshals.  I remand him to their custody.  I do recommend to

17    the bureau of prisons that Mr. Holzer be designated to an

18    institution within the District of Colorado, and let me, before

19    concluding ask, is there anything that I have missed or

20    misspoken of on or otherwise, either side wishes to bring to my

21    attention?

22         Government?

23         *MS. MARTINEZ:*  No, thank you, Your Honor.

24         *THE COURT:*  Defendant?

25         *MS. BUTTERTON:*  No, Your Honor.

1          *THE COURT:* Defendant is remanded to the custody of

2     the Marshals.  We are in recess.

3          *THE COURTROOM DEPUTY:* All rise.  Court is in recess.

4          (Recess at 4:25 p.m.)

5                         REPORTER'S CERTIFICATE

6

7          I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.

8

9          Dated at Denver, Colorado, this 1st day of April, 2021.

10                         s/Tammy Hoffschildt

11                         _____

12                         Tammy Hoffschildt, FCRR,RMR,CRR

13

14

15

16

17

18

19

20

21

22

23

24

25